# EXHIBIT 1

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

JACK W. NICKLAUS,

        Plaintiff,

v.

HOWARD P. MILSTEIN,
ANDREW W. O'BRIEN, and
NICKLAUS COMPANIES, LLC,

        Defendants.

_____ /

CASE NO. _____

## COMPLAINT

Plaintiff Jack W. Nicklaus sues Defendants Howard P. Milstein, Andrew W. O'Brien, and

Nicklaus Companies, LLC, and states:

### NATURE OF ACTION

1.      This is an action for defamation, common law unfair competition, violation of

Florida Statutes § 540.08, and violation of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*  The relief

sought includes both money damages and injunctive relief.

### PARTIES

2.      Plaintiff Jack W. Nicklaus is an individual residing in North Palm Beach, Florida.

He is a former employee of Nicklaus Companies, LLC.

3.      Defendant Howard P. Milstein is an individual residing in Mamaroneck, New York.

He is the Executive Chairman of Nicklaus Companies, LLC.

4.      Defendant Andrew W. O'Brien is an individual residing in North Palm Beach,

Florida.  He is an Executive Vice President of Nicklaus Companies, LLC and the President of its

wholly-owned subsidiary Nicklaus Brands, LLC.

NOT A CERTIFIED COPY

5.       Defendant Nicklaus Companies, LLC ("Nicklaus Companies" or "Company") is a Delaware limited liability company based in Palm Beach Gardens, Florida.

## JURISDICTION AND VENUE

6.       This Court has subject matter jurisdiction pursuant to Fla. Stat. § 26.012(2)(a), because the amount in dispute is in excess of $50,000 exclusive of attorneys' fees and costs.

7.       Mr. Milstein, a non-resident, is subject to general personal jurisdiction in Florida under Fla. Stat. § 48.193(2), because he engages in substantial and not isolated activity in Florida. Mr. Milstein is the Executive Chairman of the Nicklaus Companies, which is based in Florida, he maintains an office in Florida, he maintains a home in Florida, he frequently visits Florida, and he frequently does business with Florida residents.

8.       In addition, Mr. Milstein is subject to specific personal jurisdiction pursuant to Fla. Sta. §§ 48.193(1)(a)(1) and (1)(a)(2) for the following reasons:

(a)      The claims against him arise from acts which he performed individually and in his capacity as Executive Chairman of the Nicklaus Companies, a business in Florida;

(b)      The claim against him in Count I is based on false statements that were published to national media sources accessible in Florida and third parties located in Florida, and which caused injury to a Florida resident;

(c)      The claims against him in Counts II and IV are based on false statements that were published to national media sources accessible in Florida and third parties located in Florida, as well as other wrongful acts committed in Florida and elsewhere, all of which caused injury to a Florida resident; and

(d)      The claims against him in Counts III and V are based on wrongful acts committed in Florida and elsewhere that caused injury to a Florida resident.

9.       Mr. O'Brien, a Florida resident, is subject to general personal jurisdiction in Florida as a result of his residency in Florida.

10.      The Nicklaus Companies is also subject to general personal jurisdiction in Florida as a result of its residency in Florida.

11.     Venue is proper under Fla. Stat. §§ 47.011 *et seq.* because two of the Defendants reside in Palm Beach County and the causes of action accrued in Palm Beach County.

## GENERAL ALLEGATIONS

12.     The following is a general overview of the parties' relationship and the events leading to the present dispute.  The specific allegations upon which the claims asserted herein are premised are called out in the Counts below.

**A.     Jack W. Nicklaus and Golden Bear International, Inc.**

13.     Plaintiff Jack W. Nicklaus is an 83-year-old icon whose life in the public sphere arose in the world of sport.  He is considered by many to be one of the greatest golfers of all time, having achieved 120 professional victories worldwide and more major championships than anyone in the history of the game.

14.     Mr. Nicklaus became a professional golfer in 1961 and joined the Professional Golfers' Association of America not long thereafter.  At that time, the PGA of America was the principal organization which administered professional golf tournaments in the United States.

15.     Mr. Nicklaus played professionally as a member of the PGA of America's Tournament Players' Division until 1968, when he joined with other leaders of the Tournament Players' Division such as Arnold Palmer and Gardner Dickinson to help form what ultimately became known as the PGA Tour.  The PGA Tour is an autonomous entity and has for many years been considered the premier tournament players' association in the world.

16.     Mr. Nicklaus competed on the PGA Tour for several decades, and he briefly competed on what was then known as the PGA's Senior Tour as well.

17.     In addition, Mr. Nicklaus also became a respected businessman and philanthropist during the same period.

18.     For most of Mr. Nicklaus' career in business, he acted through Golden Bear International, Inc. ("GBI"), a closely-held corporation owned by Mr. Nicklaus and his family.

19.     Over the years, GBI formed a number of wholly-owned subsidiaries dedicated to a variety of businesses, including golf course design, golf course management, and other activities.

20.     Mr. Nicklaus began dabbling in the business of golf course design in the mid-1960s – before GBI was formed – and it quickly turned into a second career. Mr. Nicklaus' debut design, a collaboration with the late Pete Dye, was unveiled with the playing of a PGA Tour event in 1969, and he has since been involved in the design or redesign of over 300 golf courses around the world which are currently open for play. He has won every significant award tied to golf course design and is one of the few designers alive to have received the Donald Ross Award by the American Society of Golf Course Architects.

21.     In December 1994, Mr. Nicklaus executed a "Consent" which gave GBI a non-exclusive right to use and register Mr. Nicklaus' name, likeness, signature, and nicknames in connection with goods and services. GBI used that Consent to develop and register a variety of trademarks and service marks which were then licensed to third parties for commercial purposes. The Consent did not specify a fixed duration and was therefore terminable at will, but it remained in effect for many years.

22.     GBI's other principal businesses included designing, manufacturing, and distributing golf equipment, and marketing personal service contracts for Mr. Nicklaus relating to his personal endorsement and publicity rights.

23.     Eventually, Mr. Nicklaus and his family also formed other corporate entities which were not directly affiliated with GBI, including an entity known as NF Dynasty LLC ("NFD"). That entity was effectively a holding company for Jack Nicklaus Golf Club, LLC, which ran a reciprocal playing network at various Jack Nicklaus-designed golf courses around the world.

24.     As successful as Mr. Nicklaus was on the golf course and in business, however, he is perhaps most proud of his contributions to humanity as a global ambassador and philanthropist.

25.     For example, one of Mr. Nicklaus' passions, which he shares with his wife, is helping children and families in need.  In 2004, Mr. and Mrs. Nicklaus founded the Nicklaus Children's Healthcare Foundation, which has helped raise over $170 million to support the mission of the Nicklaus Children's Hospital and other innovative programs focused on the diagnosis, treatment, and prevention of childhood illness.

26.     Those activities and others led Mr. Nicklaus to become the first athlete and sportsperson to be honored with the Presidential Medal of Freedom, the Lincoln Medal, and the Congressional Gold Medal.

27.     Indeed, throughout his life, Mr. Nicklaus has earned the admiration of many because of how he carried himself both on and off the course.  He has been described in enviable terms such as honorable, trustworthy, decent, generous, kind, and thoughtful, to name just a few. That these words could be used to describe one engaged in a competitive sport at the highest level is not only extraordinary; it became a model for athletes everywhere who saw how one could succeed as a sportsperson and still be a human being worthy of friendship and respect.

**B.      The May 2007 Transaction**

28.     Shortly after Mr. Nicklaus retired from professional golf in 2005, he employed advisors to value his businesses and was told that they were worth approximately $296 million.

29.     Mr. Nicklaus' advisors and GBI's then Chief Financial Officer urged Mr. Nicklaus to monetize a minority interest in his businesses for estate planning purposes.

30.     That idea had considerable appeal to Mr. Nicklaus, in view of his own father's premature passing.

31.     Mr. Nicklaus employed investment advisors to identify potential candidates for an acquisition of a minority interest in his businesses.

32.     One of the potential candidates who expressed an interest was Howard P. Milstein, a New York businessman who owned and controlled the New York Private Bank and Trust and its operating company Emigrant Bank, one of the largest privately-owned banks in the country.

33.     Messrs. Nicklaus and Milstein did not know each other prior to their introduction in connection with a potential transaction involving Mr. Nicklaus' businesses. Mr. Milstein presented himself as an accomplished businessman whose involvement in Mr. Nicklaus' businesses would help catapult them from family-owned operations centered on the career of an extraordinary athlete and golf course designer into a global institution which would outlive Mr. Nicklaus and be of enormous value to his heirs.

34.     In broad terms, what Mr. Milstein proposed was as follows. GBI and NFD would transfer most of their assets and liabilities to a new entity known as Nicklaus Companies, LLC in exchange for $145 million and what initially would amount to a 51% effective ownership interest in the Company. The $145 million would be funded by an Emigrant Bank subsidiary known as Emigrant GB LLC, through a loan to the Company which would bear interest at 8.5% and give Emigrant GB what initially would amount to a 49% interest in the Company (the "Loan"). GBI, NFD, and Emigrant GB would then jointly run the Company, with GBI and NFD holding a majority of seats on the Company's Board of Managers (the "Board").

35.     Mr. Nicklaus considered Mr. Milstein's proposal to be the most compelling among the potential suitors because it provided what he perceived to be a combination of attractive economics, limited risk, continued control by the Nicklaus family, and the prospect of growing a relatively small family-run operation into a global institution that would long benefit his family.

36.     Unfortunately, that perception was inaccurate.   When Mr. Nicklaus was considering the proposal, he was blinded by devotion to his family and his concern for their well-being if he should die at an early age, like his father did.  He erroneously believed that his family would be able to retain control of the Company despite the burden of the Loan, and he also incorrectly thought that Mr. Milstein intended to grow the Company's businesses for the benefit of all of their owners, instead of simply himself.

37.     Mr. Nicklaus accepted what turned out to be a very bad deal for him and his family, but he nonetheless honored it in every respect.

38.     In May 2007, the transaction was consummated through a series of related written agreements, including most notably:

(a)     a Purchase and Sale Agreement between GBI, NFD, Emigrant GB, and the Company (the "PSA");

(b)     a Term Loan and Guaranty Agreement between Emigrant GB and the Company (the "Loan Agreement");

(c)     an Amended and Restated Limited Liability Company Agreement between GBI, NFD, Mr. Nicklaus, Emigrant GB, and the Company (the "LLC Agreement");

(d)     an Executive Employment Agreement between Mr. Nicklaus and the Company (the "Employment Agreement"); and

(e)     a Non-Competition Agreement between Mr. Nicklaus and the Company (the "Non-Competition Agreement").

39.     In the PSA, GBI sold the majority of its assets and liabilities to the Company and NFD sold all of its assets and liabilities to the Company, in exchange for the $145 million referenced above and 100% of the Class "A" Units in the Company.

40.     GBI's assets at that time included its wholly-owned subsidiaries and a variety of other tangible and intangible property.  The intangible property included a host of trademarks, service marks, copyrights, patents, and other specified intellectual property, as well as the

aforementioned Consent to use and register Mr. Nicklaus' name, likeness, signature, and nicknames in connection with goods and services while the Consent remained in effect.

41.     GBI conveyed all of those assets to the Company as-is, meaning it conveyed what it had and nothing more.

42.     Mr. Nicklaus was not a party to the PSA and did not otherwise transfer any assets to the Company as part of the May 2007 transaction.

43.     In the Loan Agreement, Emigrant GB agreed to loan the Company $145 million for use in funding the acquisition referenced above, in exchange for interest at rate of 8.5% and other consideration, including:

(a)     Emigrant GB would receive the first $12.325 million of the Company's cash flow after payment of operating expenses to fund the Company's interest obligation, and any interest obligations not timely paid would become payment-in-kind notes which also bore interest at 8.5% (the "PIK Notes");

(b)     Emigrant GB had the right to convert all or part of the Loan into upwards of 49% of the Class "A" Units in the Company at any time and for any reason, although it had no incentive to do so as that would eliminate its priority with respect to the Company's cash flows and the underlying interest obligation on the converted Loan amount itself;

(c)     Emigrant GB had the right to preclude the Company from prepaying the Loan in part or whole, even in the context of a merger, acquisition, or public offering;

(d)     Emigrant GB had the right to appoint four members of the Company's nine-member Board, as originally constituted; and

(e)     Emigrant GB would have the right to appoint an additional two members to the Company's Board if the Company's trailing 12-month EBITDA fell below a certain threshold for a period of 6 consecutive quarters, giving Mr. Milstein control over both the lender and the borrower at the same time.

44.     In other words, although the relationship between Emigrant GB and the Company was facially that of lender-borrower, the Loan Agreement gave Emigrant GB effective ownership of more than half of the Company – a percentage that would only increase if the Company did not pay at least $12.325 million in interest each year.

45.     In the PSA and LLC Agreement, the Company was described as having four principal "Business" purposes, namely: (a) "golf course design and management"; (b) "licensing of certain intellectual property"; (c) "designing, manufacturing and distributing golf equipment"; and (d) "marketing personal service contracts related to the personal endorsement and other publicity rights of Jack W. Nicklaus."

46.     In the Employment Agreement, Mr. Nicklaus agreed to provide a variety of services to the Company and its clients during his Employment Term, including personal services relating to each of the Company's four "Business" purposes.  Specifically, he agreed to: (a) "make himself available to perform his personal services as a golf course designer and to supervise the golf course design and consulting activities of the Company and [its subsidiary] Nicklaus Design, LLC"; (b) "perform his personal services as a spokesman and to provide public relations support for licensing and marketing activities of the Company and [its subsidiary] Nicklaus Marketing, Inc."; (c) "perform his personal services as a consultant and spokesman in connection with the design and marketing of golf equipment by the Company and [its subsidiary] Nicklaus Golf Equipment Company, L.C."; and (d) "provide his personal endorsement of golf course designs in which he participates as a named designer … [as well as] products and services licensed by the Company." In addition, he also relatedly agreed "to confirm the rights of" the Company and its subsidiaries to provide his services and endorsements during the Employment Term, if such confirmation was requested by a design, licensing, or marketing client.

47.     The Employment Agreement went on to specify, however, that Mr. Nicklaus would "retain final discretion and control" over, among other things, the selection of golf courses in which he would be personally involved as designer, and the selection of personal appearances and personal endorsements in which he would be involved as a spokesman, endorser, or otherwise. He also received a special Class "C" Unit in the Company which gave him approval and veto rights

over the Company's use, exploitation, licensing, assignment, sale, or transfer of his name, image, likeness, brands, and trademarks, both during his Employment Term and thereafter.

48.     The Employment Agreement called for Mr. Nicklaus to serve as the Company's initial Chief Executive Officer.  It provided for an Employment Term of five years commencing on May 31, 2007, with automatic renewals for one-year periods until terminated by either party. The agreement also included a non-compete provision which stated that "[d]uring the Employment Term and for a period of five (5) years thereafter, except on behalf of the Company and its Affiliates, [Mr. Nicklaus] shall not … (a) act as a designer, co-designer or design consultant, or otherwise furnish golf course design services, in connection with the development of any golf course project; or (b) lend his personal endorsement to, or provide services as an endorsement spokesman for, any product, service or Person; provided[,] however, that the foregoing shall not limit the ability of [Mr. Nicklaus] to provide his personal services or give his personal endorsement to any bona fide charitable organization."

49.     In other words, the parties contemplated that Mr. Nicklaus' Employment Term might at some point end, and, five years thereafter, he would be free to design golf courses and lend his personal endorsements to products, services or Persons, without involvement of the Company or its Affiliates.

50.     Likewise, in the separate Non-Competition Agreement, Mr. Nicklaus agreed that "[f]or so long as GBI retains ownership interest in the Company sufficient to elect at least two (2) members of the Board of Managers, but in no event for a period of less than ten (10) years after the date of the Closing …, [he would] not, without the prior written approval of the Compensation Committee of the Board of Managers of the Company (the "Board"), directly or indirectly (i) participate as an owner of more than five percent (5%) of the equity in any business which is a Competitor … of the Company or any of its Affiliates …, (ii) act as a principal of, engage in any

- 10 -

other substantial professional employment with, or provide business consulting activities to, any such Competitor, or (iii) provide [his] personal services as a spokesman or authorize the promotional use of [his] name or likeness for the business, products or services of a Competitor."

51.     Thus, it was expressly contemplated that GBI might at some point cease to own enough of the Company to elect at least two members of the Board, and, provided that happened more than ten years after the date of closing, Mr. Nicklaus would then be free to (i) own more than five percent of a Competitor, (ii) work for or with a Competitor, or (iii) provide his personal services as a spokesman or authorize the promotional use of his name or likeness for the business, products, or services of a Competitor.

52.     In fact, a few months after the May 2007 transaction closed, GBI changed its name to GBI Investors, Inc. to reflect that it had become a holding company with no business other than to hold Class "A" membership interests in the Company for so long as those interests had value or it otherwise chose to keep them.

53.     Mr. Nicklaus was one of GBI's initial designates to the Company's Board and served as its initial Chairman.

**C.     Howard Milstein Takes Control of the Company and all of its Assets**

54.     Shortly after the May 2007 transaction closed, real estate markets began to collapse, leading to enormous declines in the golf course design industry, the demand for branding and endorsements, and other businesses in which the Company was engaged.

55.     The Company's financial performance in 2007 and 2008 was similar to that of earlier periods, but the Company then experienced a substantial drop in revenues.

56.     At Emigrant GB's insistence, the Company started slow-paying vendors in order to free up more money to pay interest on the Loan, but the Company was still never able to meet its obligation to pay Emigrant GB at least $12.325 million in interest each year.

57.      Every time a payment to Emigrant GB could not be made, a PIK note was issued which added to the total amount due and the interest owed each year.

58.      In fact, the Company's annual interest obligations to Emigrant GB eventually came to exceed the Company's *total annual revenues*, a condition that continues to this day.

59.      Since the Company had insufficient cash flow to satisfy its obligation to pay Emigrant GB at least $12.325 million in interest each year, there was obviously no excess income available for distribution to GBI or NFD in connection with their ownership interests.

60.      On top of that, Mr. Milstein asked Mr. Nicklaus and other Company officers to reduce their salaries to help improve the Company's financial position, which they agreed to do.

61.      Mr. Milstein, however, was unwilling to make any concessions of his own, rejecting out of hand Mr. Nicklaus' request to modify the terms of the Loan.  Mr. Milstein insisted on receiving every penny of interest, either in the form of cash or increased PIK indebtedness.

62.      By 2011, Mr. Milstein was touting that the Nicklaus family had "zero equity" in the Company due to the unpaid loan amount, which had grown considerably by that point in time. He also leveraged the Company's condition to obtain complete control over its Board and operations, which he has wielded ever since.

**D.      Mr. Nicklaus Transitions from Business Owner to Employee Only**

63.      In 2012, as Mr. Nicklaus' initial five-year Employment Term was nearing its end, he advised Mr. Milstein that he was giving serious consideration to leaving the Company.

64.      Mr. Milstein subsequently asked Mr. Nicklaus not to terminate his employment and instead to give him the opportunity to turn the Company around in the wake of the recession.

65.      Months of sporadic discussions followed which ultimately culminated in an Employment, Governance and Control Agreement dated January 1, 2013 (the "EGC Agreement").

66.     The Employment Agreement was superseded by the EGC Agreement in part, insofar as it changed Mr. Nicklaus' compensation structure and the consideration provided for his post-employment covenants.  His existing salary and bonus entitlements were replaced with a "revenue participation" model that entitled him to specific percentages of amounts collected on certain design and marketing projects, plus a fixed payment of $12,000 per year designed to cover his contribution to the healthcare plan shared by the Company and the Nicklaus Family Office. The parties further agreed that if Mr. Nicklaus refrained from resigning his employment until June 1, 2017, the "revenue participation" would continue after the termination of his employment and serve as consideration for his post-employment covenants, with "his non-compete [being] extended for each year he receives payments from the Company."

67.     In addition, the EGC Agreement then went on to make clear that "[a]ll other terms from prior related agreements not specifically superseded by the above remain[ed] in place," which included the five-year cap on the post-employment covenant period.

68.     The EGC Agreement also memorialized the change in control of the Company which had occurred two years earlier, by stipulating that Mr. Milstein would be Co-Chairman of the Company's Board and that Emigrant Bank would have "perpetual control" of the Board. It called for all major decisions to be made by a committee of three consisting of Mr. Milstein, Mr. Nicklaus, and the Company's then-CEO, with Mr. Milstein's vote "prevail[ing]" in the event consensus was not reached.

69.     From then on, the relationship between Mr. Milstein and Mr. Nicklaus became increasingly toxic.  Mr. Milstein began treating Mr. Nicklaus *not* as a partner or even as a peer, but rather as a mere employee who was expected to follow orders – one of which was to help improve Mr. Milstein's image and reputation among those who hold Mr. Nicklaus in high esteem.

**E.      Mr. Milstein Promotes Fictitious News Stories That He Helped
the Nicklaus Family Double the Value of Its Interests in the Company**

70.      Although Mr. Milstein had complete control over the Company's operations and
effectively owned 100% of the Company as a result of the Loan, he wanted to keep that a secret
so he could market a false story about how he helped his "partner" Mr. Nicklaus grow his wealth.
He wanted the golf and business communities to see him as a sophisticated and savvy businessman
who had such a "Midas Touch" that he was able to make Mr. Nicklaus and his family wealthier
than they were prior to the May 2007 transaction, when their core businesses were performing well
and were valued at just under $300 million.

71.      For example, in a news story which was published in 2015, Mr. Milstein
characterized the financial results of the Company as "terrific" and proudly claimed that "[t]here
have been very few investments that anybody made in 2007 that have done as well as this one."
He told the reporter that the Company's revenue had "doubled" when in fact it was roughly *half*
of what it was in the years leading to the May 2007 transaction.  *See* https://www.esmmagazine.
com/a-brands/jack-nicklauss-ice-cream-shows-effect-of-billionaire-investor-10070.

72.      Similarly, in an article published by Forbes in 2017, Mr. Milstein was credited with
"help[ing] Jack Nicklaus more than double the value of his business."   In actuality, however,
the business was worth roughly *half* of what it was worth prior to the May 2007 transaction,
and the Nicklaus family's interests in that business had *zero* economic value in light of the Loan.
*See*      https://www.forbes.com/sites/erikmatuszewski/2017/01/23/billionaire-howard-milstein-
acquires-miura-distribution-rights-plans-to-expand-golf-club-line/?sh=35e23d3e1141.

73.      Mr. Milstein's false statements about the continued existence of a "partnership" and
how much he claimed to have done for the Nicklaus family's ownership interests in the Company

were "salt in the wounds" for Mr. Nicklaus and his family, for they knew the value of their interests in the Company had been reduced to nothing.

74.     Nonetheless, Mr. Nicklaus was expected to go along, keep a stiff upper lip, and pretend he had a great "partner."

**F.     Mr. Nicklaus Terminates his Employment with the Company**

75.     In February 2017, Mr. Nicklaus gave written notice under the Employment and EGC Agreements that he would be voluntarily terminating his employment with the Company effective June 1, 2017.

76.     Shortly thereafter, Mr. Milstein asked Mr. Nicklaus to reconsider his decision and the parties entered into a Standstill Agreement which called for Mr. Nicklaus to remain employed with the Company on an at-will basis while the parties discussed a new potential arrangement. The agreement specified that either side could terminate the at-will employment period at any time and for any reason, in which case "[Mr. Nicklaus'] employment with the Company shall be deemed to have been terminated … effective as of the Termination Date," *i.e.*, June 1, 2017.

77.     Over the course of the next several months, multiple proposals were exchanged, but no agreement was reached.  Mr. Nicklaus therefore gave written notice that he was terminating his continued at-will employment period, which reinstated his termination as of June 1, 2017 and triggered his post-termination non-compete restrictions.

78.     Mr. Nicklaus had originally committed to give the Company five years of service as an employee under his Employment Agreement, and he ended up giving them twice that, plus the agreed-upon five-year post-termination non-compete period.

79.     The Company delayed a public announcement of Mr. Nicklaus' departure for several months, fearing the effect it would have on the Company's core lines of business.

However, the Company internally acknowledged Mr. Nicklaus' departure in numerous documents, including its audited consolidated financial statements, which provided in pertinent part as follows:

> In February of 2017, Mr. Nicklaus elected not to renew his employment under his agreement, as modified by the EG&C, effective June 1, 2017.  On May 31, 2017, Mr. Nicklaus' employment was informally extended on current terms pursuant to a Standstill Agreement while efforts were made to conclude a mutually beneficial arrangement for his continued employment.  In August 2017, Mr. Nicklaus notified the Company of his intention to retire from the Company effective September 8, 2017 after the parties failed to reach an agreement on terms for extensions of his employment.  In February 2018, the Company and Mr. Nicklaus publicly announced his formal retirement as an employee of the Company.  The Company has continued to pay Mr. Nicklaus revenue participation payments after retirement in accordance with the 2013 EG&C Agreement in consideration of his ongoing compliance with certain post-termination covenants' of his Employment Agreement.

Nicklaus Companies, LLC Audited Consolidated Financial Statements for FY2017.

80.      Once Mr. Nicklaus ended his Employment Term, he no longer had any obligation to provide his personal services or personal endorsements to the Company or its clients, and the Company no longer had a right to market Mr. Nicklaus' personal services or personal endorsements, except to the extent he consented.

81.      Conversely, Mr. Nicklaus' post-termination restrictive covenants precluded him from engaging in the design of golf courses and the endorsement of products and services for a period of up to five years, except when doing so "on behalf of the Company and its Affiliates" or for charitable organizations.

82.      In other words, it was contemplated that Mr. Nicklaus might continue to provide services "on behalf of the Company and its Affiliates" as a contractor, in what the Company referred to as "a post-termination consulting period during which the executive will be available to the Company as a consultant and will be bound by confidentiality, noncompetition, and nonsolicitation covenants as a condition to payment of periodic consulting fees by the Company."

83.     The Company requested that Mr. Nicklaus continue to provide design and endorsement services to its clients during that five-year "post-employment consulting period," and he agreed to do so on a limited basis as an outside contractor/consultant.  He also continued to serve on the Company's Board of Managers in the role of Co-Chairman.

G.     **Mr. Milstein's Formation of 8AM Golf**

84.     As noted above, when Messrs. Milstein and Nicklaus were introduced to each other prior to the May 2007 transaction, Mr. Milstein presented himself as an accomplished businessman who could help transform Mr. Nicklaus' businesses into a global institution which would outlive Mr. Nicklaus and be of enormous value to his heirs.

85.     A few months after Mr. Nicklaus terminated his employment with the Company, Mr. Milstein and his family acquired all of Emigrant GB's rights in the Loan through a "dividend" that valued the Company at *less than half* of the appraised value of the Company in 2007.

86.     Mr. Milstein also concurrently launched his plan to transform Mr. Nicklaus' businesses into a global institution and began building an international combination of golf-related businesses.  Only instead of doing so through a Nicklaus-related entity, he chose to build that institution through a new Milstein entity known as "8AM Golf."

87.      Mr. Milstein's plan was to use the Nicklaus "halo" and the appearance of a continuing partnership with Mr. Nicklaus to carry out the grand strategy he described to Mr. Nicklaus in 2007, except Mr. Milstein and his family would be the sole beneficiaries of that strategy through their ownership of 8AM Golf.

88.     Mr. Milstein positioned 8AM Golf as a holding company of numerous golf brands, including (a) the Company; (b) a golf course design and management company which owns and manages par-3 golf courses and putting facilities; (c) a company engaged in design, manufacturing, and distribution of golf equipment, which was one of the Company's principal lines of business at

the time of the May 2007 transaction; (d) a custom golf club fitting operation; (e) a custom golf club retailer; (f) a company engaged in the design and manufacturing of golf club adapter systems; (g) Golf Magazine and Golf.com; (h) a GPS app for golfers; and (g) other golf-related operations.

89.     In addition to using Mr. Nicklaus' reputation as a springboard into a broader golf business, Mr. Milstein insisted that the Company market the services of 8AM Golf's portfolio companies to Nicklaus Design clients at every opportunity – an activity that Mr. Milstein proudly touted as "cross-selling."

90.     Mr. Milstein also routinely allowed 8AM Golf's portfolio companies to use Company intellectual property, its vast network of contacts, and Mr. Nicklaus' publicity rights, with no compensation to the Company or Mr. Nicklaus.

**H.     Mr. Milstein Tries to Induce Mr. Nicklaus to Expand His Non-Compete Obligations to the Company and Assign His Publicity Rights to the Company**

91.     Prior to and following the May 2007 Transaction, Mr. Nicklaus had the right to engage in and be compensated for personal business activities such as appearances at golf tournaments and other events.  He also had the right to license the use of his name, image, and likeness to third parties for the purpose of promoting his appearances at such events.

92.     Mr. Milstein did not like that Mr. Nicklaus was free to engage in such personal business activities, and he tried to change that on several occasions after Mr. Nicklaus ended his Employment Term with the Company.

93.     Mr. Milstein was also greatly concerned about what would happen when Mr. Nicklaus' non-compete restrictions expired, so he sought to expand those restrictions to the point that they would become perpetual, and he sought to secure exclusive ownership of Mr. Nicklaus' name, image, likeness, and other publicity rights for the benefit of the Company and 8AM Golf.

94.     For example, in October 2017, Mr. Milstein presented Mr. Nicklaus with a proposal which would have increased his compensation in exchange for Mr. Milstein having control over his life.  The proposal would have restricted Mr. Nicklaus' ability to engage in personal business activities significantly, and it would also have extended his post-termination restrictive covenants for a potentially indefinite period of time, as follows:

> For so long as JWN receives any revenue participation payments from the Company, all covenants (noncompete, nonsolicit, nondisparagement, etc.) shall be extended, *including any tail (i.e. any 5 year post termination covenant tail shall not commence until such time as JWN is no longer receiving payments).*

Email from H. Milstein, 10/17/17 (emphasis added).

95.     Mr. Nicklaus had no interest in that new proposed arrangement and promptly rejected it outright.

96.     Similarly, in February 2020, Mr. Milstein presented Mr. Nicklaus with a set of draft proposed agreements that would have increased his compensation by an even greater amount in exchange for even further control over his life.  The draft proposed agreements would have essentially eliminated Mr. Nicklaus' right to engage in paid appearances at golf tournaments and other events outside of the Company, and they would have imposed *lifetime* non-compete and non-solicitation obligations on Mr. Nicklaus and members of his family.  In addition, the Company also sought an irrevocable assignment of the Nicklaus IP, a term defined to include Mr. Nicklaus' "name, photograph, likeness, voice, image, identity, … persona," and other "rights of publicity," which the Company acknowledged Mr. Nicklaus and his family "are the owners of."  Email from H. Milstein Enclosing Draft Proposed Agreements, 02/18/20.

97.     Mr. Nicklaus and his family had no interest in that new proposed arrangement either and promptly rejected it outright as well.

98.     Undaunted, in August 2020, the Company tried again, this time by asking Mr. Nicklaus to sign a new proposed "Consent" that was broader in scope and perpetual in duration. It stated in pertinent part that:

> I, Jack W. Nicklaus, … *on behalf of myself and my estate*, hereby grant permission and my consent to the use and registration of my name, likeness, *persona*, signature, and all nicknames associated with me, including but not limited to "GOLDEN BEAR," *the image of a bear (such as but not limited to), and others, in the United States and worldwide, to Nicklaus Companies, LLC*, … along with its successors and assigns, for all of the goods and services with which said company, its assigns or successors, now or hereafter, use such name, likeness, *persona*, signature and/or nicknames. *This consent is granted in perpetuity and worldwide in scope.*

Draft Proposed Consent, 08/26/20 (emphasis added).

99.     The Company advised Mr. Nicklaus that it was still using the original Consent, evidencing that no other document pertaining to the subject matter exists, but it claimed to be "getting push back" when it sought to make use of "the old consent" in certain jurisdictions across the globe.  The Company claimed that the proposed changes to the Consent would obviate the need "to provide evidence of the transformation from" GBI to the Company and would ultimately be "helpful in making the document acceptable" around the world.

100.     In reality, the Company was principally concerned that the original Consent was terminable at will, as it did not specify a fixed duration or that it was to last "in perpetuity."

101.     Mr. Nicklaus declined to execute the new proposed Consent in the form it was presented, but he tried to be accommodating by suggesting alternatives.  He first advised that he would be willing to consider providing new consents on "a case by case basis" as needed, upon request.  He then offered to sign a modified version of the new Consent for use with third parties, provided the Company signed an Acknowledgment specifying that the Consent would not be construed to "alter, amend, enlarge, or detract from the rights owned by [him and the Company]."

102.    The Company refused to do that, as it was in fact seeking to modify the rights owned by Mr. Nicklaus and the Company.   Thus, the new proposed Consent was never given. Instead, Mr. Nicklaus formally revoked the original Consent, while reiterating that he will be willing to consider providing new consents on "a case by case basis" as needed, upon request.

103.    The next attempt came in December 2021, when the Company asked Mr. Nicklaus to sign a draft proposed letter to the promoters of the Soudal Open terminating a written agreement for Mr. Nicklaus to appear at that tournament.  The proposed letter stated in pertinent part that:

> As has already been indicated to you, Nicklaus Companies, LLC (the "Company") acquired the various golf and marketing businesses which I established during my career, *including exclusive rights to license my endorsement and the trademarks and publicity rights related to my identity for commercial purposes*.   Since this acquisition in 2007, only the Company has had the rights to use my name, likeness and related identifying information to endorse, advertise, promote and publicize businesses, products and services (including the 2022 Soudal Open).

Draft Proposed Ltr., 12/10/21 (emphasis added).

104.    Once again, however, Mr. Nicklaus refused to sign what the Company presented to him and instead sent a different letter to the promoters of the golf tournament which made clear that he "d[id] not share" the Company's view of its "rights."

105.    At the time the Company asked Mr. Nicklaus to sign its proposed letter to the promoters of the Soudal Open, the Company knew that it did *not* own "exclusive rights" to use and license Mr. Nicklaus' name, likeness, and other publicity rights for commercial purposes, as claimed.   Indeed, in a subsequent cease-and-desist letter sent to a third-party, the Company expressly stated that the unauthorized use of Mr. Nicklaus' name, image, and likeness for commercial purposes constituted "a violation of the rights *of Mr. Nicklaus*" as well as the rights of the Company.  The letter acknowledged that Mr. Nicklaus has "legal rights" to the use of his name, likeness, and other publicity rights for commercial purposes, while the Company was merely the entity "*authorized by Mr. Nicklaus*, as a celebrity domiciled in the State of Florida, to *license* and

- 21 -

*manage* commercial uses of his name, likeness and other related publicity rights under Florida law." Cease-and-Desist Ltr. from Company to Alleged Infringer, 05/03/22 (emphasis added).

106.    The Company's assessment that Mr. Nicklaus has "legal rights" to the use of his name, likeness, and other publicity rights for commercial purposes is correct.  While the Company has exclusive ownership of the trademarks and service marks which it acquired through the May 2007 Transaction or properly registered with Mr. Nicklaus' consent thereafter, it does *not* have exclusive ownership of Mr. Nicklaus' name, likeness, and other publicity rights.  It merely obtained what GBI had, which was a *non*-exclusive right to use and register his name, likeness, signature, and nicknames for goods and services, in accordance with applicable law.

107.    That non-exclusive right was necessarily dependent on Mr. Nicklaus' ongoing consent, for under both Florida and federal law, it is *illegal* to use an individual's name, likeness, or other publicity rights to suggest an endorsement of goods or services that the individual does not *personally* endorse.  *See* Fla. Stat. § 540.08(1)(a) & (b); 15 U.S.C. § 1125(a)(1)(A). "Endorsements must reflect the honest opinions, findings, beliefs, or experience *of the endorser*." 16 CFR § 255.1(a) (emphasis added).

## I.    Mr. Milstein Undertakes to Take from Mr. Nicklaus the Services of a Trusted Assistant, W. Scott Tolley

108.    For over 25 years, W. Scott Tolley served an important role for Mr. Nicklaus, assisting him with business development, marketing, public relations efforts, and other matters. His duties included, among other things, coordinating with real estate developers and others interested in securing Mr. Nicklaus' personal services for golf course design and redesign projects, coordinating with companies interested in securing Mr. Nicklaus' personal services as an endorser of goods or services, coordinating Mr. Nicklaus' personal business activities such as paid

appearances at golf tournaments and other events, and managing Mr. Nicklaus' press activities and social media accounts.

109.    In early 2022, Mr. Milstein set out to sever those ties, so Mr. Nicklaus would be deprived of the benefit of Mr. Tolley's services when Mr. Nicklaus' post-termination restrictive covenants expired in June 2022.

110.    One of Mr. Milstein's first acts in that regard was to direct the Company's then-President to meet with Mr. Tolley and communicate that the Company intended to sue him in multiple venues unless he signed a Company-prepared "Separation, Turnover and Non-Interference Agreement" which would have ended his decades-long business affiliation and relationship with Mr. Nicklaus for all time.

111.    In an effort to appease Mr. Milstein and avoid the need for a drawn-out legal battle, Messrs. Nicklaus and Tolley decided to convert their relationship from one of employer-employee to principal-consultant, which is where it stands today.

112.    Mr. Milstein, however, was unsatisfied.  He wanted to control Mr. Nicklaus' life and deprive him of the public access he has long enjoyed with Mr. Tolley's assistance.

113.    In March 2022, Mr. Milstein had Company representatives prepare a new version of the proposed "Separation, Turnover and Non-Interference Agreement."  That version was titled "Non-Interference Agreement" and was sent to Mr. Tolley along with a cover note indicating that he would need to sign it in order "to forestall the lawsuit currently being prepared against [him]."

114.    Mr. Nicklaus met with the Company's then-President and its General Counsel in an effort to resolve this issue but was unsuccessful.  He was informed that Mr. Milstein was adamant about suing Mr. Tolley unless Messrs. Nicklaus and Tolley agreed to sever their relationship completely for all time – which Mr. Nicklaus was unwilling to do.

115.    In April 2022, Mr. Milstein directed the Company's outside counsel to send a letter to Mr. Tolley with a subject line which read "Notice of Potential Litigation Concerning Activities Relating to Use and Licensing of Endorsements by Jack W. Nicklaus for Commercial Purposes." The letter alleged that, in the course of providing services to Mr. Nicklaus, Mr. Tolley had "violated various contractual and legal obligations to the Company, including by infringing on the publicity rights of the Company and by interfering with its contracts and business relationships." The letter then advised that if Mr. Tolley did not sign the "Non-Interference Agreement" which would operate to end his decades-long business affiliation and relationship with Mr. Nicklaus, the Company would soon be filing a lawsuit against Mr. Tolley in Palm Beach County state court "in substantially the form of the enclosed draft complaint" (the "Threatened Complaint").

116.    The Threatened Complaint devoted dozens of pages to attacking Mr. Tolley with false allegations concerning his activities on behalf of Mr. Nicklaus from early 2018 forward.  It then proceeded to assert a series of claims concerning what Mr. Tolley could and could not do on Mr. Nicklaus' behalf during that period of time, based on a wholly incorrect view of Mr. Nicklaus' rights under the Employment Agreement.

117.    Mr. Milstein's principal objective in threatening to assert such claims was to intimidate Messrs. Nicklaus and Tolley into severing their longstanding relationship, thereby denying Mr. Nicklaus the benefits of Mr. Tolley's continued assistance.  If that failed, he wanted to attack Mr. Nicklaus' rights through a proxy, in order to avoid a confrontation with the person whose name adorns the Company and adjudicate his rights without his participation.

118.    Mr. Milstein directed that Mr. Tolley be given time to think about the cost of litigating against him, both financially and professionally, believing that Mr. Tolley would fold and Mr. Nicklaus would be deprived of Mr. Tolley's assistance when he became free to compete with the Company.

119.   On April 28, 2022, the undersigned attorney advised the Company's counsel that the Company's would-be claims were based on mistaken conclusions, were legally flawed, and could only be brought in arbitration in any event, as they implicate rights and obligations under the Employment Agreement which contains a binding arbitration clause.

120.   In response, the Company's counsel advised that the Threatened Complaint would be filed in Palm Beach County Circuit Court, notwithstanding the arbitration provision.

121.   For Mr. Nicklaus, the threat to sue Mr. Tolley and expose him to financial and professional ruin if he did not agree to sever ties with Mr. Nicklaus for all time was the proverbial "straw that broke the camel's back."

**J.      The Other Pending Actions**

**1.      Arbitration in Florida**

122.   On May 3, 2022, a little less than a month prior to the expiration of Mr. Nicklaus' five-year post-termination non-compete period, Mr. Nicklaus gave written notice to the Company that he was resigning his Board office and directorship effective immediately and would not accept any new design or endorsement projects from the Company going forward.

123.   Messrs. Nicklaus and Tolley also concurrently filed a Demand for Arbitration under Mr. Nicklaus' Employment Agreement, seeking a variety of relief, including a declaration that "(a) Mr. Nicklaus retained certain rights regarding the use of his name, likeness, image, and brand, following the May 2007 transaction; (b) Mr. Nicklaus had the right to engage in and be compensated for personal business activities such as paid appearances at events, speaking engagements, and the like,  following the May 2007 transaction; (c) Mr. Nicklaus did not act inconsistently with his post-employment restrictive covenants while they were in effect; (d) Mr. Nicklaus' post-employment restrictive covenants have expired; and (e) Mr. Nicklaus is now free

- 25 -

of any restrictions on his ability to design golf courses, endorse products, or engage in other related commercial activities."

124.    In response, the Company has asserted that Mr. Nicklaus' post-termination restrictive covenants are effectively perpetual in nature, and that it has the right to control what Mr. Nicklaus does and does not do for the rest of his life.  It contends that Mr. Nicklaus could only provide design and endorsement services "on behalf of the Company and its Affiliates" after he quit, but since he provided such services, that meant he *never* quit and the five-year post-termination covenant period *never began to run*.  The Company also claims that the five-year period will not begin to run until the Company decides to stop paying revenue participation, as if the proposal referenced in paragraph 94 above had been accepted instead of rejected.

125.    In addition, the Company further contends that even if Mr. Nicklaus is now free to do that which his five-year post-termination non-compete restrictions prevented him from doing while they were in effect – namely, design golf courses and lend his personal endorsement to products, services, or Persons without the involvement of the Company or its Affiliates – he cannot do so in his own name, as the Company says "[it] acquired exclusive rights to the commercial use of Mr. Nicklaus' name, image, and likeness when it acquired GBI's and its subsidiaries' assets."

### 2.    The Lawsuit in New York

126.    On May 13, 2022, at Mr. Milstein's direction, the Company filed a lawsuit against GBI and Mr. Nicklaus in New York state court.

127.    The Company's initial Complaint asserted claims under the PSA and LLC Agreement, for alleged breaches of the implied covenant of good faith and fair dealing, alleged breaches of fiduciary duties, and alleged tortious interference.  The Company also later added a claim for alleged breaches of the Non-Competition Agreement.

128.    In August 2022, the Company filed a motion for a preliminary injunction tracking the prohibitions of the Non-Competition Agreement.  Specifically, it requested an order directing GBI and Mr. Nicklaus "to cease from … (i) participating as an owner of more than five percent (5%) of the equity in any business which is a Competitor of the Company or any of its Affiliates, (ii) acting as a principal of, engaging in any other substantial professional employment with, or providing business consulting activities to, any such Competitor, or (iii) providing Mr. Nicklaus's personal services as a spokesman or authorizing the promotional use of Mr. Nicklaus's name or likeness for the business, products or services of a Competitor, without obtaining prior written approval of the Compensation Committee of the Board of Managers of the Company."

129.    It had been many years since GBI had an ownership interest in the Company sufficient to support the restrictive covenants in the Non-Competition Agreement.  However, to eliminate any argument on the issue, GBI proceeded to assign whatever ownership interest it had in the Company to the Company itself, as permitted under the May 2007 transaction documents, thus precluding any enforcement of the Non-Competition Agreement.

130.    In November 2022, following a three-day evidentiary hearing, the Court found that the Company was not entitled to preliminary injunctive relief based on any non-compete or non-solicitation obligations.  The Court stated that Mr. Nicklaus was free to design golf courses on his own and may "use his own name in his business."  The Court determined that the Company was entitled to a preliminary injunction only as to the use of what was defined in the PSA as "Transferred Intellectual Property" and the licensing of Mr. Nicklaus' name, image, and likeness for commercial endorsements without the Company's consent.  With respect to the latter issue, the Court ruled that the Company was likely to prevail on its argument that it obtained from GBI an exclusive right to license Mr. Nicklaus' name, image, and likeness for commercial endorsements,

meaning that the Company and Mr. Nicklaus have to partner in order to provide his personal endorsements to businesses, goods, and services.

131.   The following month, the Court issued a written Decision + Order on the Company's motion for preliminary injunction, effectuating the foregoing ruling.

132.   GBI and Mr. Nicklaus have since moved to vacate the preliminary injunction in light of the original Consent referenced above and related evidence that the Company did *not* in fact acquire from GBI an exclusive right to license Mr. Nicklaus' name, image, and likeness for commercial endorsements.  The Court recently issued an Order to Show Cause why that motion should not be granted, and it is currently in the process of being briefed.

133.   The Court also recently dismissed all but one and a half of the Company's claims as a matter of law, for failure to state a claim on which relief can be granted.  The only claims that currently remain pending are (a) the portion of the Company's claim against GBI for breach of the PSA which seeks to effectuate the transfers of intellectual property in that agreement, and (b) the Company's claim against Mr. Nicklaus for breach of the Non-Competition Agreement, which the Court indicated would be more appropriately addressed on a motion for summary judgment.

134.   For convenience, the pending arbitration proceeding in Florida and the pending lawsuit in New York state court are referred to herein as the "Other Pending Actions."

**K.     The Present Action**

135.   In the present action, Mr. Nicklaus asserts claims against the Defendants for defamation, common law unfair competition, violation of Florida Statutes § 540.08, and violation of the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.

136.   Those claims do not arise from or otherwise relate to the agreements at issue in the Other Pending Actions; nor are they dependent on the outcome of the Other Pending Actions. The wrongful acts at issue in this litigation arise from transactions and occurrences which are

separate from those at issue in the Other Pending Actions, and the remedies sought for that conduct are independent of those sought in the Other Pending Actions.

137.    The wrongful acts at issue in this litigation are described more fully in the sections that follow.

**L.    Defendants' Efforts to Destroy Mr. Nicklaus' Reputation**

138.    In pursuing the private dispute resolution mechanism of arbitration, Mr. Nicklaus sought to avoid a public fight with Mr. Milstein and the Company.

139.    Mr. Milstein, however, wanted a public forum which he could use as a vehicle to tarnish Mr. Nicklaus' reputation and hinder his ability to compete with the Company once his five-year post-termination non-compete period expired.

140.    Having relied heavily on Mr. Nicklaus' personal services to generate revenue for the Company over the years and having leveraged him to boost the performance of 8AM Golf and his own image in the golf industry, Mr. Milstein recognized that a future with Mr. Nicklaus acting as a competitor would necessarily be difficult.  He is seeking to forestall that future by arbitrating and litigating for as long as humanly possible, in the hope that he can prevent the now 83-year-old Mr. Nicklaus from competing with the Company in the time he has left.  Failing that, Mr. Milstein seeks to require that Mr. Nicklaus compete with the Company as the invisible man, without the use of his name, image, likeness, and other publicity rights, even though the agreements between the parties expressly contemplated that he would be able to do exactly that.

141.    From the outset, however, Mr. Milstein recognized that he was unlikely to succeed in obtaining such relief from the Arbitrator or the Court presiding over the Other Pending Actions. He therefore sought to damage Mr. Nicklaus' reputation in a way that would make him radioactive in the world of golf course design and endorsements and hinder his ability to effectively compete with the Company for business.

142.    With the aid of the other Defendants, Mr. Milstein sought to do that by creating a false association between Mr. Nicklaus and the controversial Saudi-backed golf league now known as LIV Golf.

143.    The Defendants launched the first salvo in that regard through the Company's initial Complaint in the New York lawsuit.  That Complaint included a series of false allegations which had no relevance to any of the legal claims asserted and were overtly designed to discredit Mr. Nicklaus and hinder his ability to compete with the Company for business going forward.

144.    The most concerning and disturbing of the Company's false allegations was that Mr. Nicklaus had wanted to accept a leadership role with the controversial Saudi golf league now known as LIV Golf, and the Company effectively had to "save[] Mr. Nicklaus from himself." Specifically, the Complaint alleged that:

(a)    "In the Spring of 2021, Nicklaus Companies learned, after the fact, that Mr. Nicklaus was involved in scheduling a personal meeting with both the Chairman and the Chief Executive Officer of Golf Saudi …."

(b)    "[T]he purpose of the private meetings was to negotiate an agreement for Mr. Nicklaus to provide his public support and use his considerable influence in professional golf to promote a new golf league backed by Golf Saudi, which would have been a direct rival to the PGA Tour [and] had been publicly opposed by the PGA Tour."

(c)    "Mr. Nicklaus encouraged Golf Saudi to recruit him to endorse their controversial golf league program [to advance] his own personal agenda and financial interests …."

(d)    "Fortunately for Nicklaus Companies – and Mr. Nicklaus – the Company was eventually able to convince Mr. Nicklaus to stop exploring a deal for the endorsement of the Saudi-backed league."

(e)    "The Company essentially saved Mr. Nicklaus from himself by extricating him from a controversial project that could have not only tarnished his legacy and reputation, but severely damaged the Nicklaus Companies' name, brands and business."

(f)    "Thanks to the intervention of Nicklaus Companies, the Company was able to minimize fallout from the situation and protect the goodwill and good name of both the Company and Mr. Nicklaus."

(g)    "If not for the efforts of Nicklaus Companies, Mr. Nicklaus could have been pilloried in the news media for accepting payment for what could be characterized as betraying the PGA Tour."

Complaint ¶¶ 79-80, 86-89.

145.    Those allegations were pure, unadulterated fiction.  The only part that was even remotely accurate was that "Mr. Nicklaus could have been pilloried in the news media for accepting payment for what could be characterized as betraying the PGA Tour."

146.    Indeed, Mr. Milstein *knew* the foregoing allegations were untrue and would cause enormous damage to Mr. Nicklaus' reputation if widely circulated, but he nonetheless directed that they be included in the Company's Complaint and then *repeated to national media sources* and *other third parties*.

147.    As discussed more fully below, shortly after the Company filed its Complaint in New York, its public relations firm, PRCG | Haggerty LLC, sent copies of the Complaint to news reporters and steered them to the false statements concerning Mr. Nicklaus and the Saudi golf league in order to ensure that the false statements received significant media attention.

148.    That effort resulted in damaging news stories which featured those false statements and had widespread circulation.

149.    At Mr. Milstein's direction, Mr. O'Brien then sent copies of the damaging news stories to Company clients and others in the golf industry and passed off the false statements repeated therein as true.  In fact, Mr. O'Brien even went so far as to state that Mr. Nicklaus' advanced age had resulted in dementia and repeatedly likened him to someone who needed to have his car keys taken away.

150.    The Defendants knew – and have since admitted – that Mr. O'Brien's assault on Mr. Nicklaus' age and health was improper and the statements made were categorically untrue,

but Mr. Milstein nonetheless authorized Mr. O'Brien to proceed with that assault in furtherance of their overall strategy.

151.    The Defendants engaged in the foregoing conduct for the improper purpose of discrediting Mr. Nicklaus and hindering his ability to compete with the Company for business once his post-termination covenants lapsed.  They wanted him to work for the Company or not at all.

152.    In the Spring of 2021, when the events described in the Company's Complaint allegedly occurred, the new Saudi-backed golf league was in its infancy and had yet to become a subject of mainstream discourse.  In May 2022, however, when the Company filed its Complaint, association with the new league was hugely controversial.  The players who chose a big payday in exchange for associating themselves with the Saudi Royal Family lost sponsorships, fan support, and access to the frequent television appearances enjoyed by members of the PGA Tour.

153.    Mr. Milstein wanted Mr. Nicklaus to suffer the same fate and thus sought to create a false association between Mr. Nicklaus and the Saudi golf league which he openly admitted would be devastating to Mr. Nicklaus' reputation and legacy:

Q.      [O]ne thing you said that I think is important is that the association with Jack Nicklaus' name with the Saudi LIV Tournament would be adverse to Jack Nicklaus' reputation.  Would you agree with that?

A.      I think it would be adverse to the company's reputation, and to his reputation, yes.

* * *

Jack's brand and … his image and … market position is kind of clean cut, all-American traditionalist in the golf world.  That's who Jack is.

The Saudis, of course, have a number of issues, including, you know, this Khashoggi incident.  [N]one of that fit in with the rest of … his image.

* * *

Keep in mind, Phil Mickelson basically lost all of his reputation on this mess with the Saudis…. [He] probably will not make the hall of fame in golf now because of that association.

Depo. of H. Milstein, 09/12/22, pp. 168:07-15, 170:16-23, 176:12-21.

154.    Other Company officials, including Mr. O'Brien, have also acknowledged in testimony that the mere association of Mr. Nicklaus' name with LIV Golf would be severely damaging to his reputation and legacy.  It would cause him to be viewed as a traitor, as he helped found the PGA Tour and hosts a premier event on the Tour, namely, the Memorial Tournament.

155.    Nevertheless, the Defendants decided to broadcast their fictional story to the widest possible audience, in an effort to convince the world that Mr. Nicklaus had wanted to accept a leadership role with the Saudi golf league, and the Company had to "save[] [him] from himself."

156.    Mr. Milstein wanted to paint himself as the hero and Mr. Nicklaus as the villain, when in fact the truth is quite the opposite.

157.    During Mr. Nicklaus' 50-plus year career as a golf course designer, he travelled throughout the world promoting the game of golf and the development of golf courses.

158.    One of the places Mr. Nicklaus had never visited and where there are few golf courses is the Kingdom of Saudi Arabia.

159.    Led by the Saudi Royal Family, the Saudi Private Investment Fund embarked on a long term, multi-faceted program to address a future when the extraction and sale of crude oil would cease to bring the level of prosperity it does today.  The Saudi Private Investment Fund wants that future to include greater levels of revenue from tourism and golf, so it established and funds the organization known as Golf Saudi to build golf courses and sponsor golf tournaments.

160.    For those engaged in the business of designing golf courses, the prospect of designing new courses in Saudi Arabia was seen as a good business opportunity, and the competition for that business was steep.

161.    In 2019, Company officials and others affiliated with 8AM Golf set out to aggressively court the leadership of Golf Saudi for design projects and golf-related business.

162.    The Company official most involved in that effort was its Executive Vice President of Business Development, Paul T. Stringer, who also serves as the President of the Company's design subsidiary, Nicklaus Design, LLC.  It so happens that one of Mr. Stringer's longtime personal friends is a high-level consultant for Golf Saudi named Jed Moore.

163.    That effort resulted in a multi-million-dollar agreement with a Golf Saudi entity for the design of a Jack Nicklaus Signature golf course in Qiddiya, which is located in the outskirts of Riyadh, Saudi Arabia.

164.    In February 2021, Mr. Stringer was asked by his friend Jed Moore to set up a meeting between Mr. Nicklaus and several Saudi officials involved in the Qiddiya project, including the head of the Saudi Public Investment Fund (His Excellency Yasir Al-Rumayyan) and one of the highest-ranking Golf Saudi officials (Majed Al-Sorour).

165.    Mr. Stringer agreed to set up the meeting, which ultimately turned into three, all of which were held in Palm Beach County, Florida.

166.    The first meeting was in early March 2021.  It was characterized by Mr. Stringer as a "no agenda" visit with an important design client that planned to build many more golf courses in the future.  He arranged for Mr. Nicklaus to meet with the Saudi officials for about 45 minutes in Mr. Nicklaus' offices, followed by a round of golf at The Bear's Club hosted by Mr. Nicklaus' eldest son, the Company's then-Vice Chairman, Jack W. Nicklaus II.

167.    The Company's then-President and Chief Executive Officer, John R. Reese, was in attendance at the meeting, as was Mr. Stringer.

168.    The bulk of the meeting was spent exchanging pleasantries, golf stories, and thoughts about the Qiddiya project.  The Saudi officials then briefly described their efforts to launch what they were then calling the "Premier Golf League."

169.    Mr. Nicklaus had heard about the proposed new golf league the year before and had publicly vowed his support for the PGA Tour.  He listened politely to what the Saudi clients had to say but expressed no interest in participating in the new league in any way.  The clients then left for lunch and golf at The Bear's Club, as planned.

170.    The second meeting occurred later that same month, after the Saudi officials asked if they could play The Bear's Club again.  The request was conveyed directly to Mr. Nicklaus' eldest son, who promptly advised Mr. Stringer so he would be aware of it.

171.    Mr. Nicklaus and his son visited with the Saudi officials for about a half-hour at The Bear's Club before the round of golf – most of which was, again, spent exchanging pleasantries and the like.  Toward the end of the visit, Mr. Nicklaus was asked by the Saudi officials if he would be willing to call the PGA Tour's Commissioner, Jay Monahan, and ask if he would be willing to meet with representatives of Golf Saudi to discuss how they might work together going forward.  Mr. Nicklaus agreed to do that as a courtesy to the client.  The rest of the group then left to play golf.

172.    Mr. Nicklaus reached out to Mr. Monahan later that week and was told that the PGA Tour had no interest in collaborating with Golf Saudi.

173.    The third meeting occurred in early May 2021, after Mr. Nicklaus' eldest son received a message indicating that the Saudi officials wanted to meet with Mr. Nicklaus again to discuss a variety of matters.  Mr. Nicklaus promptly advised Mr. Reese of the request and invited him to attend the meeting, which he did.

174.    It was during that meeting that Mr. Nicklaus was asked, for the first and only time, to accept a leadership role with the new Saudi golf league for what promised to be a significant amount of money.  Mr. Nicklaus knew immediately it was something he could not do and turned it down on the spot.  The offer was then increased to even greater amounts of money, but Mr.

Nicklaus continued to stand firm.  He told the Saudi officials that he appreciated the offer but had to decline, as he had helped create the PGA Tour and it was an important part of his legacy.  He told them that if the PGA Tour was not in favor of the new league, then he could not be either.  The Saudi officials abruptly left at that point.

175.    Mr. Nicklaus then followed up with a letter to the Saudi officials confirming what he had said at the meeting.  The letter was carefully worded to avoid offending a Company client while remaining firm that he "respectfully must decline" the client's proposal.  He explained that "[i]n many ways, by accepting your offer I would be turning my back on what I created and have championed," which he understandably "cannot" do.

176.    Mr. Nicklaus also provided a copy of the letter to Mr. Monahan, who subsequently read it to the PGA Tour players.

177.    Mr. Nicklaus did not discuss the Saudi offer with Mr. Milstein or anyone else at the Company before saying "no thank you" at the meeting in which the offer was presented.  No one had to "convince" him of anything or otherwise "save[] [him] from himself."  He made the decision to decline the offer on his own and on the spot, based on his unwavering support for the PGA Tour.

178.    The Defendants' statements to the contrary were manufactured falsehoods designed to severely damage Mr. Nicklaus' reputation and legacy *one year after* he declined the Saudi offer.

179.    Those lies were far from an honest mistake, as the Company's then-President and Chief Executive Officer has candidly acknowledged.  When asked about the Company's statements on this topic, Mr. Reese admitted under oath that they were *completely untrue*:

> Q.    Your complaint in this case said essentially, in fact, literally, that you saved Jack Nicklaus from himself.
>
> A.    Yeah, I didn't write that.  I didn't say that.  I was not part of that sentence. … *[Mr. Nicklaus] made the decision.  The entire decision he made…. [H]e didn't include the company in the decision….*

* * *

Q.    You accused him of wanting to do a deal with the Saudis … and you stopped him from doing it.  That's what was in the newspapers.

A.    I wasn't a part of that.  I didn't do that.

\* \* \*

Q.    Why would this be in this complaint, sir?

A.    I don't know.

Q.    But you were the person at the meeting who heard Mr. Nicklaus tell them no.

A.    Right.

Q.    And you testified that you didn't tell him to say no, he did it by himself.

A.    *Correct*.

Q.    So why would you put this in a complaint –

A.    I didn't put it in the complaint.

Q.    Your company did.

A.    Okay.

Q.    Why?

A.    *I don't know.*

Tr. of Hrg., 09/30/22, pp. 80:14 - 81:19, 89:10-15, 122:08 - 123:07 (emphasis added).

180.    Mr. Milstein knows why the false allegations were included in the Complaint, and the answer is that he wanted a national news story that would be certain to grab headlines and tarnish Mr. Nicklaus' reputation in light of the significant controversy which then existed regarding the new Saudi-backed golf league.  He expected that the mere filing of the Complaint would lead to pillorying, which he believed would be protected by a litigation privilege.

181.    To Mr. Milstein's dismay, however, no reporter immediately noticed the Complaint and picked up the story.  The reporters who would typically cover such stories were occupied with the PGA Championship, which was set to commence on May 19, 2022.

182.   Mr. Milstein was anxious for the pillorying of Mr. Nicklaus to begin as soon as possible, as Mr. Nicklaus' home event – the Memorial Tournament – was only two weeks away. He knew that Mr. Nicklaus would be on an international stage there and wanted him to have to spend time defending against the Company's salacious allegations rather than addressing the golfing public on his new initiatives and charitable work.

183.   To ensure that happened, Mr. Milstein enlisted the aid of the Company's longstanding public relations firm, PRCG | Haggerty LLC.  He directed that firm to send copies of the Company's Complaint to newspaper reporters and steer them to the false allegations concerning Mr. Nicklaus and the Saudi golf league, in an effort to ensure that the false statements received significant media attention.

184.   In fact, when Mr. Milstein was deposed in connection with the New York litigation, he not only acknowledged that he had caused the Company's false allegations to be published outside of the litigation, he admitted that the *reason* he did so was to counter Mr. Nicklaus' efforts to compete with the Company for business:

> Q.    [C]an you explain why your company would send these complaints to newspaper reporters?
>
> A.    We would receive inquiries about the – the fact that Jack is going around telling everybody, as – as you wrote in one of your letters, and as Jack wrote, that he's proceeding because he thinks he's not constrained by any of the agreements, and – and obligations he undertook when we invested 145 million dollars in the company.  That's simply not true….

Depo. of H. Milstein, 09/12/22, pp. 186:20 - 187:10.

185.   One of the newspaper reporters who was provided with a copy of the Complaint was renowned golf journalist Alex Miceli, who writes for Sports Illustrated and USA Today, among other publications.  Mr. Miceli promptly wrote an article about the suit, and it was published on Sports Illustrated's main website, www.si.com.  The article reported that Mr. Nicklaus had

allegedly engaged in "wrongful conduct regarding negotiations" relating to the Saudi golf league, and it then went on to quote the following false allegations from the Complaint:

> "Fortunately for Nicklaus Companies – and Mr. Nicklaus – the Company was eventually able to convince Mr. Nicklaus to stop exploring a deal for the endorsement of the Saudi-backed league," reads a portion of the suit. "The Company essentially saved Mr. Nicklaus from himself by extricating him from a controversial project that could have not only tarnished his legacy and reputation, but severely damaged the Nicklaus Companies' name, brands and business."

> "Thanks to the intervention of Nicklaus Companies, the Company was able to minimize fallout from the situation and protect the goodwill and good name of both the Company and Mr. Nicklaus. The potential irreparable harm that Nicklaus Companies faced had Mr. Nicklaus's unauthorized activities not been abandoned has been highlighted by the continued statements made by the PGA Tour and various leading Tour players and the substantial negative news coverage criticizing Phil Mickelson's involvement as a paid endorser of the Saudi-backed golf league. If not for the efforts of Nicklaus Companies, Mr. Nicklaus could have been pilloried in the news media for accepting payment for what could be characterized as betraying the PGA Tour."

Alex Miceli, *Jack Nicklaus is Being Sued by the Nicklaus Companies*, Sports Illustrated, 05/21/22.

186.   The consensus reaction to that article, as exemplified by the following Twitter post, was that "Jack really, really wanted that LIV money!":



187.   Shortly after Mr. Miceli's article was published by Sports Illustrated, similar news stories appeared in other publications with widespread circulation, including USA Today.

188.    In Mr. Milstein's view, "the most damaging article for Jack was the one that appeared in the Columbus Dispatch" about a week before the start of the Memorial Tournament. Mr. Milstein felt the article was particularly damaging because Mr. Nicklaus grew up in Columbus and "is the home town hero" there.  Depo. of H. Milstein, 09/12/22, pp. 180:25 - 181:06.

189.    The referenced article was written by Rob Oller and was simultaneously published in both online and print editions of The Columbus Dispatch and USA Today.  It stated that:

> Jack Nicklaus likes to talk and be talked about.  But not like this.  Not when the Golden Bear is getting tarnished by his words and behind-the-scenes workings.
>
> * * *
>
> [The lawsuit by the Nicklaus Companies] alleges Nicklaus endangered marketing agreements by, among other actions, negotiating with the PIF Saudi Investment Fund that bankrolls the LIV Golf Invitational Series - the same series that has gotten LIV commissioner Greg Norman and LIV supporter Phil Mickelson into hot water.
>
> Nicklaus said in a recent interview with the Firepit Collective website that he chose not to accept a lucrative offer to help administrate LIV Golf.
>
> "I was offered something in excess of $100 million by the Saudis, to do the job probably similar to the one that Greg is doing," Nicklaus said. "I turned it down. Once verbally, once in writing.  I said, 'Guys, I have to stay with the PGA Tour. I helped start the PGA Tour.'"
>
> Nicklaus Companies, LLC, sees it differently, claiming in the lawsuit that *it* convinced Nicklaus to abandon the idea of working with the Saudis.
>
> "Fortunately for Nicklaus Companies - and Mr. Nicklaus - the Company was eventually able to convince Mr. Nicklaus to stop exploring a deal for the endorsement of the Saudi-backed league," the suit reads.  "The Company essentially saved Mr. Nicklaus from himself by extricating him from a controversial project that could have not only tarnished his legacy and reputation, but severely damaged the Nicklaus Companies' name, brands and business."
>
> * * *
>
> [C]ommon sense says Nicklaus should not have come within sniffing distance of LIV Golf, given the Saudis' horrific record on human rights. But the lawsuit suggests that something – Money?  Ego?  Unwokeness? – drove the Bear to brush against a thorn bush he had no business being near.

Rob Oller, *Jack Nicklaus Lawsuit Reveals a Golden Bear in Danger of Becoming Tarnished*, The Columbus Dispatch & USA Today, 05/23/22 (emphasis in original).

190.    Mr. Milstein directed Mr. O'Brien to keep him apprised of all news stories that resulted from the publication of the Company's false allegations outside of the litigation, which Mr. O'Brien did until the stories became voluminous and repetitive.  That only took a few days, as the mean-spirited falsehoods quickly traveled around the world.

191.    Mr. Milstein claims that he "didn't like seeing" the damaging news stories he caused to be published, but in reality he was thrilled by them.  He was enormously grateful for what the Company's public relations firm had been able to accomplish in that regard.

192.    Indeed, Mr. Milstein instructed Mr. O'Brien to *exploit* the damaging news stories he had procured – including "the most damaging article" from the Columbus Dispatch – by sending copies of the articles to Company clients and others in the golf industry.  They used the articles to discredit Mr. Nicklaus in markets where he would be competing with the Company for business.

193.    When Mr. O'Brien shared those news stories with Company clients and others in the golf industry, he typically repeated the false allegation that the Company had to intervene with Mr. Nicklaus in order to save him from himself.  In fact, in some instances, he even asserted that the Company *had to sue* Mr. Nicklaus in order *to stop him* from turning his back on the PGA Tour and aligning himself with the Saudi-backed golf league.

194.    Significantly, Mr. O'Brien also falsely represented to clients and others that Mr. Nicklaus' advanced age had resulted in dementia and he needed to have his car keys taken away.

195.    The Defendants knew that Mr. O'Brien's statements about Mr. Nicklaus' age and health were manifestly untrue.  In fact, Mr. Milstein subsequently acknowledged in testimony that the now 83-year-old Mr. Nicklaus "is more energetic than anybody else even half his age."  Tr. of Hrg., 09/30/22, p. 167:17-18.

196.    Nonetheless, Mr. Milstein authorized Mr. O'Brien to proceed with his assault on Mr. Nicklaus' age and health in furtherance of their strategy to discredit Mr. Nicklaus and hinder his ability to compete with the Company for business once his post-termination covenants lapsed.

197.    As noted above, the Defendants wanted Mr. Nicklaus to work for the Company or not work at all.

198.    It was at Mr. Milstein's behest that Mr. O'Brien engaged in the foregoing conduct, and like Mr. Milstein, he was acting both as an individual and as an agent of the Company.

199.    In fact, when Mr. Milstein was questioned about this, he openly acknowledged that the Company had sent copies of the damaging news stories to its clients and others, republishing the original lies again and again.  He defended the conduct as necessary to counter Mr. Nicklaus' efforts to compete with the Company:

Q.    Do you know why officers of your company are taking the new stories and circulating them among the Nicklaus Companies['] design clients and endorsement clients? …

A.    Yes, I – I do know why.

Q.    [W]hy did you take the news stories generated … by the lawsuit you filed, which includes these salacious allegations [which] you knew would discredit Jack [and] distribut[e] these news stories to third parties? ….

A.    Okay.  So here's – here's what happened.  Jack filed his motion for arbitration in Florida.  Since Florida only had an arbitration clause for the employment agreement, which is the least of the three agreements, and does not include anything to do with the non-compete and other issues in the purchase and sale and non-compete agreements and other agreements.  We – as you know – moved for – for this to be in the jurisdiction and venue provided for in the purchase and sale agreement, as well as that other agreements, namely the New York courts.  And so that's where we are with this now.  It has nothing – and the fact that Jack has gone out, and you have publicaly [sic] stated and he has publicaly [sic] stated that he's going to be designing golf courses on his own, of course, leaves the questions in the minds of our clients and potential clients.  Are you – is the company still doing this?  Does the company have the right to do it?  Does Jack have the right to do it?  Who has the right to do it?

So we have to answer these questions that are harming the business that we're running.  And we do that in a positive way.  We don't do anything needlessly or vengefully or spitefully, vis-à-vis Jack.  Believe it or not, through all this, I've been a friend to Jack, and I've done countless things for him that you could only describe as -- as I've described it.  And I'm not sure why he's pursuing this theory.  And I'm not sure how this will get resolved, but I very much regret that – regret that this – there is a conflict that's – we didn't even have to explain to anybody.

Q.    The question [is] why are you distributing news stories to your [clients]?

A.    To clarify the confusion in the minds of the public … as to what is going on.

* * *

[W]hen you enter the field of litigation, this is the kind of thing that happens, you open up a Pandora's box.  My intention is to protect the Nicklaus Companies, and I always hope I can do that with Jack.  Sometimes I have to do it in a way that creates friction, which I regret; but [it is] what it is ….

Depo. of H. Milstein, 09/12/22, pp. 177:19 - 180:14, 181:10-19.

200.    In truth, however, Mr. Milstein has no regrets about what he, Mr. O'Brien, and the Company did.  They made a conscious decision to spread lies about Mr. Nicklaus both inside and outside of litigation; lies that accused Mr. Nicklaus of wanting to sell out the PGA Tour and having dementia, which plainly constitute defamation *per se*.

201.    Indeed, the Defendants' conduct in publishing and republishing those falsehoods was particularly egregious and malicious in view of the following:

(a)    The Defendants knew that most people are familiar with Mr. Nicklaus and would immediately understand the significance of him allegedly wanting to accept a leadership role in the controversial Saudi-backed golf league now known as LIV Golf;

(b)    While Mr. Nicklaus has refrained from openly criticizing players who have left the PGA Tour to join LIV Golf, believing that they are entitled to make their own decisions, Mr. Nicklaus is in a different position, having helped create the PGA Tour many decades ago and being one of the greatest champions in its history;

(c)     Had Mr. Nicklaus chosen, for a great deal of money, to part with the PGA Tour and take on a leadership role with respect to LIV Golf, it would have been devastating to the PGA Tour and the cities and charitable causes which have long benefitted from the Tour, as it would have provided cover for other prominent figures and supporters of the PGA Tour to do the same;

(d)     The Defendants knew that Mr. Nicklaus had – without hesitation – turned down an enormous amount of money in declining the Saudi proposal, yet they falsely asserted that Mr. Nicklaus was driven by greed to want to become involved with LIV Golf;

(e)     The Defendants knew that false assertion would cause significant damage to Mr. Nicklaus' reputation and hinder his ability to compete with the Company for business;

(f)     In fact, the Defendants believed that falsely describing Mr. Nicklaus as greedy and as someone who needed to be "saved … from himself" would lead others to view Mr. Milstein as a hero who "saved" both Mr. Nicklaus and the PGA Tour, and Mr. Nicklaus as a villain who wanted to betray the PGA Tour;

(g)     In addition, the Defendants also believed that falsely describing Mr. Nicklaus as greedy would help them market Mr. Milstein's other false narratives regarding the May 2007 transaction in which Mr. Nicklaus and his family lost half of the value of the business Mr. Nicklaus built over his long and illustrious career;

(h)     Those other false narratives include representations that the Company acquired exclusive rights to Mr. Nicklaus' name, image, likeness, and other publicity rights from GBI, thereby precluding Mr. Nicklaus from competing with the Company in his own name even after his non-compete restrictions lapsed;

(i)     Mr. Milstein has no intention of ever allowing Mr. Nicklaus to exercise his rights to compete with the Company, and he believes that the false narratives he has spun with respect to LIV Golf and otherwise will help him achieve that strategy.

202.    In short, the malice the Defendants hold toward Mr. Nicklaus and his desire to compete with the Company knows no bounds.

**M.    Defendants' Other False Claims and Their Fraudulent Use of Mr. Nicklaus' Personal Endorsement**

203.    After Jack Nicklaus ended his association with the Company in early May 2022, the Company accelerated its plan for "life after Jack."  The centerpiece of that transition plan was to create a façade that Mr. Nicklaus was still Mr. Milstein's partner, was still intimately involved with the Company, and continued to endorse the Company's businesses and trade partners.

204.    To help create that façade, Mr. Milstein directed that a photo taken over a decade ago with Mr. Nicklaus at his side continue to be prominently displayed on the Company's website, as if there was a continuing relationship between the two:



205.    Likewise, Mr. Milstein also directed that the Company take a famous quote from Mr. Nicklaus about picking the right golf partner and use it to falsely imply that Mr. Nicklaus was still his "partner":



206.    Further, although Mr. Nicklaus resigned his Board office and directorship in early May 2022, the Company continued to prominently identify Mr. Nicklaus as the Co-Chairman of its Board of Directors for many months, in order to create the impression that Mr. Nicklaus was still intimately involved with the Company and its operations.

207.    In addition, Mr. Milstein also directed that a video featuring Mr. Nicklaus be included on 8AM Golf's landing page, in order to create the impression of a relationship between Mr. Nicklaus and the 8AM Golf entities as well:



208.    In fact, the Defendants have not only been misleading the public as to the existence of a continuing relationship between Mr. Nicklaus and the Company, they have been actively telling anyone who will listen that Mr. Nicklaus cannot design golf courses in his own name without the Company's consent in an effort to hinder his ability to compete for business.

209.    To make matters worse, the Defendants are also actively marketing Mr. Nicklaus' personal endorsement to Company and 8AM Golf clients, without his approval.

210.    For example, after Mr. Nicklaus ended his association with the Company last year, the Company began marketing a new category of golf course design product which it refers to as a "Jack Nicklaus Heritage" design.

211.     Historically, the Company has offered four types of golf course design products, which can briefly be described as follows:

(a)     "Jack Nicklaus Signature" designs, which involved the personal services of Mr. Nicklaus and the right to use his name, image, and likeness in marketing the course, in exchange for a fee that typically was about $2.5 million;

(b)     "Jack Nicklaus Legacy" designs, which involved more limited personal services of Mr. Nicklaus along with the personal services of his eldest son, as well as the right to use their names, images, and likenesses in marketing the course, in exchange for a fee that typically was about $1.75 million;

(c)     "Jack Nicklaus II Signature" designs, which involved the personal services of Mr. Nicklaus' eldest son and the right to use his son's name, image, and likeness in marketing the course, in exchange for a fee that typically was about $1 million; and

(d)     "Nicklaus Designs," which did not involve the personal services of either Mr. Nicklaus or his eldest son and permitted the owner of the course only to use the name "Nicklaus Design" in connection with marketing the course, in exchange for a fee that typically was about $750,000.

212.     The Company's new design product – "Jack Nicklaus Heritage" designs – are "Nicklaus Designs" in every way except that the Company is for the first time in its history permitting the owner of a course that *Mr. Nicklaus played no role in designing* to use his name, image, and likeness in marketing the course, *as if he designed and/or endorses it*.

213.     In other words, the Company is actively marketing the "right" to falsely state or imply that Mr. Nicklaus was involved in designing a course he had no involvement in designing and/or endorses a course he has not personally endorsed.

214.     Indeed, the Company refers to the name, image, and likeness rights it is conveying to those who purchase "Jack Nicklaus Heritage" designs as the "Nicklaus Endorsement."

215.     Mr. Milstein was the ultimate decisionmaker who approved the marketing of "Jack Nicklaus Heritage" designs and the use of Mr. Nicklaus' name, image, and likeness with respect to golf courses he played no role in designing and has not personally endorsed.

- 47 -

216.     Mr. O'Brien, in turn, has been actively involved in marketing the new design product and its benefits to potential clients.

217.     In addition, at Mr. Milstein's behest, Mr. O'Brien and the Company have also engaged in the same type of misconduct with respect to other businesses, goods, and services.

218.     For instance, the Company has offered Mr. Nicklaus' personal endorsement in connection with golf balls that Mr. Nicklaus has never personally hit and does not endorse.

219.     The Company also recently agreed to allow EA Sports to use Mr. Nicklaus' name, image, and likeness to promote its new videogame PGA Tour 2023, despite the fact that Mr. Nicklaus had nothing to do with the game and has not endorsed it.

220.     Perhaps most disturbingly, however, the Company is also using a digital twin of Mr. Nicklaus to create the appearance of an ongoing association with the Company and to make endorsements of businesses, goods, and services that the real Mr. Nicklaus does not endorse.

221.     Several years ago, Mr. Milstein, Mr. O'Brien and others at the Company approached Mr. Nicklaus with the idea of using new artificial intelligence technology to create a 38-year-old digital twin of Mr. Nicklaus to interact with golf fans and potentially make endorsements with Mr. Nicklaus' permission.

222.     The Company pitched the opportunity as one that would complement and enhance Mr. Nicklaus' personal services business and be of economic value to his family.  It also assured Mr. Nicklaus that the technology would only be deployed and used with his express consent.

223.     The Company needed Mr. Nicklaus' blessing, as it could not undertake the project without his participation.  It also needs his ongoing consent, as it cannot legally put words into the mouth of Mr. Nicklaus' digital twin that Mr. Nicklaus did not himself write or speak, and it cannot use the digital twin to make endorsements of anything Mr. Nicklaus does not himself endorse.

- 48 -

224.    Mr. Nicklaus participated in the development of his digital twin with the belief that he would have ultimate control over the end-product and its use.

225.    The Defendants, however, had other plans which they did not disclose to Mr. Nicklaus when they were seeking to induce his participation in the digital twin project.  They planned to use Mr. Nicklaus' digital twin to replace Mr. Nicklaus if he ever decided to part ways with the Company and cease providing services to its clients.

226.    Just days after Mr. Nicklaus ended his association with the Company in May 2022, the Company publicly announced the "launch [of] the inaugural Digital Twin of Jack Nicklaus." The press release touted that the Company and its trade partners intended to use the Digital Twin as a "digital brand ambassador" to endorse businesses, goods, and services.

227.    The Company then added the Digital Twin to its website, further implying that Mr. Nicklaus has a continuing role in the business:



228.    Ever since the Company launched "the inaugural Digital Twin of Jack Nicklaus," it has been actively marketing the Digital Twin for use by Company and 8AM Golf clients who wish to take advantage of the Nicklaus "halo."  It plans to deploy the Digital Twin to endorse businesses, goods, and services which the real Mr. Nicklaus does not personally endorse.

229.    In other words, the Company is seeking to dupe consumers into believing that they are supporting Mr. Nicklaus' commercial activities or buying goods and services that he has personally endorsed, when he actually has nothing to do with them.

230.    In fact, the Company recently did exactly that in connection with the creation and marketing of a "Jack Nicklaus NFT" (non-fungible token).  The Company falsely advertised that "Golf legend Jack Nicklaus has partnered with Soul Machines to launch his historic NFT Collection ... [to] immortalize his legendary career on web3 [using] Soul Machines Digital Twin technology":



231.    In reality, Mr. Nicklaus had not partnered with Soul Machines or any other entity to create or otherwise endorse a non-fungible token.  He had no involvement in the project and did not otherwise endorse the end-product.

232.     Indeed, the Defendants are not only using Mr. Nicklaus' Digital Twin to endorse businesses, goods, and services that the real Mr. Nicklaus does not endorse, they have effectively hijacked Mr. Nicklaus' own personal social media accounts and are using them as a platform to further their false claims.

233.     By way of example, two days before Mr. Nicklaus initiated the present action, the Company posted the following message to Mr. Nicklaus' personal social media accounts, suggesting that he is involved in and/or endorses "the world's first Nicklaus Heritage Design" – an 18-hole championship "Nicklaus course" to be located in a development called Jack's Bay on the island of Eleuthera, in The Bahamas:



234.    The Company timed that post to coincide with an announcement by the owner of the development which also expressly suggests that Mr. Nicklaus is involved in and/or endorses "the first Jack Nicklaus Heritage Championship Course" being constructed in Jack's Bay:



235.    While Mr. Nicklaus supported the Company's effort to land Jack's Bay as a client before he ended his association with the Company last year, he most certainly did not authorize the Company or its client to suggest that he is involved in the design of the course or endorses it. He was not consulted on the foregoing posts and did not consent to them being made.

236.     Regrettably, the Defendants have also used Mr. Nicklaus' social media accounts to falsely suggest that he endorses other Nicklaus Design courses which he has not in fact endorsed, and that he continues to endorse certain clients with whom he no longer has a relationship.

237.     For instance, the following post made without Mr. Nicklaus' consent was intended to suggest that Mr. Nicklaus was involved in or otherwise endorses a Nicklaus Design project which he was not involved in and has not endorsed:



238.    Similarly, the following post made without Mr. Nicklaus' consent was intended to suggest that Mr. Nicklaus has a continuing endorsement relationship with a particular client with whom he no longer has a relationship:



239.    The Defendants' conduct as described in this section constitutes a violation of both state and federal law.

**COUNT I**

**DEFAMATION**

**(False Statements Relating to Mr. Nicklaus and the New Saudi Golf League)**

240.   Mr. Nicklaus repeats the allegations contained in paragraphs 1 through 239 as if fully set forth herein.  The specific allegations establishing the Defendants' liability for defamation are set forth in paragraphs 138 through 202.

241.   At Mr. Milstein's direction, the Company's Complaint in the New York litigation included false statements of fact which had no relevance to any of the legal claims asserted there. They were overtly designed to discredit Mr. Nicklaus as both a person and a professional and hinder his ability to compete with the Company for golf course design work and other business going forward.  The false statements of fact relevant the claim for defamation are as follows:

(a)   "In the Spring of 2021, Nicklaus Companies learned, after the fact, that Mr. Nicklaus was involved in scheduling a personal meeting with both the Chairman and the Chief Executive Officer of Golf Saudi …."

(b)   "[T]he purpose of the private meetings was to negotiate an agreement for Mr. Nicklaus to provide his public support and use his considerable influence in professional golf to promote a new golf league backed by Golf Saudi, which would have been a direct rival to the PGA Tour [and] had been publicly opposed by the PGA Tour."

(c)   "Mr. Nicklaus encouraged Golf Saudi to recruit him to endorse their controversial golf league program [to advance] his own personal agenda and financial interests …."

(d)   "Fortunately for Nicklaus Companies – and Mr. Nicklaus – the Company was eventually able to convince Mr. Nicklaus to stop exploring a deal for the endorsement of the Saudi-backed league."

(e)   "The Company essentially saved Mr. Nicklaus from himself by extricating him from a controversial project that could have not only tarnished his legacy and reputation, but severely damaged the Nicklaus Companies' name, brands and business."

(f)   "Thanks to the intervention of Nicklaus Companies, the Company was able to minimize fallout from the situation and protect the goodwill and good name of both the Company and Mr. Nicklaus."

(g)    "If not for the efforts of Nicklaus Companies, Mr. Nicklaus could have been pilloried in the news media for accepting payment for what could be characterized as betraying the PGA Tour."

Complaint ¶¶ 79-80, 86-89.

242.    Mr. Milstein had hoped that by including the false statements in the Complaint, they would be protected by a litigation privilege.  But any claim of privilege was subsequently lost when he arranged for the false statements to be published to third parties *outside* of the litigation, which, by design, led to further publication and re-publication.

243.    At Mr. Milstein's direction, the Company's public relations firm sent copies of the Company's Complaint to news reporters and steered them to the false statements quoted above, in order to ensure that those false statements received significant media attention.

244.    That effort resulted in damaging news stories which featured those false statements and had widespread circulation.

245.    Mr. Milstein and Mr. O'Brien then used the damaging news stories which accepted the false statements as true to discredit Mr. Nicklaus in the markets in which he would be competing with the Company for business.

246.    At Mr. Milstein's direction, Mr. O'Brien exploited the damaging news stories which the Company's public relations firm had procured by sending copies to Company clients and others in the golf industry and passing off the false statements therein as true.

247.    When Mr. O'Brien shared those damaging news stories with Company clients and others in the golf industry, he typically repeated the false allegation that the Company had to intervene with Mr. Nicklaus to save him from himself, and in some instances he even stated that the Company *had to sue* Mr. Nicklaus in order *to stop him* from turning his back on the PGA Tour and aligning himself with the Saudi-backed golf league.  He also falsely stated that Mr. Nicklaus had *dementia* and *needed to have his car keys taken away*.

248.    It was at Mr. Milstein's behest that Mr. O'Brien engaged in the foregoing conduct, and like Mr. Milstein, he was acting both as an individual and as an agent of the Company.

249.    The Defendants had actual knowledge of the falsity of the statements referenced above at the time those statements were made and repeated.   In the alternative, the Defendants acted with a reckless disregard for the veracity of the statements made and repeated.

250.    The Defendants' false statements regarding Mr. Nicklaus and the Saudi golf league were defamatory per se.  On their face, they tended to subject Mr. Nicklaus to hatred, distrust, ridicule, contempt, and disgrace, and injure him in his profession.  Which is why the Defendants published and republished those false statements to national media sources and other third parties.

251.    In the alternative, these false statements are actionable as defamation per quod. They were made and repeated for the malicious purpose of damaging Mr. Nicklaus' reputation as both a person and a professional, and they in fact caused harm to his reputation and his ability to compete with the Company for business.

252.    As Mr. Milstein acknowledged during his deposition, a person of common mind at the time the false statements about Mr. Nicklaus and the Saudi golf league were made knew that "[t]he Saudis … have a number of issues," including the now infamous "Khashoggi incident." The assertion that Mr. Nicklaus wanted to accept a leadership role with the new Saudi golf league was therefore inherently "adverse to … his reputation" and rendered commercial relations with him undesirable.  Depo. of H. Milstein, 09/12/22, pp. 168:07-15, 170:16-23.

253.    In fact, the Defendants not only knew but were overtly counting on the fact that their false statements would cause immediate reputational harm to Mr. Nicklaus that would be impossible to erase from the public consciousness.

254.    In Mr. Milstein's own words: "Phil Mickelson basically lost all of his reputation on this mess with the Saudis … [and] probably will not make the hall of fame in golf now because of that association."  Depo. of H. Milstein, 09/12/22, p. 176:12-21.

255.    The Defendants wrongfully sought to deceive third parties into believing that Mr. Nicklaus wanted to be part of that "mess," and they must now be held accountable therefor.

WHEREFORE, Mr. Nicklaus requests entry of a final judgment against Mr. Milstein, Mr. O'Brien, and the Company, jointly and severally, for compensatory damages, punitive and exemplary damages, interest, costs, and such further relief as the Court deems proper.[1]

### COUNT II
### COMMON LAW UNFAIR COMPETITION
### (False Statements Intended to Impair Competition)

256.    Mr. Nicklaus repeats the allegations contained in paragraphs 1 through 239 as if fully set forth herein.  The specific allegations establishing the Defendants' liability for common law unfair competition are set forth in paragraphs 138 through 239.

257.    Mr. Nicklaus and the Company are competitors with respect to golf course design and share a common pool of potential customers.

258.    Messrs. Milstein and O'Brien, individually and as agents of the Company, knowingly made false statements and engaged in other deceitful conduct which disparaged Mr. Nicklaus' reputation, misrepresented the condition of his health, and misled others into believing that he was unable to engage in the business of golf course design on his own and in his own name.  The false statements and deceitful conduct in question are identified in paragraphs 144, 147-50, 180, 182-89, 192-99, 204-10, 212-13, 217-20, 226-30, and 232-38.

---

[1] Mr. Nicklaus will separately seek leave to amend this Count to assert a request for punitive damages in accordance with Fla. Stat. § 768.72(1).

259.    The Defendants used those false statements and engaged in that deceitful conduct in order to advance the business interests of the Company and 8AM Golf, as well as their own standing in the golf industry, to the detriment of Mr. Nicklaus.

260.    The Defendants' false statements and deceitful conduct have created and continue to create a likelihood of customer confusion as to (a) whether Mr. Nicklaus had wanted to accept a leadership role with the new Saudi-backed golf league and had to be "save[d] … from himself"; (b) whether Mr. Nicklaus is suffering from dementia and needs to have his car keys taken away; (c) whether Mr. Nicklaus continues to be associated with the Company; and (d) whether Mr. Nicklaus may engage in the business of golf course design on his own and in his own name.

261.    The Defendants' false statements and deceitful conduct were intended to hinder and have in fact hindered Mr. Nicklaus' ability to compete with the Company for business.

262.    Mr. Nicklaus has been damaged by the Defendants' actions in an amount to be established at trial.

263.    Mr. Nicklaus is also suffering irreparable injury as a result of Defendants' actions and will continue to suffer such injury unless the Defendants are enjoined from such actions.

WHEREFORE, Mr. Nicklaus requests entry of a final judgment against Mr. Milstein, Mr. O'Brien, and the Company, jointly and severally, for compensatory damages, interest, costs, injunctive relief, and such further relief as the Court deems proper.[2]

---

[2] Mr. Nicklaus will separately seek leave to amend this Count to assert a request for punitive damages in accordance with Fla. Stat. § 768.72(1).

## COUNT III
## VIOLATION OF FLORIDA STATUTES § 540.08
### (False Endorsement)

264.    Mr. Nicklaus repeats the allegations contained in paragraphs 1 through 239 as if fully set forth herein.  The specific allegations establishing the Defendants' liability for violation of Fla. Stat. § 540.08 are set forth in paragraphs 203 through 239.

265.    Messrs. Milstein and O'Brien, individually and as agents of the Company, have caused and are continuing to cause the Company to use Mr. Nicklaus' name, image, and likeness for purposes of trade and other commercial and advertising purposes in ways that Mr. Nicklaus has not consented to either orally or in writing, as required under Fla. Stat. § 540.08(1)(a).

266.    Messrs. Milstein and O'Brien, individually and as agents of the Company, have also caused and are continuing to cause the Company to license the use of Mr. Nicklaus' name, image, and likeness to third parties for use in suggesting his personal endorsement of businesses, goods, and services without his written consent, as required under Fla. Stat. § 540.08(1)(b).

267.    The Defendants' actions in this regard have created the false implication that Mr. Nicklaus has a continuing association with the Company, when in actuality he does not. They have also created the false implication that Mr. Nicklaus personally endorses certain businesses, goods, and services, when in reality he does not.

268.    Mr. Nicklaus has been damaged by the Defendants' actions in an amount to be established at trial.

269.    Mr. Nicklaus is also suffering irreparable injury as a result of Defendants' actions and will continue to suffer such injury unless the Defendants are enjoined from such actions.

270.    WHEREFORE, Mr. Nicklaus requests entry of a final judgment against Mr. Milstein, Mr. O'Brien, and the Company, jointly and severally, for compensatory damages, interest, costs, injunctive relief, and such further relief as the Court deems proper.[3]

**COUNT IV**
**VIOLATION OF THE LANHAM ACT**
**15 U.S.C. § 1125(a)**
**(False Statements Intended to Impair Competition)**

271.    Mr. Nicklaus repeats the allegations contained in paragraphs 1 through 239 as if fully set forth herein.  The specific allegations establishing the Defendants' liability for violation of 15 U.S.C. § 1125(a) are set forth in paragraphs 138 through 239.

272.    Mr. Nicklaus and the Company are competitors with respect to golf course design and share a common pool of potential customers.

273.    Messrs. Milstein and O'Brien, individually and as agents of the Company, knowingly made false statements and engaged in other deceitful conduct which disparaged Mr. Nicklaus' reputation, misrepresented the condition of his health, and misled others into believing that he was unable to engage in the business of golf course design on his own and in his own name.  The false statements and deceitful conduct in question are identified in paragraphs 144, 147-50, 180, 182-89, 192-99, 204-10, 212-13, 217-20, 226-30, and 232-38.

274.    The Defendants' false statements and other deceitful conduct constitute commercial speech.  They were designed to advance the Company's business interests by hindering a competitor's ability to compete for business, and they were widely disseminated to potential customers of such business.

---

[3] Mr. Nicklaus will separately seek leave to amend this Count to assert a request for punitive damages in accordance with Fla. Stat. § 768.72(1).

275.     The Defendants' false statements and deceitful conduct have created and continue to create a likelihood of customer confusion as to (a) whether Mr. Nicklaus had wanted to accept a leadership role with the new Saudi-backed golf league and had to be "save[d] … from himself"; (b) whether Mr. Nicklaus is suffering from dementia and needs to have his car keys taken away; (c) whether Mr. Nicklaus continues to be associated with the Company; and (d) whether Mr. Nicklaus may engage in the business of golf course design on his own and in his own name.

276.     The Defendants' false statements and deceitful conduct have also had a material effect on Mr. Nicklaus' ability to attract potential customers for his golf course design business. The false statements and deceitful conduct were intended to hinder and have in fact hindered Mr. Nicklaus' ability to compete for such business.

277.     The Defendants' false statements and deceitful conduct affected interstate commerce, as Mr. Nicklaus performs golf course design services both across the country and around the world.

278.     Mr. Nicklaus has been damaged by the Defendants' actions in an amount to be established at trial.

279.     Mr. Nicklaus is also suffering irreparable injury as a result of Defendants' actions and will continue to suffer such injury unless the Defendants are enjoined from such actions.

280.     WHEREFORE, Mr. Nicklaus requests entry of a final judgment against Mr. Milstein, Mr. O'Brien, and the Company, jointly and severally, for compensatory damages, interest, attorneys' fees, costs, injunctive relief, and such further relief as the Court deems proper.[4]

---

[4] Mr. Nicklaus will separately seek leave to amend this Count to assert a request for punitive damages in accordance with Fla. Stat. § 768.72(1).

**COUNT V**
**VIOLATION OF THE LANHAM ACT**
**15 U.S.C. § 1125(a)**
**(False Endorsement)**

281.   Mr. Nicklaus repeats the allegations contained in paragraphs 1 through 239 as if fully set forth herein.  The specific allegations establishing the Defendants' liability for violation of 15 U.S.C. § 1125(a) are set forth in paragraphs 203 through 239.

282.   Messrs. Milstein and O'Brien, individually and as agents of the Company, have misleadingly used and continue to misleadingly use Mr. Nicklaus' name, image, and likeness to create a false impression that (a) Mr. Nicklaus continues to be associated with the Company; (b) Mr. Nicklaus is associated with 8AM Golf; and (c) Mr. Nicklaus personally endorses certain businesses, goods, and services.

283.   Stated another way, the Defendants have misleadingly used and continue to misleadingly use Mr. Nicklaus' name, image, and likeness in ways that are likely to cause reasonably prudent consumers in the marketplace to be confused as to whether (a) Mr. Nicklaus continues to be associated with the Company; (b) Mr. Nicklaus is associated with 8AM Golf; and (c) Mr. Nicklaus personally endorses certain businesses, goods, and services.

284.   The Defendants are aware that their misleading use of Mr. Nicklaus' name, image, and likeness has caused and is continuing to cause confusion as to whether (a) Mr. Nicklaus continues to be associated with the Company; (b) Mr. Nicklaus is associated with 8AM Golf; and (c) Mr. Nicklaus personally endorses certain businesses, goods, and services.

285.   The Defendants' misleading use of Mr. Nicklaus' name, image, and likeness as described herein is wrongful and violates 15 U.S.C. § 1125(a).

286.   Mr. Nicklaus has been damaged by the Defendants' actions in an amount to be established at trial.

287.     Mr. Nicklaus is also suffering irreparable injury as a result of Defendants' actions and will continue to suffer such injury unless the Defendants are enjoined from such actions.

288.     WHEREFORE, Mr. Nicklaus requests entry of a final judgment against Mr. Milstein, Mr. O'Brien, and the Company, jointly and severally, for compensatory damages, interest, attorneys' fees, costs, injunctive relief, and such further relief as the Court deems proper.[5]

**<u>DEMAND FOR JURY TRIAL</u>**

Mr. Nicklaus demands a jury trial with respect to all matters so triable under applicable Florida and federal law.

Dated: April 21, 2023                         Respectfully submitted,

**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**

150 West Flagler Street, Suite 2200
Miami, Florida 33131
Phone: (305) 789-3200
Fax: (305) 789-3395

By: */s/ Eugene E. Stearns*
        Eugene E. Stearns
        Fla. Bar No. 0149335
        estearns@stearnsweaver.com
        Matthew Buttrick
        Fla. Bar No. 0176028
        mbuttrick@stearnsweaver.com
        Albert D. Lichy
        Fla. Bar No. 94272
        alichy@stearnsweaver.com
        Cecilia D. Simmons
        Fla. Bar. No. 469726
        csimmons@stearnsweaver.com
        Adrienne Love
        Fla. Bar. No 21835
        alove@stearnsweaver.com

*Attorneys for Plaintiff Jack W. Nicklaus*

---

[5] Mr. Nicklaus will separately seek leave to amend this Count to assert a request for punitive damages in accordance with Fla. Stat. § 768.72(1).

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

JACK W. NICKLAUS,

     Plaintiff,

CASE NO. _____

v.

HOWARD P. MILSTEIN,
ANDREW W. O'BRIEN, and
NICKLAUS COMPANIES, LLC,

     Defendants,

## CIVIL ACTION SUMMONS

TO:    **Howard P. Milstein**
       **6 East 43rd Street, Third Floor**
       **New York, NY 10017**

### IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days* after this Summons is served on you to file a written response to the attached Complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

Palm Beach County Courthouse
Clerk of Courts
205 North Dixie Highway
West Palm Beach, FL 33401

you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff's Attorney" named below:

Eugene E. Sterns, Esq. (Florida Bar No. 0149335)
Matthew Buttrick, Esq. (Florida Bar No. 0176028)
Albert D. Lichy, Esq. (Florida Bar No. 94272)
Cecilia D. Simmons, Esq. (Florida Bar No. 469726)
Adrienne Love, Esq. (Florida Bar No. 21835)
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
150 West Flagler Street, Suite 2200
Miami, Florida 33130
(305) 789-3200

THE STATE OF FLORIDA

TO EACH SHERIFF OF THE STATE:  You are commanded to serve this Summons along with a copy of the Complaint in this lawsuit and the Court's Standing Order for Case Management on the above-named Defendant.

DATED ON _____Apr 21 2023_____, 2023.

JOSEPH ABRUZZO
CLERK OF THE CIRCUIT COURT

By: _____
As Deputy Clerk

Raegan Lee

*Except when suit is brought pursuant to section 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to be inserted as to it is 40 days. When suit is brought pursuant to section 768.28, Florida Statutes, the time to be inserted is 30 days.

2

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito y presentarla ante este tribunal. Una llamada telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas en dicho caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado immediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiffs' Attorney."  (Demandante or Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous.  Vous avez 20 jours consecutifs a partir de la date de l'assignation de cet citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal.  Un simple coup de telephone est insuffisant pour vouse proteger; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et do nom des parties nommees ici, si vous souhaitez que le Tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur de Tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiffs' Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

3

This notice is provided pursuant to Administrative Order No. 2.207-6/22

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

IN RE: STANDING ORDER FOR
CASE MANAGEMENT FOR SUBMISSION
OF AGREED CASE MANAGEMENT PLAN FOR
CASES FILED ON OR AFTER APRIL 30, 2021

_____/

### STANDING ORDER FOR CASE MANAGEMENT AND SUBMISSION OF AGREED CASE MANAGEMENT PLAN IN CIVIL CASES IN THE FIFTEENTH JUDICIAL CIRCUIT FILED ON OR AFTER APRIL 30, 2021 (DCMSO)

Pursuant to Florida Rule of Civil Procedure 1.200(a), Florida Rule of General Practice and Judicial Administration 2.545, and Administrative Order 3.107 entered by the Chief Judge of this Circuit, the parties are informed of the following information and procedures applicable to civil lawsuits filed in the Circuit Court on or after April 30, 2021:

1. **SERVICE OF THIS ORDER.** The Plaintiff is directed to serve a copy of this Order with each Summons issued in this case. One copy of this Order is to be filed with the Clerk of the Circuit Court with proof of service.

2. **CIVIL CASE MANAGEMENT SYSTEM.** The Supreme Court of Florida has established guidelines for the prompt processing and resolution of civil cases. This Court has adopted a case management system to help meet those guidelines. In contested cases, the parties are required to participate in the case management system. The case management system requires early consultation and cooperation among the parties for the preparation and submission of an Agreed Case Management Plan and early involvement by the Court. The Agreed Case Management Plan requires the parties to identify a case track, confer in good faith and attempt to narrow the matters in controversy, identify the issues that require direct involvement by the Court, and establish a schedule for addressing those issues.[1] The Agreed Case Management Plan may be accessed at the Court's website at: https://15thcircuit.com/civil-differentiated-forms-and-orders.

Unless all of the Defendants have been served and have been defaulted or dropped, an Agreed Case Management Plan must be submitted to the assigned divisional queue via the Court's online scheduling system (OLS) as an attachment, in PDF format, to a proposed Order Accepting Agreed Case Management Plan on or before 130 days from the date of filing of the initial complaint. If the parties are unable to agree on an Agreed Case Management Plan by the applicable deadline, a

---

[1] Case Track options include Expedited, Streamlined, General, or Complex. Case Tracks have been established in order to comply with the case disposition standards set forth in Florida Rule of General Practice and Judicial Administration 2.250(a)(1)(B).

case management conference will be scheduled by the Court or the Court will review and issue an Order Implementing Case Management Plan without agreement of the Parties. No matters that arise as a result of this standing order, including lack of agreement, will be set on the Court's Uniform Motion Calendar and will, instead, be settled by the Court either at the case management conference or via an Order Implementing Case Management Plan without agreement of the parties. If a case management conference is scheduled, attendance by trial counsel and those parties who are not represented by counsel is mandatory.

If all Defendants are served and defaulted or dropped, the Plaintiff will file the appropriate documentation to pursue a Default Final Judgment within 130 days of the filing of the complaint and Final Judgment is to be entered or set for hearing within 150 days of the filing of the complaint.

      3. **MEDIATION/ALTERNATIVE DISPUTE RESOLUTION (ADR)**. ADR provides parties with an out-of-court alternative to settling disagreements. Mediation is a type of ADR wherein an independent third party attempts to arrange a settlement at a conference between the parties. The Court requires the parties to participate in Mediation prior to trial unless the parties agree to another form of ADR.

      **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, on this 26 day of April, 2021.

                                **Administrative Circuit Judge**

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

JACK W. NICKLAUS,

      Plaintiff,

v.

HOWARD P. MILSTEIN,
ANDREW W. O'BRIEN, and
NICKLAUS COMPANIES, LLC,

      Defendants,

CASE NO. _____

## CIVIL ACTION SUMMONS

TO:    **Andrew W. O'Brien**
       **3801 PGA Boulevard, Suite 565**
       **Palm Beach Gardens, FL 33410**

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days* after this Summons is served on you to file a written response to the attached Complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

Palm Beach County Courthouse
Clerk of Courts
205 North Dixie Highway
West Palm Beach, FL 33401

you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff's Attorney" named below:

Eugene E. Sterns, Esq. (Florida Bar No. 0149335)
Matthew Buttrick, Esq. (Florida Bar No. 0176028)
Albert D. Lichy, Esq. (Florida Bar No. 94272)
Cecilia D. Simmons, Esq. (Florida Bar No. 469726)
Adrienne Love, Esq. (Florida Bar No. 21835)
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
150 West Flagler Street, Suite 2200
Miami, Florida 33130
(305) 789-3200

THE STATE OF FLORIDA

TO EACH SHERIFF OF THE STATE:  You are commanded to serve this Summons along with a copy of the Complaint in this lawsuit and the Court's Standing Order for Case Management on the above-named Defendant.

DATED ON _____Apr 21 2023_____, 2023.

JOSEPH ABRUZZO
CLERK OF THE CIRCUIT COURT

By _____

As Deputy Clerk

Raegan Lee

*Except when suit is brought pursuant to section 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to be inserted as to it is 40 days. When suit is brought pursuant to section 768.28, Florida Statutes, the time to be inserted is 30 days.

2

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito y presentarla ante este tribunal. Una llamada telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas en dicho caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado immediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiffs' Attorney."  (Demandante or Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous.  Vous avez 20 jours consecutifs a partir de la date de l'assignation de cet citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal.  Un simple coup de telephone est insuffisant pour vouse proteger; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et do nom des parties nommees ici, si vous souhaitez que le Tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur de Tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiffs' Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

3

This notice is provided pursuant to Administrative Order No. 2.207-6/22

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon moun ki enfim ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

4

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

IN RE: STANDING ORDER FOR
CASE MANAGEMENT FOR SUBMISSION
OF AGREED CASE MANAGEMENT PLAN FOR
CASES FILED ON OR AFTER APRIL 30, 2021

_____ /

**STANDING ORDER FOR CASE MANAGEMENT AND SUBMISSION OF AGREED
CASE MANAGEMENT PLAN IN CIVIL CASES
IN THE FIFTEENTH JUDICIAL CIRCUIT FILED ON OR AFTER APRIL 30, 2021
(DCMSO)**

Pursuant to Florida Rule of Civil Procedure 1.200(a), Florida Rule of General Practice and Judicial Administration 2.545, and Administrative Order 3.107 entered by the Chief Judge of this Circuit, the parties are informed of the following information and procedures applicable to civil lawsuits filed in the Circuit Court on or after April 30, 2021:

1. **SERVICE OF THIS ORDER.** The Plaintiff is directed to serve a copy of this Order with each Summons issued in this case. One copy of this Order is to be filed with the Clerk of the Circuit Court with proof of service.

2. **CIVIL CASE MANAGEMENT SYSTEM.** The Supreme Court of Florida has established guidelines for the prompt processing and resolution of civil cases. This Court has adopted a case management system to help meet those guidelines. In contested cases, the parties are required to participate in the case management system. The case management system requires early consultation and cooperation among the parties for the preparation and submission of an Agreed Case Management Plan and early involvement by the Court. The Agreed Case Management Plan requires the parties to identify a case track, confer in good faith and attempt to narrow the matters in controversy, identify the issues that require direct involvement by the Court, and establish a schedule for addressing those issues.[1] The Agreed Case Management Plan may be accessed at the Court's website at: https://15thcircuit.com/civil-differentiated-forms-and-orders.

Unless all of the Defendants have been served and have been defaulted or dropped, an Agreed Case Management Plan must be submitted to the assigned divisional queue via the Court's online scheduling system (OLS) as an attachment, in PDF format, to a proposed Order Accepting Agreed Case Management Plan on or before 130 days from the date of filing of the initial complaint. If the parties are unable to agree on an Agreed Case Management Plan by the applicable deadline, a

---

[1] Case Track options include Expedited, Streamlined, General, or Complex. Case Tracks have been established in order to comply with the case disposition standards set forth in Florida Rule of General Practice and Judicial Administration 2.250(a)(1)(B).

case management conference will be scheduled by the Court or the Court will review and issue an Order Implementing Case Management Plan without agreement of the Parties.  No matters that arise as a result of this standing order, including lack of agreement, will be set on the Court's Uniform Motion Calendar and will, instead, be settled by the Court either at the case management conference or via an Order Implementing Case Management Plan without agreement of the parties. If a case management conference is scheduled, attendance by trial counsel and those parties who are not represented by counsel is mandatory.

If all Defendants are served and defaulted or dropped, the Plaintiff will file the appropriate documentation to pursue a Default Final Judgment within 130 days of the filing of the complaint and Final Judgment is to be entered or set for hearing within 150 days of the filing of the complaint.

       3. **MEDIATION/ALTERNATIVE DISPUTE RESOLUTION (ADR)**.  ADR provides parties with an out-of-court alternative to settling disagreements. Mediation is a type of ADR wherein an independent third party attempts to arrange a settlement at a conference between the parties. The Court requires the parties to participate in Mediation prior to trial unless the parties agree to another form of ADR.

       **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, on this 26 day of April, 2021.

_____
**Administrative Circuit Judge**

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

JACK W. NICKLAUS,                                    CASE NO. _____

      Plaintiff,

v.

HOWARD P. MILSTEIN,
ANDREW W. O'BRIEN, and
NICKLAUS COMPANIES, LLC,

      Defendants,

## CIVIL ACTION SUMMONS

TO:    **Nicklaus Companies, LLC**
       **3801 PGA Boulevard, Suite 565**
       **Palm Beach Gardens, FL 33410**

## IMPORTANT

A lawsuit has been filed against you.  You have 20 calendar days\* after this Summons is served on you to file a written response to the attached Complaint with the clerk of this court.  A phone call will not protect you.  Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court.  There are other legal requirements.  You may want to call an attorney right away.  If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

Palm Beach County Courthouse
Clerk of Courts
205 North Dixie Highway
West Palm Beach, FL 33401

you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff's Attorney" named below:

Eugene E. Sterns, Esq. (Florida Bar No. 0149335)
Matthew Buttrick, Esq. (Florida Bar No. 0176028)
Albert D. Lichy, Esq. (Florida Bar No. 94272)
Cecilia D. Simmons, Esq. (Florida Bar No. 469726)
Adrienne Love, Esq. (Florida Bar No. 21835)
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
150 West Flagler Street, Suite 2200
Miami, Florida 33130
(305) 789-3200

THE STATE OF FLORIDA

TO EACH SHERIFF OF THE STATE:  You are commanded to serve this Summons along with a copy of the Complaint in this lawsuit and the Court's Standing Order for Case Management on the above-named Defendant.

DATED ON _____ Apr 21 2023 _____, 2023.

JOSEPH ABRUZZO
CLERK OF THE CIRCUIT COURT

(SEAL)

By: _____

As Deputy Clerk

Raegan Lee

*Except when suit is brought pursuant to section 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to be inserted as to it is 40 days. When suit is brought pursuant to section 768.28, Florida Statutes, the time to be inserted is 30 days.

2

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito y presentarla ante este tribunal. Una llamada telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas en dicho caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado immediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiffs' Attorney."  (Demandante or Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous.  Vous avez 20 jours consecutifs a partir de la date de l'assignation de cet citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal.  Un simple coup de telephone est insuffisant pour vouse proteger; vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et do nom des parties nommees ici, si vous souhaitez que le Tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur de Tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiffs' Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

3

This notice is provided pursuant to Administrative Order No. 2.207-6/22

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una persona minusválida que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon moun ki enfm ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

4

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

IN RE: STANDING ORDER FOR
CASE MANAGEMENT FOR SUBMISSION
OF AGREED CASE MANAGEMENT PLAN FOR
CASES FILED ON OR AFTER APRIL 30, 2021

_____  _____/

**STANDING ORDER FOR CASE MANAGEMENT AND SUBMISSION OF AGREED**
**CASE MANAGEMENT PLAN IN CIVIL CASES**
**IN THE FIFTEENTH JUDICIAL CIRCUIT FILED ON OR AFTER APRIL 30, 2021**
**(DCMSO)**

Pursuant to Florida Rule of Civil Procedure 1.200(a), Florida Rule of General Practice and Judicial Administration 2.545, and Administrative Order 3.107 entered by the Chief Judge of this Circuit, the parties are informed of the following information and procedures applicable to civil lawsuits filed in the Circuit Court on or after April 30, 2021:

1. **SERVICE OF THIS ORDER.** The Plaintiff is directed to serve a copy of this Order with each Summons issued in this case. One copy of this Order is to be filed with the Clerk of the Circuit Court with proof of service.

2. **CIVIL CASE MANAGEMENT SYSTEM.** The Supreme Court of Florida has established guidelines for the prompt processing and resolution of civil cases. This Court has adopted a case management system to help meet those guidelines. In contested cases, the parties are required to participate in the case management system. The case management system requires early consultation and cooperation among the parties for the preparation and submission of an Agreed Case Management Plan and early involvement by the Court. The Agreed Case Management Plan requires the parties to identify a case track, confer in good faith and attempt to narrow the matters in controversy, identify the issues that require direct involvement by the Court, and establish a schedule for addressing those issues.[1] The Agreed Case Management Plan may be accessed at the Court's website at: https://15thcircuit.com/civil-differentiated-forms-and-orders.

Unless all of the Defendants have been served and have been defaulted or dropped, an Agreed Case Management Plan must be submitted to the assigned divisional queue via the Court's online scheduling system (OLS) as an attachment, in PDF format, to a proposed Order Accepting Agreed Case Management Plan on or before 130 days from the date of filing of the initial complaint. If the parties are unable to agree on an Agreed Case Management Plan by the applicable deadline, a

---

[1] Case Track options include Expedited, Streamlined, General, or Complex. Case Tracks have been established in order to comply with the case disposition standards set forth in Florida Rule of General Practice and Judicial Administration 2.250(a)(1)(B).

case management conference will be scheduled by the Court or the Court will review and issue an Order Implementing Case Management Plan without agreement of the Parties. No matters that arise as a result of this standing order, including lack of agreement, will be set on the Court's Uniform Motion Calendar and will, instead, be settled by the Court either at the case management conference or via an Order Implementing Case Management Plan without agreement of the parties. If a case management conference is scheduled, attendance by trial counsel and those parties who are not represented by counsel is mandatory.

If all Defendants are served and defaulted or dropped, the Plaintiff will file the appropriate documentation to pursue a Default Final Judgment within 130 days of the filing of the complaint and Final Judgment is to be entered or set for hearing within 150 days of the filing of the complaint.

      3. **MEDIATION/ALTERNATIVE DISPUTE RESOLUTION (ADR)**. ADR provides parties with an out-of-court alternative to settling disagreements. Mediation is a type of ADR wherein an independent third party attempts to arrange a settlement at a conference between the parties. The Court requires the parties to participate in Mediation prior to trial unless the parties agree to another form of ADR.

      **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, on this 26 day of April, 2021.

_____

**Administrative Circuit Judge**

Filing # 171878464 E-Filed 04/26/2023 04:19:42 PM

## RETURN OF SERVICE

**State of Florida**                 **County of Palm Beach**                  **Circuit Court**

Case Number: 502023CA009653XXXXMB DIV: AH

Plaintiff,:
**JACK W. NICKLAUS,**

vs.

Defendant,:
**HOWARD P. MILSTEIN, ANDREW W. O'BRIEN, and NICKLAUS COMPANIES, LLC,**

For:
Eugene Stearns
Sterns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
150 West Flagler Street
Suite 2200
Miami, FL 33130

Received by On Demand Process Service, LLC on the 21st day of April, 2023 at 12:31 pm to be served on **Nicklaus Companies, LLC c/o Nason, Yeager, Gerson, Harris & Fumero, P.A, RA, 3001 PGA Boulevard, Suite 305, Palm Beach Gardens, FL 33410**.

I, Nixon Fleurimond, do hereby affirm that on the **21st day of April, 2023** at **2:30 pm, I:**

served a **CORPORATION** by delivering a true copy of the **Summons (20 Day), Standing Order for Case Management, Civil Cover Sheet and Complaint** with the date and hour of service endorsed thereon by me, to: **Linda Cone c/o Nason, Yeager, Gerson, Harris & Fumero, P.A, RA** as **Legal Assistant** for **Nicklaus Companies, LLC**, at the address of: **3001 PGA Boulevard, Suite 305, Palm Beach Gardens, FL 33410**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 50, Sex: F, Race/Skin Color: White, Height: 5'4", Weight: 180, Hair: Salt & Pepper, Glasses: N

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true. I am over the age of eighteen, have no interest in the above action and am a Certified Process Server in good standing in the circuit in which service was effected in accordance with State Statutes.



**/ s / Nixon Fleurimond**

**Nixon Fleurimond**
CPS #1316

**On Demand Process Service, LLC**
P.O. Box 440565
**Miami, FL 33144**
**(305) 305-9872**

Our Job Serial Number: WPS-2023007118

Copyright © 1992-2023 DreamBuilt Software, Inc. - Process Server's Toolbox V8.2n



IN AND FOR PALM BEACH COUNTY, FLORIDA
ATTORNEY: HOLWELL SHUSTER & GOLDBERG LLP
ADDRESS: 425 LEXINGTON AVENUE, 14TH FLOOR NEW YORK, NY 10017

CASE NUMBER: 502023CA009653XXXXMB

JACK W. NICKLAUS,

Date Filed: 04/21/2023

Plaintiff    Job #: 1471620
Court Date:  Time:

vs
HOWARD P. MILSTEIN, et al.,

Defendant

**AFFIDAVIT OF NON SERVICE**

STATE OF NEW YORK, COUNTY OF NASSAU, SS.:

Baldeo C. Drepaul, being duly sworn, deposes and says: that deponent is not a party to this action, is over 18 years of age and resides in the State of New York.

That on **04/21/2023** at **2:07 PM.**, at 6 EAST 43RD STREET, THIRD FLOOR, NEW YORK, NY 10017
Deponent attempted to serve the within **Summons in a Civil Action, Complaint and Civil Cover Sheet**
On **HOWARD P. MILSTEIN**

That diligent effort was made by deponent to serve the within document(s) on the defendant(s)/respondent therein named without success for the reasons indicated below:

I attempted service on 04/21/23 @ 2:07 p.m. As per the building security, he called up to the Subject's office and I was advised that he is not available and that the legal department team is closed. I was advised to try back on April 25, 2023.

Baldeo C. Drepaul
DCA License#   2093579

Sworn to before me on 04/21/2023

LATCHME DEVI DREPAUL
Notary Public, State of New York
Registration No. 01DR6332029
Qualified in Queens County
Certificate filed in New York County
Commission Expires 10/26/2023



COURT SUPPORT, INC., 265 POST AVE #150, WESTBURY, NY 11590 LICENSE #1382542

IN AND FOR PALM BEACH COUNTY, FLORIDA

**Attorney:** Holwell Shuster & Goldberg LLP
**Address:** 425 Lexington Avenue, 14th Floor New York, NY 10017

| | |
|---|---|
| JACK W. NICKLAUS, | **Case Number:** 502023CA009653XXXXMB |
| | **Client's File No.:** |
| *vs* *Plaintiff* | **Court Date:** |
| HOWARD P. MILSTEIN, et al., | **Date Filed:** 04/21/2023 |
| *Defendant* | |

STATE OF NEW YORK, COUNTY OF NASSAU, SS.:

**AFFIDAVIT OF SERVICE**

**Baldeo C. Drepaul,** being sworn says:

Deponent is not a party herein; is over the age of 18 years and resides in the State of New York.

On **4/21/2023**, at **3:44 PM** at: **888 PARK AVE., LOBBY, NEW YORK, NY 10075** Deponent served the within **Summons in a Civil Action, Complaint and Civil Cover Sheet**

On: **HOWARD P. MILSTEIN, therein named.**

☒ **#1 SUITABLE AGE PERSON**
By delivering thereat a true copy of each to Luis Rodriguez (Doorman) a person of suitable age and discretion who stated that he/she is authorized to accept service. Said premises is recipient's :[] actual place of business / employment [X] dwelling house (usual place of abode) within the state.

☒ **#2 DESCRIPTION**
| | | | |
|---|---|---|---|
| **Sex:** Male | **Color of skin:** Hispanic | **Color of hair:** Black | **Glasses:** No |
| **Age:** 36-50 | **Height:** 5ft 9inch - 6ft 0inch | **Weight:** 161-200 Lbs | **Other Features:** |

☒ **#3 MILITARY SERVICE**
I asked the person spoken to whether defendant was in active military service of the United States or the State of New York in any capacity whatsoever and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated.

☐ **#4 WITNESS FEES**
Subpoena Fee Tendered in the amount of $

☒ **#5 OTHER**
I arrived at the Subject's location and Mr. Rodriguez, as doorman, confirmed that the Subject is a tenant in the building. I was advised entry denied into the building and advised that is the building procedures. I was advised he is authorized to accept service on his behalf.

☒ **#6 MAILING**
**Baldeo C. Drepaul** being duly sworn, deponent completed service by depositing a copy of the said documents in a postpaid properly addressed envelope, bearing the words "Personal and Confidential" by First Class mail on: **04/24/2023** to **HOWARD P. MILSTEIN** at 888 PARK AVE., APT 8B , NEW YORK, NY 10075 in an official depository of the United States Postal Service in the State of New York. The envelope did not indicate on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served.

:

Sworn to before me on 04/24/2023

LATCHME DEVI DREPAUL
Notary Public, State of New York
Registration No. 01DR6332029
Qualified in Queens County
Certificate filed in New York County
Commission Expires 10/26/2023

Baldeo C. Drepaul
DCA License # 2093579

*COURT SUPPORT, INC.*, 265 POST AVE #150, WESTBURY, NY 11590 LICENSE #1382542

NOT A CERTIFIED COPY

## <u>RETURN OF SERVICE</u>

| | | |
|---|---|---|
| **State of Florida** | **County of Palm Beach** | **Circuit Court** |

Case Number: 502023CA009653XXXXMB DIV: AH

Plaintiff,:
**JACK W. NICKLAUS**,

vs.

Defendant,:
**HOWARD P. MILSTEIN, ANDREW W. O'BRIEN, and NICKLAUS COMPANIES, LLC**,

For:
Eugene Stearns
Sterns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
150 West Flagler Street
Suite 2200
Miami, FL 33130

Received by On Demand Process Service, LLC on the 21st day of April, 2023 at 12:31 pm to be served on **Andrew W. O'Brien, 3801 PGA Boulevard, Suite 565, Palm Beach Gardens, FL 33410**

I, Nixon Fleurimond, do hereby affirm that on the **21st day of April, 2023** at **2:40 pm, I:**

**INDIVIDUALLY/PERSONALLY** served by delivering a true copy of the **Summons (20 Day), Standing Order for Case Management, Civil Cover Sheet and Complaint** with the date and hour of service endorsed thereon by me, to: **Andrew W. O'Brien** at the address of: **3801 PGA Boulevard, Suite 565, Palm Beach Gardens, FL 33410**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 70, Sex: M, Race/Skin Color: White, Height: 6'4", Weight: 220, Hair: Dark Brown, Glasses: Y

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true. I am over the age of eighteen, have no interest in the above action and am a Certified Process Server in good standing in the circuit in which service was effected in accordance with State Statutes.



**/s/ Nixon Fleurimond**

**Nixon Fleurimond**
CPS #1316

**On Demand Process Service, LLC**
P.O. Box 440565
**Miami, FL 33144**
**(305) 305-9872**

Our Job Serial Number: WPS-2023007117

Copyright © 1992-2023 DreamBuilt Software, Inc. - Process Server's Toolbox V8.2n



# JOSEPH ABRUZZO
### CLERK OF THE CIRCUIT COURT & COMPTROLLER
### PALM BEACH COUNTY

**CASE NUMBER: 50-2023-CA-009653-XXXX-MB**
**CASE STYLE: NICKLAUS, JACK W V MILSTEIN, HOWARD P**

| Search Criteria | Search Results | Case Info | Party Names | Dockets & Documents | Case Fees | Court Events |
|---|---|---|---|---|---|---|

View documents and order certified copies*. See our eCaseView FAQ for step-by-step guidance and information about what documents are available online.

*The Social Security office does not accept electronic certified documents. Any certified copy needed for a name change or benefits with the Social Security office will need to be obtained by mail or in person from one of our office locations.

**Document Icons**

Document available. Click icon to view.

Add a certified copy of the document to your shopping cart.

Document is Viewable on Request (VOR). Click to request.

VOR document is being reviewed. Click to be notified when available.

0

Public = | VOR = | In Process = | Page Size: 25

| | Docket Number | Effective Date | Description | Notes |
|---|---|---|---|---|
| | 1 | 04/21/2023 | DIVISION ASSIGNMENT | AH: Circuit Civil Central - AH (Civil) |
| | 2 | 04/21/2023 | CIVIL COVER SHEET | |
| | 3 | 04/21/2023 | COMPLAINT | F/B PLT |
| | 4 | 04/21/2023 | SUMMONS ISSUED | estearns@stearnsweaver.com;jaybar@stearnsweaver.com ISSUED TO HOWARD P MILSTEIN EFILED |
| | 5 | 04/21/2023 | SUMMONS ISSUED | ESTEARNS@STEARNSWEAVER.COM;JAYBAR@STEARNSWEAVER.COM ISSUED TO ANDREW W OBRIEN EFILED |
| | 6 | 04/21/2023 | SUMMONS ISSUED | estearns@stearnsweaver.com;jaybar@stearnsweaver.com ISSUED TO NICKLAUS COMPANIES LLC EFILED |
| | 7 | 04/21/2023 | PAID $431.00 ON RECEIPT 4869430 | $431.00 4869430 Fully Paid |
| | 8 | 04/26/2023 | SERVICE RETURNED (NUMBERED) | RETURN OF SERVICE SERVED NICKLAUS COMPANIES LLC - 04/21/2023 |
| | 9 | 04/26/2023 | SERVICE RETURN- NOT SERVED | AFFIDAVIT OF NON SERVICE HOWARD P. MILSTEIN |
| | 10 | 04/26/2023 | SERVICE RETURNED (NUMBERED) | SERVED HOWARD P MILSTEIN - 04/21/2023 |

| | | 11 | 04/26/2023 | SERVICE RETURNED (NUMBERED) | RETURN OF SERVICE SERVED ANDREW W. O'BRIEN - 04/21/2023 |

517<5790b61-fb49-483a-94c3-bf5044d8dc1c