**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 23-CV-80764-RLR**

JACK W. NICKLAUS,

        Plaintiff,

v.

HOWARD P. MILSTEIN,
ANDREW W. O'BRIEN, and
NICKLAUS COMPANIES, LLC,

        Defendants.

_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO STAY PROCEEDINGS,
<u>OR, IN THE ALTERNATIVE, TO DISIMSS THE COMPLAINT</u>**

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Eugene E. Stearns (Fla. Bar No. 0149335)
Matthew Buttrick (Fla. Bar No. 0176028)
Albert D. Lichy (Fla. Bar No. 94272)
Cecilia D. Simmons (Fla. Bar. No. 469726)
Adrienne Love (Fla. Bar. No 21835)
150 West Flagler Street | Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

*Attorneys for Plaintiff Jack W. Nicklaus*

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT .........................................................................................................................5

I.  A STAY PENDING THE RESOLUTION OF THE NEW YORK ACTION
    IS UNWARRANTED AND WOULD BE INAPPROPRIATE ..........................................5

    A.  The New York Action is Not a Truly Parallel Proceeding .....................................5

    B.  Even if the New York Action Were a Truly Parallel Proceeding,
        the *Colorado River* Factors Would Not Merit Abstention Here .............................6

        (1)  The New York Action is Not an Action in Rem,
             and Neither is This One ...............................................................................7

        (2)  The Evidence and Witnesses Are Predominantly
             in Palm Beach County .................................................................................7

        (3)  There is No Potential for Piecemeal Litigation That Would Be
             Abnormally Excessive or Deleterious .........................................................8

        (4)  The New York Action Has Not Proceeded Further in Any Way That
             Warrants Abstention ...................................................................................9

        (5)  The Claims in This Case Are Governed by Florida and Federal Law .........9

        (6)  The Defendants Acknowledge That Both Fora Are Adequate ....................9

        (7)  This Action is Not Vexatious or Reactive .................................................10

II. THE LLC AGREEMENT'S FORUM SELECTION CLAUSE IS INAPPLICABLE
    AND A DISMISSAL BASED ON IT WOULD CLEARLY BE ERROR .....................11

III. EACH OF MR. NICKLAUS' FIVE COUNTS STATES A CLAIM ON WHICH
     RELIEF CAN BE GRANTED ..................................................................................14

    A.  Counts I and II Are Not Precluded by Florida's Litigation Privilege
        or Any Other Privilege...........................................................................................14

    B.  Count I More Than Adequately Alleges the Elements of Defamation *Per Se*
        and Defamation *Per Quod* ....................................................................................20

C.      Counts II Through V Are Not Dependent on Mr. Nicklaus' Ownership of
        Intellectual Property Rights or Otherwise Subject to Dismissal...........................22

        1.      Counts II and IV State Viable Claims Based on False Statements
                Intended to Impair Competition.................................................................23

        2.      Counts III and V State Viable Claims for False Endorsement .................24

CONCLUSION..........................................................................................................................27

# TABLE OF AUTHORITIES

Statutes / Rules

15 U.S.C. §§ 1051 *et seq.*................................................................................2

15 U.S.C. § 1125 ..........................................................4, 5, 6, 8, 11, 24, 25, 26, 27

16 CFR § 255.1 ...................................................................................4, 25

28 U.S.C. § 1404 .............................................................................4, 11, 14

Fed. R. Civ. P. 12(b)(6) ......................................................................4, 14

Fla. Stat. § 540.08 ..........................................2, 4, 5, 6, 8, 11, 24, 25, 27

Cases

*ABL-USA Enters. Inc. v. Hawk Aviation Ltd.*,
    15 F. Supp. 2d 1297 (S.D. Fla. 1998) ...............................................9

*Acosta v. James A. Gustino, P.A.*,
    478 F. App'x 620 (11th Cir. 2012) ....................................................6

*Aflalo v. Weiner*,
    2018 WL 3235529 (S.D. Fla. July 2, 2018)......................................20

*Am. Mfrs. Mut. Ins. Co. v. Edward D. Stone, Jr. & Assoc.*,
    743 F.2d 1519 (11th Cir. 1984) .........................................................6

*Ambrosia Coal & Const. Co. v. Pagés Morales*,
    368 F.3d 1320 (11th Cir. 2004) ...........................................5, 6, 7, 8, 9

*Arison Shipping Co. v. Smith*,
    311 So. 2d 739 (Fla. 3d DCA 1975) ...............................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................14

*Atl. Games of Delray, LLC v. Atl. Games, LLC*,
    2015 WL 12672725 (S.D. Fla. June 17, 2015)..................................7

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
    571 U.S. 49 (2013)..............................................................................8

*Atmos Nation LLC v. Alima*,
    2018 WL 4901406 (S.D. Fla. Aug. 14, 2018)...................................9

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).................................................................................14

*Baker v. Warner/Chappell Music, Inc.,*
    2018 WL 1570360 (S.D. Fla. Mar. 29, 2018)......................................7

*Ball v. D'Lites Enters., Inc.,*
    65 So. 3d 637 (Fla. 4th DCA 2011) ...................................16, 17, 18

*Block v. First Blood Assocs.,*
    691 F. Supp. 685 (S.D.N.Y. 1988) ...........................................17, 18

*Bracken v. DASCO Home Med. Equip., Inc.,*
    2013 WL 3275479 (S.D. Ohio June 27, 2013) ..................................13

*Bridge C.A.T. Scan Associates v. Ohio-Nuclear, Inc.,*
    608 F. Supp. 1187 (S.D.N.Y. 1985)........................................17, 18

*Clayton v. Howard Johnson Franchise Sys., Inc.,*
    954 F.2d 645 (11th Cir. 1992) .........................................................12

*Coffee v. Stolidakis,*
    2022 WL 2533535 (D. Nev. July 6, 2022) .......................................22

*Colorado River Water Conservation Dist. v. U.S.,*
    424 U.S. 800 (1976)..........................................................5, 6, 7, 8, 9

*Compass Bank v. Smigran,*
    2010 WL 11597607 (S.D. Fla. Sept. 7, 2010) ...................................6

*Cornett v. Carrithers,*
    465 Fed. App'x 841 (11th Cir. 2012) ..............................................11

*de Cortes v. Brickell Inv. Realty, LLC,*
    546 F. Supp. 3d 1332 (S.D. Fla. 2021) ......................................22, 24

*Edmonson v. Velvet Lifestyles, LLC,*
    43 F.4th 1153 (11th Cir. 2022) .......................................................27

*Falic v. Legg Mason Wood Walker, Inc.,*
    347 F. Supp. 2d 1260 (S.D. Fla. 2004) ............................................22

*Fortson v. Colangelo,*
    434 F. Supp. 2d 1369 (S.D. Fla. 2006) ............................................22

*Gen. Elec. Co. v. Lighting Sci. Grp. Corp.,*
    2019 WL 3451128 (S.D.N.Y. July 31, 2019) ..................................13

*Glynn v. City of Kissimmee,*
    383 So. 2d 774 (Fla. 5th DCA 1980) ................................................................19

*Hardy v. Advocare Int'l L.P.,*
    2010 WL 11509179 (C.D. Cal. Dec. 10, 2010) .................................................13

*Holiday Inns of Am., Inc. v. Holiday House, Inc.,*
    279 F. Supp. 648 (W.D. Pa. 1968) ......................................................................7

*Huszar v. Gross,*
    468 So. 2d 512 (Fla. 1st DCA 1985) ...................................................................18

*Jackson-Platts v. General Elec. Capital Corp.,*
    727 F.3d 1127 (11th Cir. 2013) ............................................................5, 7, 8, 9

*KFC Corp. v. Kamal,*
    2020 WL 7634590 (W.D. Ky. Dec. 22, 2020).....................................................13

*Kobi Karp Architecture & Interior Design, Inc. v.*
    *O'Donnell Dannwolf & Partners Architects, Inc.,*
    2020 WL 4287005 (S.D. Fla. July 27, 2020) .......................................................7

*Lazy Lee, LLC v. Lazy Lee Prods. LLC,*
    2015 WL 12803185 (S.D. Fla. July 13, 2015)......................................................6

*Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.,*
    639 So. 2d 606 (Fla. 1994)...................................................................................14

*Matonis v. Care Holdings Group, L.L.C.,*
    423 F. Supp. 3d 1304 (S.D. Fla. 2019) ..........................................................21, 24

*McAteer v. Ciardi Ciardi & Astin, P.C.,*
    2019 WL 4305570 (S.D. Fla. Sept. 11, 2019) ..........................................8, 9, 10

*Moses H. Cone Memorial Hospital v. Mercury Constr. Co.,*
    460 U.S. 1 (1983)...............................................................................................5, 6

*Newman v. Crom Corp.,*
    2012 WL 3536548 (N.D. Fla. Aug. 15, 2012) ....................................................21

*Samara v. Juice Plus+ Co., LLC,*
    2020 WL 13389215 (M.D. Fla. Sept. 9, 2020) ...................................................19

*Schmidt v. Verascomp, Inc.,*
    2008 WL 11331749 (S.D. Fla. July 30, 2008) .....................................................7

*Schreidell v. Shoter*,
    500 So. 2d 228 (Fla. 3d DCA 1986) ...........................................................................19

*Souza v. Nowhere Bottle & Social Club, Inc.*,
    2020 WL 13420543 (S.D. Fla. Feb. 27, 2020) .............................................................27

*Spears v. Albertson's, Inc.*,
    848 So. 2d 1176 (Fla. 1st DCA 2003) ...................................................................19, 21

*Taslidzic v. Luther*,
    2018 WL 3134419 (S.D. Fla. May 21, 2018) ...........................................................23, 24

*Taylor v. Trapeze Mgt., LLC*,
    2018 WL 9708619 (S.D. Fla. Mar. 26, 2018).............................................................27

*Torremar Condo. Ass'n, Inc . v. Great Am. Ins. Co.*,
    2015 WL 11198246 (S.D. Fla. July 9, 2015)................................................................12

*Universal Express, Inc. v. S.E.C.*,
    177 Fed. Appx. 52 (11th Cir. 2006).............................................................................16

*Webster v. Dean Guitars*,
    955 F.3d 1270 (11th Cir. 2020) ...................................................................................26

*West v. Warden*,
    869 F.3d 1289 (11th Cir. 2017) ...................................................................................14

*Wolf v. Menh*,
    2019 WL 3753121 (D.D.C. Aug. 8, 2019) ...................................................................16

Other

Restatement (2d) of Torts § 575, Cmt. b (1977)...........................................................22

Plaintiff Jack W. Nicklaus respectfully submits this memorandum of law in opposition to the Motion to Stay Proceedings, or, in the Alternative, to Dismiss the Complaint filed by Defendants Howard P. Milstein, Andrew W. O'Brien, and Nicklaus Companies, LLC ("Company") [ECF 27].

## INTRODUCTION

The Defendants would have this Court believe that this is "a reactive lawsuit" in which Mr. Nicklaus is seeking to litigate issues that are currently being litigated in New York.  Mot. 1-2.  It is not.  The claims asserted in this lawsuit do not overlap with any claim pending in New York and in no way depend on the outcome of that action.

Though one would not know it from the Defendants' Motion, Justice Joel M. Cohen recently dismissed all but one and a half of the Company's seven claims in the New York Action. The only claims remaining are (i) a portion of the Company's claim against GBI Investors, Inc. for breach of a Purchase and Sale Agreement ("PSA") to which Mr. Nicklaus is not a party and (ii) a claim against Mr. Nicklaus for breach of a standalone Non-Competition Agreement which Justice Cohen preliminarily ruled has expired by its terms and no longer has any prospective effect. There is no claim pending under the Company's LLC Agreement or for breach of fiduciary duties allegedly arising under that Agreement.  Those claims were dismissed on the ground that they were not legally viable.  ECF 1-1, Compl. ¶ 133; NYSCEF 54, 310, 313.

Contrary to the Defendants' suggestion, Justice Cohen has not preliminarily ruled that the Company owns the exclusive commercial rights to Mr. Nicklaus' name, image, and likeness. Following a three-day evidentiary hearing, he determined that there is a material distinction between Mr. Nicklaus (a) engaging in the business of golf course design in his own name and (b) licensing the use of his name, image, and likeness for endorsements of products and services. Justice Cohen ruled that Mr. Nicklaus "can compete, especially in the golf course design area," and "he has to be able to use his own name in his business" *regardless* of whether he has the right to exploit his name through endorsements.  Compl. ¶¶ 130-31; NYSCEF 246, pp. 353-54, 356-57. In the court's words, Mr. Nicklaus "*has rights to his name* and … the exploitative value of his name as an endorser of products and the like, is where the line is drawn."  *Id.* (emphasis added).

Justice Cohen is now rethinking whether it is appropriate for that "line" to be drawn at all, as there is substantial evidence that Mr. Nicklaus did *not* in fact convey an exclusive right to license his name, image, and likeness to GBI before GBI transferred the bulk of its assets to the Company. That evidence reflects that Mr. Nicklaus unambiguously "reserved" a variety of rights concerning

the use and licensing of his name, image, and likeness for commercial endorsements, including "the right in his discretion to enter into any Service Contract in his own name or in the name of any other entity designated by him to provide his personal services to Clients where he determines that GBI is not the appropriate party to provide the required services." NYSCEF 324, p. 378/491.

In other words, Mr. Nicklaus had the *option* of providing endorsements through GBI, but he also had the option of providing them on his own. He "reserved the right" to perform such services "in his own name" or through "any other entity," which is the *opposite* of exclusivity. *Id.*

When Justice Cohen was presented with that evidence and other historical documents which were not available at the preliminary injunction hearing, he issued an Order to Show Cause why the injunction should not be vacated. NYSCEF 309. He also subsequently made clear that he is "focused on getting this right." NYSCEF 334, p. 46. We are now awaiting a decision thereon, but the claims asserted in this case do *not* depend on how those issues are ultimately resolved. They do not turn on whether Mr. Nicklaus has the right to license his name, image, and likeness for commercial endorsements of businesses, products, and services. The causes of action sued upon here would be viable *even if the Company owned* Mr. Nicklaus' name, image, and likeness.

Mr. Nicklaus' Complaint in this case asserts claims for defamation, unfair competition, violation of Florida Statutes § 540.08, and violations of the Lanham Act, 15 U.S.C. §§ 1051 *et seq*. He alleges that the Defendants knowingly made false statements which disparaged his reputation, misrepresented the condition of his health, and misled third parties into believing that he is unable to engage in golf course design work on his own. He also alleges that the Defendants have used his name and likeness in ways which falsely represent that he is still associated with the Company and personally endorses certain businesses, goods, and services which he does not in fact endorse. Compl. ¶¶ 144, 147-50, 180, 182-89, 192-99, 203-39, 241-55, 258, 265-67, 273, 282-84.

That defamatory and fraudulent conduct would be actionable under state and federal law regardless of how the New York Action turns out.

The Defendants repeatedly assert that the truthfulness of the false statements sued upon is an issue in the New York Action, but that is not so. While *some* of the false statements sued upon were *initially* made in the New York Action before being repeated to national media sources, clients, and other third parties, the truth of those statements is not an issue in the New York Action. The false statements initially made in that litigation had no relevance to any of the causes of action asserted in the case and were included for the sole purpose of discrediting Mr. Nicklaus and hindering his ability to compete with the Company for business going forward. Compl. ¶ 143.

Moreover, the Company's CEO at the time of the underlying events has admitted under oath that the statements in question were untrue, and the Company has since moved for leave to file an amended pleading which *eliminates* the most salacious and damaging of those statements, tacitly acknowledging they were wrongful. Compl. ¶ 179; NYSCEF 336, 339.

The most salacious and damaging of the Defendants' false statements represented that Mr. Nicklaus had wanted to accept a leadership role with the controversial Saudi golf league now known as LIV Golf, and the Company effectively had to "save[] Mr. Nicklaus from himself." Compl. ¶¶ 144, 241. Mr. Milstein knew those statements were entirely untrue and would cause enormous damage to Mr. Nicklaus' reputation if widely circulated, but he nonetheless directed that they be included in the Company's initial complaint in the New York Action and then repeated to national media sources, clients, and others in the golf industry. *Id.* ¶¶ 146-48, 180-84, 242-44. Mr. Milstein had hoped that by initially making those statements in a pleading, they would be protected by a litigation privilege; but any potential claim of privilege was subsequently lost when he directed the Company's public relations firm to separately communicate those false statements to national media sources, as if in a press release, in order to ensure that the false statements received widespread media attention – which they did. *Id.* ¶¶ 147-48, 183-90, 242-44.

To make matters worse, the Defendants then sought to exploit the damaging news articles they had procured by sending them to clients and others in the golf industry and passing off the false statements repeated in the articles as true. *Id.* ¶¶ 192-93, 245-47. In fact, Mr. O'Brien even went so far as to falsely represent to clients and others that Mr. Nicklaus' advanced age had resulted in dementia and he needed to have his car keys taken away. *Id.* ¶¶ 194, 247.

When Mr. Milstein was deposed in the New York Action, he not only acknowledged that he caused the false statements about Mr. Nicklaus to be made and repeated outside of the litigation, he acknowledged that the *reason* he did so was to counter Mr. Nicklaus' efforts to compete with the Company for business. *Id.* ¶¶ 184, 199. He also admitted that he knew those false statements would be devastating to Mr. Nicklaus' reputation and injure him in his profession because:

> The Saudis, of course, have a number of issues, including, you know, this Khashoggi incident. [N]one of that fit in with the rest of [Mr. Nicklaus'] image.
>
> * * *
>
> Keep in mind, Phil Mickelson basically lost all of his reputation on this mess with the Saudis…. [He] probably will not make the hall of fame in golf now because of that association.

*Id.* ¶¶ 153, 253-54.

Were that not enough, the Defendants have also engaged in a host of additional conduct which is fraudulent and deceptive. They have unabashedly attempted to convince the public that Mr. Nicklaus is *not* competing with the Company for business, and they have licensed the use of his name, image, and likeness for personal endorsements of businesses, products, and services that he does *not* actually endorse – in blatant violation of both state and federal law. *Id.* ¶¶ 203-39; Fla. Stat. § 540.08(1)(a) & (b); 15 U.S.C. § 1125(a); 16 CFR § 255.1(a) ("Endorsements must reflect the honest opinions, findings, beliefs, or experience *of the endorser*.") (emphasis added).

The Defendants have no legitimate answer to this, so they mischaracterize the claims asserted in the New York Action and this one in order to manufacture an argument for abstention. They say the New York Action is a "parallel" proceeding and "the mirror image" of this case, when in reality it could not be more different and plainly does not warrant a stay here. Mot. 9-12.

The Defendants also disingenuously assert that Mr. Nicklaus agreed to litigate all disputes between the parties – of any kind – in New York. They ask this Court to read a single sentence of the LLC Agreement's forum selection provision in isolation and determine that it extends to "any litigation between Mr. Nicklaus and the Company" or its officers, "not just disputes relating to the LLC Agreement" itself. Mot. 13, 16-17.

In other words, the Defendants assert that if Mr. Nicklaus was driving down Clematis Street and Mr. Milstein ran into him with his car, any litigation to address that would have to be brought over 1,200 miles away, in a state or federal court of New York. *Id.*

Respectfully, that is ridiculous. The LLC Agreement cannot reasonably be interpreted to call for such a result, either on its face or otherwise. When that agreement is read as a whole and in conjunction with other contemporaneous agreements which call for disputes between the parties to be resolved in venues *other than* New York, it is obvious that the parties did *not* agree that all disputes between them would have to be litigated in New York. They agreed that all disputes "arising out of or relating to" the LLC Agreement would have to be litigated in New York.

Here, the Defendants do not contend that any of the claims asserted arise out or relate to the LLC Agreement. Nor can they, as the claims indisputably arise out of the common law and a pair of state and federal statutes. Thus, there is no basis for a transfer or dismissal of this case under 28 U.S.C. § 1404(a) and the doctrine of *forum non conveniens*.

That leaves the Defendants' motion under Rule 12(b)(6), which as discussed below is not remotely well taken. In fact, each of the five claims asserted in this case more than adequately states a claim upon which relief can be granted.

## ARGUMENT

**I.  A STAY PENDING THE RESOLUTION OF THE NEW YORK ACTION IS UNWARRANTED AND WOULD BE INAPPROPRIATE**

A little less than fifty years ago, in *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800 (1976), the Supreme Court discussed the circumstances in which it is permissible for federal courts to abstain from their "virtually unflagging obligation … to exercise the jurisdiction given them." *Id.* at 817-18. "As the Supreme Court explained, and as [the Eleventh Circuit] has repeatedly cautioned, abstention 'is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.'" *Jackson-Platts v. General Elec. Capital Corp.*, 727 F.3d 1127, 1140 (11th Cir. 2013) (citations omitted).  Thus, the exception may be invoked "'[o]nly [when] the clearest of justifications' merits abstention." *Id.* (citation omitted).

In evaluating whether *Colorado River* abstention is warranted, a court must first assess whether there is "[a] parallel state court litigation [which] will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Moses H. Cone Memorial Hospital v. Mercury Constr. Co.*, 460 U.S. 1, 28 (1983).  "[T]he decision to invoke *Colorado River* necessarily contemplates that the federal court will have *nothing* further to do in resolving any substantive part of the case," and "[i]f there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all." *Id.* (emphasis added).

In the present case, the Court need not venture past this first step, as the New York Action will not resolve all of the issues between the parties.

### A.  The New York Action is Not a Truly Parallel Proceeding

Contrary to the Defendants' suggestion, while two of the parties to the New York Action are also parties to this litigation, the proceedings do not involve "substantially the same parties" or – more importantly – "substantially the same issues," as required to be considered "parallel." *See, e.g., Ambrosia Coal & Const. Co. v. Pagés Morales*, 368 F.3d 1320, 1332 (11th Cir. 2004); *Jackson-Platts*, 727 F.3d at 1140.  In the New York Action, there are two pending claims, namely, a claim against GBI under a Purchase and Sale Agreement to which Mr. Nicklaus was not a party, and a claim against Mr. Nicklaus under a Noncompetition Agreement which Justice Cohen has ruled is no longer in effect.  NYSCEF 54, 247, 310.  Here, by contrast, Mr. Nicklaus asserts claims against three Defendants – two of which are not parties to the New York Action – for defamation, common law unfair competition, violation of Fla. Stat. § 540.08, and violation of the Lanham Act.

The Defendants contend that *if they prevail* in the New York Action, it will have *an effect* on this case, but that is incorrect and would not render the proceedings "parallel" in any event. Though some of the false statements sued upon here were initially made in the New York Action, the truth of those statements is not an issue in that proceeding for the reasons discussed above. Likewise, while the Company is seeking to use its claim against GBI in the New York Action to establish exclusive ownership of Mr. Nicklaus' name, image, and likeness, the claims asserted in this case do not depend on how that issue is resolved. The misconduct underlying the claims for defamation, unfair competition, violation of Fla. Stat. § 540.08, and violation of the Lanham Act would be actionable regardless of who owns the name, image, and likeness rights.

Thus, it cannot credibly be argued that a final judgment in the New York Action will result in "the *complete* and prompt resolution of the issues between the parties," leaving this Court with "*nothing* further to do." *Moses H. Cone Memorial Hospital*, 460 U.S. at 28 (emphasis added). There is more than ample reason to "doubt" that, which means it "would be a serious abuse of discretion to grant the stay." *Id.*; *Am. Mfrs. Mut. Ins. Co. v. Edward D. Stone, Jr. & Assoc.*, 743 F.2d 1519, 1526 (11th Cir. 1984) (finding "state action [wa]s not truly parallel because it d[id] not involve the same issues presented in the federal case"); *Acosta v. James A. Gustino, P.A.*, 478 F. App'x 620, 622 (11th Cir. 2012) (district court abused discretion in granting stay where there was "doubt about whether resolution of the State Action would decide th[e] [federal] case"; *Compass Bank v. Smigran*, 2010 WL 11597607, at *3 (S.D. Fla. Sept. 7, 2010) (denying stay where defendant failed to show state action "w[ould] dispose of all claims presented in the federal case"); *Lazy Lee, LLC v. Lazy Lee Prods. LLC*, 2015 WL 12803185, at *2 (S.D. Fla. July 13, 2015) (denying stay where plaintiff's claims for violation of the Lanham Act "would remain unresolved even if the state court rules in favor of [defendant]").

### B.   Even if the New York Action Were a Truly Parallel Proceeding, the *Colorado River* Factors Would Not Merit Abstention Here

If the Court were inclined to go further and address the *Colorado River* factors themselves, the outcome would be the same. That inquiry requires "a careful balancing" of what amounts to seven discrete factors, "with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Memorial Hospital*, 460 U.S. at 15-16; *Ambrosia Coal*, 368 F.3d at 1331-32.

In this case, *none* of the relevant factors warrants abstention, so there is no justification for the Court to decline the exercise of its jurisdiction.

**(1)     The New York Action is Not an Action in Rem, and Neither is This One**

"The first *Colorado River* factor asks if one court assumed jurisdiction over the property before the other court." *Jackson-Platts*, 727 F.3d at 1141. "[T]his factor applies only where there is a proceeding in rem." *Id.* "Put differently, where 'there is no *real property* at issue,' this factor does not favor abstention." *Id.* (emphasis in original) (citation omitted).

The Defendants do not contend that there is "real property at issue" in the New York Action or the present one, but they attempt to finesse that problem by citing to a pre-*Colorado River* case from the Western District of Pennsylvania which suggested that "trade marks, though intangible and not chattels, constitute genuine and substantial property rights akin to a res." Mot. 11-12 (quoting *Holiday Inns of Am., Inc. v. Holiday House, Inc.*, 279 F. Supp. 648, 649 (W.D. Pa. 1968)). In the Eleventh Circuit, however, courts have uniformly held that the first *Colorado River* factor is *not* implicated by disputes over intangible property. *See Schmidt v. Verascomp, Inc.*, 2008 WL 11331749, at *2 (S.D. Fla. July 30, 2008) (finding parallel actions relating to trademark rights did not involve "[an] assumption of property"); *Atl. Games of Delray, LLC v. Atl. Games, LLC*, 2015 WL 12672725, at *3 (S.D. Fla. June 17, 2015) (finding parallel actions concerning the right to use a particular trademark were not "*in rem* proceeding[s]"); *Baker v. Warner/Chappell Music, Inc.*, 2018 WL 1570360, at *5 (S.D. Fla. Mar. 29, 2018) (finding parallel actions relating to copyrights "[we]re not proceedings *in rem*"); *Kobi Karp Architecture & Interior Design, Inc. v. O'Donnell Dannwolf & Partners Architects, Inc.*, 2020 WL 4287005, at *5 (S.D. Fla. July 27, 2020) (recognizing that "[t]he first factor d[id] not apply" to trademark and copyright actions).

Moreover, as noted above, the claims asserted in the present case do not depend on ownership of any intangible rights. So, even if a case involving intangible rights *could* be considered a proceeding in rem, this factor would not favor abstention.

**(2)     The Evidence and Witnesses Are Predominantly in Palm Beach County**

"The second factor, which addresses the convenience of the federal forum, … focus[es] primarily on the physical proximity of the federal forum to the evidence and witnesses." *Ambrosia Coal*, 368 F.3d at 1332; *Jackson-Platts*, 727 F.3d at 1141. Here, there can be no serious dispute that this Court is a convenient forum. Mr. Nicklaus is a longtime resident of North Palm Beach, and the Company is headquartered a few miles away, in Palm Beach Gardens. Compl. ¶¶ 2, 5. Mr. Milstein is the Executive Chairman of the Company and maintains both an office and a home within Palm Beach County. *Id.* ¶¶ 3, 7. Likewise, Mr. O'Brien is an Executive Vice President of the Company and a resident of Palm Beach County. *Id.* ¶¶ 4, 9. Moreover, "Defendants, in fact,

removed this case to this forum," and thus can hardly now claim it is not convenient. *McAteer v. Ciardi Ciardi & Astin, P.C.*, 2019 WL 4305570, at *2 (S.D. Fla. Sept. 11, 2019) (Rosenberg, J.).

Indeed, the Defendants do not contend that this Court is an inconvenient forum per se. They claim that *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49 (2013), "requires a different analysis" here in light of the LLC Agreement's forum selection provision. Mot. 13. That argument fails for a variety of reasons, however, beginning with the fact that *Atlantic Marine* did not involve *Colorado River*. The decision offers no support for the idea that a Court should be influenced by a forum selection clause in evaluating the *Colorado River* factors. Moreover, as discussed more fully below, the LLC Agreement's forum selection clause cannot legitimately be construed to cover this action in any event. The Defendants ask this Court to read one sentence of that provision in a vacuum and interpret it in a way that conflicts with other portions of the same provision and other related agreements, which is plainly impermissible.

Thus, even if the Court could appropriately consider a forum selection clause in evaluating this *Colorado River* factor, it would not favor abstention.

### (3)   There is No Potential for Piecemeal Litigation That Would Be Abnormally Excessive or Deleterious

"The third factor concerns the avoidance of piecemeal litigation … [and] does not favor abstention unless the circumstances enveloping th[e] cases will likely lead to piecemeal litigation that is abnormally excessive or deleterious." *Ambrosia Coal*, 368 F.3d at 1333. "Run of the mill piecemeal litigation will not do"; nor will "litigation [which] is 'inevitably piecemeal'" because the cases involve "distinct issues of law and fact." *Jackson-Platts*, 727 F.3d at 1142-43.

The Defendants assert that the two proceedings in question here involve "identical issues," Mot. 13, but they most certainly do not. The New York Action involves claims under a PSA to which Mr. Nicklaus is not a party and a Non-Competition Agreement which is no longer in effect, while the present litigation involves claims for defamation, common law unfair competition, violation of Fla. Stat. § 540.08, and violations of the Lanham Act. There is no universe in which those two sets of claims can be considered "identical" or involving "identical issues," as they necessarily involve "distinct issues of law and fact." *Jackson-Platts*, 727 F.3d at 1142-43.

The Defendants pretend otherwise, repeatedly arguing "the truthfulness of the allegations in the New York Action … are at the heart of both litigations," Mot. 13, but that is inaccurate for the reasons discussed above. Nor is there a "risk of competing rulings," Mot. 13-14, as the claims in this case do not depend on who owns Mr. Nicklaus' name, image, and likeness rights.

Indeed, in *McAteer*, this Court rejected similar arguments, noting that the two cases at issue could not be considered "identical" or creating a risk of "abnormally excessive or deleterious" piecemeal litigation because "[they] involve[d] different parties and different causes of action." 2019 WL 4305570, at *2. The same is of course true here, and, thus, like the two preceding factors, this one also provides no support for the requested stay. *Id.*

### (4)    The New York Action Has Not Proceeded Further in Any Way That Warrants Abstention

The fourth *Colorado River* factor examines whether the state action has progressed in ways warranting abstention. "This factor … is to be applied in a pragmatic, flexible manner with a view toward the realities of the case at hand." *Jackson-Platts*, 727 F.3d at 1142 (citation omitted).

Here, "the progress of the state action is irrelevant," as the proceedings "are *too dissimilar* for the relative progress of each to make any difference in assessing the propriety of a stay." *Atmos Nation LLC v. Alima*, 2018 WL 4901406, at *4 (S.D. Fla. Aug. 14, 2018) (emphasis added). In fact, the New York Action has no relevance here at all, except for (a) the false statements initially made therein which were subsequently repeated to national media sources and others, and which the Company has since admitted were wrongful; and (b) Justice Cohen's ruling that Mr. Nicklaus can compete with the Company in the area of golf course design in his own name.

### (5)    The Claims in This Case Are Governed by Florida and Federal Law

The fifth factor considers whether state or federal law is applicable in the federal action, and whether the state action is a better vehicle to address any state law issues in the federal action. *Ambrosia Coal*, 368 F.3d at 1334; *Jackson-Platts*, 727 F.3d at 1143.

The Defendants cannot plausibly contend that this factor favors abstention in this matter, as there is no claim governed by New York law which a New York court would be better suited to address. The claims asserted in this matter are governed by a mix of Florida and federal law, and none of the legal issues are particularly complex.

Since "[t]he Supreme Court of New York is in no better position to interpret Florida law than is this Court, and [the] Defendants removed this case from [a] Florida court to [this Court]," this factor plainly does not support abstention. *ABL-USA Enters. Inc. v. Hawk Aviation Ltd.*, 15 F. Supp. 2d 1297, 1299 (S.D. Fla. 1998).

### (6)    The Defendants Acknowledge That Both Fora Are Adequate

The sixth factor "will only weigh in favor or against abstention when one of the fora is inadequate to protect a party's rights." *Ambrosia Coal*, 368 F.3d at 1334. Here, the Defendants

concede that "both this Court and the New York Court are adequate to protect the parties' rights," rendering this factor "neutral." Mot. 15; *McAteer*, 2019 WL 4305570, at *2 (noting that this factor "does not favor abstention" where "the parties do not contend that either fora is inadequate to protect their rights [and] Defendants chose this forum by removing the case to federal court").

**(7)    This Action is Not Vexatious or Reactive**

Finally, the Defendants assert that abstention is also warranted here because this action is "vexatious or reactive." Mot. 15. That argument is nothing if not ironic.

In January 2022, Mr. Milstein began actively challenging Mr. Nicklaus' legal rights, recognizing that the post-termination restrictive covenants in his Employment Agreement would soon be expiring. One of the actions Mr. Milstein took in that regard was to communicate that he believes Mr. Nicklaus' post-termination restrictive covenants are effectively perpetual in nature, and that he has the right to control what Mr. Nicklaus does and does not do for the rest of his life. In addition, Mr. Milstein also decided to challenge Mr. Nicklaus' legal rights through a proxy by threatening to pursue baseless claims against Mr. Nicklaus' Manager. Compl. ¶¶ 109-21.

On May 3, 2022, Mr. Nicklaus initiated an arbitration under his Employment Agreement in an effort to dispense with the aforementioned challenges to his legal rights. *Id.* ¶¶ 122-23. His demand for arbitration requested a variety of specific relief, including a declaration that his post-employment restrictive covenants have expired and he is now free of any restrictions on his ability to design golf courses, endorse products, or engage in other related activities. *Id.* ¶ 123.

Ten days later, at Mr. Milstein's direction, the Company filed the New York Action against GBI and Mr. Nicklaus. *Id.* ¶ 126. The core allegation as to Mr. Nicklaus was that he had acted inconsistently with "restrictions on his ability to design golf courses and endorse products" and "has wrongfully asserted that he is now free of any [such] restrictions." NYSCEF 1, ¶¶ 9, 98. The complaint also included the false allegations referenced above regarding Mr. Nicklaus and the controversial Saudi golf league. *Id.* ¶¶ 79-80, 86-89.

Mr. Milstein wanted a national news story that would be certain to grab headlines and tarnish Mr. Nicklaus' reputation, but no reporter immediately picked up the story. Compl. ¶ 180. Mr. Milstein therefore directed the Company's public relations firm to share the complaint with national media sources and steer them to the false allegations therein, in order to ensure they received widespread attention – which they did. *Id.* ¶¶ 183-90.

- 10 -

The Defendants then exploited the damaging news stories they procured by sending them to clients and other third parties and passing off the false allegations repeated in the stories as true. *Id.* ¶¶ 192-93.  Indeed, Mr. O'Brien even went so far as to falsely state to clients and others that Mr. Nicklaus had dementia and needed to have his car keys taken away.  *Id.* ¶ 194.

In addition, the Defendants also concurrently began using Mr. Nicklaus' name, image, and likeness in ways that are fraudulent and deceptive.  They have tried to convince the world that Mr. Nicklaus is not engaged in competition with the Company, and they have licensed the use of his name, image, and likeness for personal endorsements of businesses, products, and services that he does not actually endorse, in violation of state and federal law.  *Id.* ¶¶ 203-39.

In this action, Mr. Nicklaus seeks relief for the foregoing misconduct, through claims for defamation, unfair competition, violation of Fla. Stat. § 540.08, and violation of the Lanham Act. Those claims are in no way "vexatious" or "reactive" to any ruling issued in another proceeding. To the contrary, they seek redress for vexatious and malevolent behavior that no one should have to endure but which unfortunately continues to this day.

Put simply, this case does not present the type of exceptional circumstances needed to overcome this Court's obligation to exercise its jurisdiction in this matter.

## II.   THE LLC AGREEMENT'S FORUM SELECTION CLAUSE IS INAPPLICABLE AND A DISMISSAL BASED ON IT WOULD CLEARLY BE ERROR

The Defendants next assert that this action should be dismissed under 28 U.S.C. § 1404(a) and the doctrine of *forum non conveniens*.  Mot. 16-18.  Their argument is predicated entirely on one sentence in the Company's LLC Agreement, which they claim requires all disputes between Mr. Nicklaus and the Company or its officers to be litigated in a state or federal court of New York regardless of whether the dispute has any connection to the LLC Agreement whatsoever.  *Id.* Under the law and facts applicable to this case, however, that is not a tenable position.

"To begin, the construction of forum selection clauses by federal courts is a matter of federal common law, not state law …, [but those clauses] are to be interpreted by reference to 'ordinary contract principles'" which are largely derived from state law.  *Cornett v. Carrithers*, 465 Fed. App'x 841, 842 (11th Cir. 2012) (citations omitted).  Those principles dictate that:

- "where two or more documents are executed by the same parties, at or near the same time and concerning the same transaction or subject matter, the documents are generally construed together as a single contract";

- "[t]he entire contract should be considered and provisions should not be considered in isolation to other provisions";

- "[t]he court should reach a contract interpretation consistent with reason, probability, and the practical aspect of the transaction"; and

- "the contract should not be interpreted to achieve an absurd result."

*Clayton v. Howard Johnson Franchise Sys., Inc.*, 954 F.2d 645, 648 (11th Cir. 1992); *Torremar Condo. Ass'n, Inc . v. Great Am. Ins. Co.*, 2015 WL 11198246, at *2 (S.D. Fla. July 9, 2015).

Here, the Defendants rely on a single sentence from one of several related agreements entered at around the same time, as part of the same transaction.  The principal agreements were the PSA, the LLC Agreement, the Non-Competition Agreement, and the Employment Agreement. Those four agreements all contain choice of law and venue provisions, but the choices of law and venue differ materially.  The PSA is governed by New York law and provides for non-exclusive jurisdiction in New York, while the LLC Agreement is governed by Delaware law and provides for exclusive jurisdiction in New York on claims "arising out of or relating to th[at] Agreement." The Non-Competition and Employment Agreements, by contrast, are governed by Florida law, with the former providing for non-exclusive jurisdiction in Florida and the latter calling for arbitration in Florida.  NYSCEF 71-74, PSA §§ 12.15(a)-(b); LLC Agreement §§ 9.17, 9.18(a); Non-Competition Agreement §§ 6.1, 6.3; Employment Agreement §§ 6.9, 6.11.

Nonetheless, according to the Motion, the parties "agreed that all disputes between them – not just disputes relating to the LLC Agreement – would be brought in a New York court." Mot. 5, 16-17.

In advancing this position, the Defendants conspicuously fail to quote several portions of the LLC Agreement provision at issue, which is titled "Consent to Jurisdiction."  It states that:

> Each party hereby irrevocably and unconditionally submits, for itself and its property, to the jurisdiction of the courts of the State of New York, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding *arising out of or relating to* this Agreement…. Each party further agrees that any action or proceeding brought against the other, shall be brought only in a court of the State of New York, or to the extent permitted by law, in such federal court.
>
> Each party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding *arising out of or relating to* this Agreement in any court referred to [above].

NYSCEF 72, LLC Agreement §§ 9.18(a) & (b) (emphasis added).

The Defendants would have this Court read the middle sentence quoted above in isolation and find that "any litigation between Mr. Nicklaus and the Company" or its officers must be

pursued in a state or federal court of New York.  Mot. 16-17.  Yet, that would plainly be inconsistent with ordinary contract principles and yield a demonstrably absurd result.

In *Bracken v. DASCO Home Med. Equip., Inc.*, 2013 WL 3275479 (S.D. Ohio June 27, 2013), the district court confronted a similar situation.  The agreement at issue there stated that "[a]ny action brought by either the Company or Associate must be maintained in the state courts situated in Franklin County, Ohio," but it also included other language tied to "the Agreement." *Id.* at *7.  The court remarked that "[v]iewing the forum selection clause in isolation, it could be construed to apply broadly to any action … regardless of whether it arose from the Agreement," however "[t]he language construed as a whole evidences an intent to limit the forum selection clause to matters related to the Agreement." *Id.* at *7-8.  Specifically, the court determined that "[a]lthough … the drafter could have chosen to draft the forum selection clause to reference the 'Agreement,' as was done throughout the Agreement [where] the intent was to limit its scope, the remainder of the Agreement provides that limitation." *Id.* at *8.

Likewise, in *Hardy v. Advocare Int'l L.P.*, 2010 WL 11509179 (C.D. Cal. Dec. 10, 2010), the plaintiff had signed an agreement which stated that "venue for any legal action arising between [her] and the Company shall be in Dallas County, Texas." *Id.* at *3.  The defendant argued that "the forum selection clause, by its plain language, applies to *any* claim these parties might bring against each other," but the district court disagreed, finding "[that] reading [wa]s possible only if the first two sentences of the [venue provision] are read in isolation." *Id.* (emphasis in original). The court noted that "[t]o interpret the clause so as to apply to *any* dispute between the parties would lead to an absurd result in which the clause applied to, for example, a dispute arising out of an automobile accident between [the parties]." *Id.* (emphasis in original).

In addition, at least two other courts have reached the same conclusions on similar facts. *See Gen. Elec. Co. v. Lighting Sci. Grp. Corp.*, 2019 WL 3451128, at *2 (S.D.N.Y. July 31, 2019) (finding forum selection clause which was not "cabined in the same manner" as other provisions was "most naturally read" to include the same limitations and did not apply to disputes unrelated to the agreement); *KFC Corp. v. Kamal*, 2020 WL 7634590, at *2-3 (W.D. Ky. Dec. 22, 2020) (rejecting argument that forum selection clause should be read to apply to litigation of disputes unrelated to the agreement, on the ground that it was "absurd").

The same result follows here.  When the LLC Agreement's Consent to Jurisdiction clause is read in its entirety and in conjunction with the contemporaneous agreements referenced above, it is clear that the parties did *not* intend for all disputes between them to be litigated in the state or

federal courts of New York.  What they intended was for all disputes "arising out of or relating to" the LLC Agreement to be litigated in New York.

In this case, the Defendants do not contend that the claims asserted arise out of or relate to the LLC Agreement.  Nor do they contend that this forum is inconvenient within the meaning of a traditional *forum non conveniens* analysis.  Their argument is based entirely on one sentence from the LLC Agreement's forum selection clause, which is inapplicable here.

In fact, even if that clause *were* applicable here, the most the Defendants could obtain is a *transfer* to the District Court for the Southern District of New York under 28 U.S.C. § 1404(a). The Defendants' argument for dismissal is based on the specious notion that the New York Action is a proceeding in rem and "establishes a bar" to this action, Mot. 17-18, which is plainly incorrect.

However, the Court need not reach that issue, as the LLC Agreement's forum selection clause has no application to this case and provides no basis for a transfer, much less a dismissal.

## III.    EACH OF MR. NICKLAUS' FIVE COUNTS STATES A CLAIM ON WHICH RELIEF CAN BE GRANTED

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) may only be granted when the pleading at issue fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"When considering a motion to dismiss, [the court must] 'accept as true the facts set forth in the complaint and draw all reasonable inferences in the plaintiff's favor.'" *West v. Warden*, 869 F.3d 1289, 1296 (11th Cir. 2017) (citation omitted).

### A.    Counts I and II Are Not Precluded by Florida's Litigation Privilege or Any Other Privilege

The Defendants argue that Counts I and II should be dismissed with prejudice under "Florida's litigation privilege." Mot. 3, 19.  They claim that the false statements sued upon were "made during the course of a judicial proceeding" and are therefore "absolutely privileged." *Id.* at 19 (quoting *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins. Co.*, 639 So. 2d 606, 607-08 (Fla. 1994)).

Respectfully, that is not a viable position.  Though *some* of the false statements sued upon were *initially* made during the course of a judicial proceeding, any claim of privilege was subsequently *lost* when Mr. Milstein arranged for those false statements to be "repeated to national

media sources and other third parties … for the improper purpose of discrediting Mr. Nicklaus and hindering his ability to compete with the Company for business."  Compl. ¶¶ 146, 151, 242-45. Specifically, the Complaint alleges that:

> Mr. Milstein … wanted a national news story that would be certain to grab headlines and tarnish Mr. Nicklaus' reputation in light of the significant controversy which then existed regarding the new Saudi-backed golf league.  He expected that the mere filing of the Complaint would lead to pillorying, which he believed would be protected by a litigation privilege.

> To Mr. Milstein's dismay, however, no reporter immediately noticed the Complaint and picked up the story.  The reporters who would typically cover such stories were occupied with the PGA Championship, which was [about to commence].

> Mr. Milstein was anxious for the pillorying of Mr. Nicklaus to begin as soon as possible, as Mr. Nicklaus' home event – the Memorial Tournament – was only two weeks away.  He knew that Mr. Nicklaus would be on an international stage there and wanted him to have to spend time defending against the Company's salacious allegations rather than addressing the golfing public on his new initiatives and charitable work.

> To ensure that happened, Mr. Milstein enlisted the aid of the Company's longstanding public relations firm, PRCG | Haggerty LLC.  He directed that firm to send copies of the Company's Complaint to newspaper reporters and steer them to the false allegations concerning Mr. Nicklaus and the Saudi golf league, in an effort to ensure that the false statements received significant media attention.

> In fact, when Mr. Milstein was deposed in connection with the New York litigation, he not only acknowledged that he had caused the Company's false allegations to be published outside of the litigation, he admitted that the *reason* he did so was to counter Mr. Nicklaus' efforts to compete with the Company for business:

> Q.   [C]an you explain why your company would send these complaints to newspaper reporters?

> A.   We would receive inquiries about the – the fact that Jack is going around telling everybody, as – as you wrote in one of your letters, and as Jack wrote, that he's proceeding because he thinks he's not constrained by any of the agreements, and – and obligations he undertook when we invested 145 million dollars in the company.  That's simply not true….

> Depo. of H. Milstein, 09/12/22, pp. 186:20 - 187:10.

> * * *

> Mr. Milstein directed Mr. O'Brien to keep him apprised of all news stories that resulted from the publication of the Company's false allegations outside of the litigation, which Mr. O'Brien did until the stories became voluminous and repetitive.  That only took a few days, as the mean-spirited falsehoods quickly traveled around the world…. Mr. Milstein [then] instructed Mr. O'Brien to *exploit* the damaging news stories he had procured – including [what they described as]

"the most damaging article" from [Mr. Nicklaus' hometown paper] – by sending copies of the articles to Company clients and others in the golf industry.  They used the articles to discredit Mr. Nicklaus in markets where he would be competing with the Company for business.

* * *

Significantly, Mr. O'Brien also falsely represented to clients and others that Mr. Nicklaus' advanced age had resulted in dementia and he needed to have his car keys taken away.

The Defendants knew that Mr. O'Brien's statements about Mr. Nicklaus' age and health were manifestly untrue…. Nonetheless, Mr. Milstein authorized Mr. O'Brien to proceed with his assault on Mr. Nicklaus' age and health in furtherance of their strategy to discredit Mr. Nicklaus and hinder his ability to compete with the Company for business once his post-termination covenants lapsed…. [T]he Defendants wanted Mr. Nicklaus to work for the Company or not work at all.

Compl. ¶¶ 180-84, 190, 192-97 (emphasis in original).

The Defendants assert that "a publication to the media of [a] public complaint does not give rise to defamation," Mot. 20, but the cases they purport to rely upon are of no help to them. In *Universal Express, Inc. v. S.E.C.*, 177 Fed. Appx. 52 (11th Cir. 2006), for example, there was no claim for defamation at all.  The plaintiff asserted that the SEC had commenced an investigation against it in violation of its constitutional rights, and the principal question on appeal was whether the district court could consider the SEC's publicly-filed civil enforcement complaint on a motion to dismiss "without converting the motion [in]to one for summary judgment."  *Id.* at 53-54. Likewise, the Defendants pretend that *Wolf v. Menh*, 2019 WL 3753121 (D.D.C. Aug. 8, 2019), is relevant here when in reality it is not.  The language they quote from that opinion was discussing "*Connecticut* law [concerning] '[p]ublication to the media of material that the media was independently entitled to view,'" which could not be more different than Florida law on the issue. *Id.* at *3 (emphasis added) (citation omitted).

In fact, although the Defendants admit that Counts I and II are governed by Florida law, Mot. 3, 19-20, they notably fail to mention a Florida appellate decision which rejected the very argument they make in this case – *Ball v. D'Lites Enters., Inc.*, 65 So. 3d 637 (Fla. 4th DCA 2011). In *Ball*, the plaintiffs sued for defamation after the defendants made false statements in a publicly-filed complaint and then republished those statements on their website.  The trial court dismissed the claim, finding "the statements on the website were directly related to the litigation and thus were absolutely immune," but the court of appeals reversed, "analogiz[ing] the publication of [such] statements … to calling a press conference with the media or otherwise publishing

defamatory information to the newspapers or other media," which are not protected by privilege. *Id*. at 638-39.  The court reasoned that:

> [T]he website publication in this case was not made in connection with the judicial proceeding.  It was not made in the proceedings itself, nor was it made to a participant connected to the proceeding such as a witness.  *Like statements to the newspapers or press conferences*, *these statements have no part in the judicial proceedings.  Instead, they were made to the world at large* ….
>
> *The judicial proceeding immunity should not be extended to such publications, because it does nothing to enhance policy behind the privilege which is to provide free and full disclosure of facts in a judicial proceeding.*

*Id.* at 641 (emphasis added).

So too here.  The Defendants' communications with national media sources were not made in connection with a judicial proceeding and had no part in such proceedings.  They were made for the purpose of generating "a national news story that would be certain to grab headlines and tarnish Mr. Nicklaus' reputation in light of the significant controversy which then existed regarding the new Saudi-backed golf league."  Compl. ¶¶ 180, 183.  "Mr. Milstein had hoped that by including the false statements in [a pleading], they would be protected by a litigation privilege," but the sharing of those false statements with the press did nothing to enhance the policy behind the privilege and in fact ran directly counter to it.  *Id.* ¶¶ 242-44.

Since the Defendants concede that this issue is governed by Florida's litigation privilege, we respectfully submit that *Ball* is dispositive here and ends the inquiry.  But it bears noting that the same result would also follow under New York law if it were deemed applicable in this case.  In *Bridge C.A.T. Scan Associates v. Ohio-Nuclear, Inc.*, 608 F. Supp. 1187 (S.D.N.Y. 1985), for instance, the court observed that in New York "[t]he delivery of a copy or report of a complaint to the press is *not* a statement made during the course of judicial proceedings and therefore is *not* protected by the common law privilege afforded such statements."  *Id.* at 1195 (emphasis added).  When one "purposely and maliciously … stimulate[s] press coverage and wide publicity of a complaint [containing] false and malicious statements [it] is beyond the pale of protection."  *Id.*  Similarly, in *Block v. First Blood Assocs.*, 691 F. Supp. 685 (S.D.N.Y. 1988), the court noted that "under New York law, communications to the press about pending litigation are not privileged."  *Id.* at 699.  Thus, a party who institutes a judicial proceeding and then circulates a press release or other communication based thereon "cannot claim an absolute privilege."  *Id.* (citation omitted).

The Defendants attempt to circumvent all of this by asserting that they were merely being *responsive* to media inquiries and "opted to simply produce an already-public record to avoid

ambiguity relative to its position in the ongoing judicial proceeding," Mot. 20, but that is a far cry from what the Complaint herein actually alleges.  That pleading states that Mr. Milstein directed the Company's public relations firm "to send copies of the Company's Complaint to newspaper reporters *and steer them to the false allegations* concerning Mr. Nicklaus and the Saudi golf league, *in an effort to ensure that the false statements received significant media attention*," which they did.  Compl. ¶¶ 183-89 (emphasis added).  "Mr. Milstein [then] instructed Mr. O'Brien to *exploit* the damaging news stories he had procured," including what Mr. Milstein himself characterized as "the most damaging article," by "sending copies of the articles to Company clients and others in the golf industry."  *Id.* ¶ 192 (emphasis in original).  "They used the articles to discredit Mr. Nicklaus in markets where he would be competing with the Company for business."  *Id.*

In other words, the Defendants did not simply send copies of the Company's complaint to newspaper reporters, as claimed.  They took actions designed to ensure that their false statements concerning Mr. Nicklaus received widespread press, and they then used the damaging news stories they procured to further harm Mr. Nicklaus' reputation and his ability to compete with the Company for business.  Compl. ¶¶ 183-89, 192-93, 243-47.

The Defendants suggest that "[t]he sharing of th[ose] news articles … [was] protected by the litigation privilege because [each was] 'a report on the status of [a] lawsuit,'" Mot. 21, but the case they cite on that point – *Huszar v. Gross*, 468 So. 2d 512 (Fla. 1st DCA 1985) – does not support their position.  In *Huszar*, the principal defendant was a state executive officer who enjoys "an absolute privilege as to defamatory publications made in connection with the performance of [his] official duties and responsibilities."  *Id.* at 515.  The court therefore found that the officer could not be held liable for making allegedly defamatory statements in his official capacity regarding "official action of public interest."  *Id.* at 515-16.

Here, by contrast, the Defendants are not government officers who were commenting on governmental action of public interest.  They are two private individuals and an entity which caused false statements regarding Mr. Nicklaus to be repeated to national media sources and others for the purpose of damaging his reputation and hindering his ability to compete with the Company once his post-termination covenants lapsed.  Compl. ¶¶ 3-5, 183-89, 192-93, 243-47.

Thus, as in *Ball*, *Bridge C.A.T. Scan*, and *Block*, the false statements sued upon in this case simply "are not protected by absolute immunity given to statements made in judicial proceedings."  *Ball*, 65 So. 3d at 641; *Bridge*, 608 F. Supp. at 1195; *Block*, 691 F. Supp. at 699.

The Defendants also attempt to shoehorn this case into one of Florida's qualified privileges, but that effort is unavailing as well for multiple reasons. First, the qualified privilege they seek to invoke is inapplicable on its face, as it only extends to "intra-company" business communications between "those having corresponding interests and duties." *Arison Shipping Co. v. Smith*, 311 So. 2d 739, 741 (Fla. 3d DCA 1975). It protects "a publication in regard to business made by one having an interest therein and solely to others having an interest in the business." *Schreidell v. Shoter*, 500 So. 2d 228, 232 (Fla. 3d DCA 1986); *Samara v. Juice Plus+ Co., LLC*, 2020 WL 13389215, at *4 (M.D. Fla. Sept. 9, 2020). Here, the false statements sued upon did not concern the Company's business; they concerned Mr. Nicklaus, whose post-termination covenants were about to lapse. Nor did the Defendants make those false statements solely to others involved in the Company's business; they caused the false statements in the Company's complaint to be repeated to national media sources, and they then republished the same false statements to other third parties, along with the additional false statements that Mr. Nicklaus' advanced age had resulted in dementia and he needed to have his car keys taken away. Compl. ¶¶ 144, 146-49, 183-89, 192-93, 243-47, 250-51. Under Florida law, that is plainly too wide of an audience for the privilege to apply. *See Arison Shipping*, 311 So. 2d at 741 ("Florida law has consistently held that the qualified privilege attaching to business communications is lost when the scope of an intra-company communication to those having corresponding interests and duties is exceeded.").

Moreover, and more fundamentally, the qualified privilege "is a defense" as to which the defendants bear the burden of proof, and it "vanishes" if the false statements sued upon were "made with malice." *Glynn v. City of Kissimmee*, 383 So. 2d 774, 776 (Fla. 5th DCA 1980); *Spears v. Albertson's, Inc.*, 848 So. 2d 1176, 1179 (Fla. 1st DCA 2003). Thus, "[w]hether the privilege exists or has been exceeded in some manner [is] a mixed question of law and fact which should be determined by the trier of fact." *Glynn*, 383 So. 2d at 776; *Spears*, 848 So. 2d at 1179.

In this case, the Complaint is more than adequate to support a finding of malice, as it expressly alleges that the Defendants "sought to damage Mr. Nicklaus' reputation in a way that would make him radioactive in the world of golf course design and endorsements." Compl. ¶ 141. They acted with "the improper purpose of discrediting Mr. Nicklaus and hindering his ability to compete with the Company for business once his post-termination covenants lapsed." *Id.* ¶¶ 151, 196, 250-51. "In fact, the Defendants not only knew but *were overtly counting on the fact* that their false statements would cause immediate reputational harm to Mr. Nicklaus that would be impossible to erase from the public consciousness," which they did. *Id.* ¶ 253 (emphasis added).

And the Company has since requested leave to file an amended pleading which would eliminate the most salacious of the false statements initially made in the New York Action, effectively acknowledging that they were *wrongful*.  NYSCEF 336, 339 (pp. 32-33).

Thus, even if the qualified privilege were applicable on its face, which it plainly is not, there would be no legitimate basis to invoke it here.

### B.    Count I More Than Adequately Alleges the Elements of Defamation *Per Se* and Defamation *Per Quod*

As noted in Defendants' Motion, a false statement "rises to the level of defamation *per se* 'if, when considered alone and without innuendo, it (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession.'" Mot. 22 (quoting *Aflalo v. Weiner*, 2018 WL 3235529, at *2 (S.D. Fla. July 2, 2018)).  The Defendants assert that the Complaint does not allege any such false statements, but it most certainly does.  It explicitly alleges that the Defendants made false statements of fact which tended to subject Mr. Nicklaus to hatred, distrust, ridicule, contempt, and disgrace, and injure him in his profession, as follows:

> In the Spring of 2021, when the events described in the Company's Complaint allegedly occurred, the new Saudi-backed golf league was in its infancy and had yet to become a subject of mainstream discourse.  In May 2022, however, when the Company filed its Complaint, association with the new league was hugely controversial.  The players who chose a big payday in exchange for associating themselves with the Saudi Royal Family lost sponsorships, fan support, and access to the frequent television appearances enjoyed by members of the PGA Tour.

> Mr. Milstein wanted Mr. Nicklaus to suffer the same fate and thus sought to create a false association between Mr. Nicklaus and the Saudi golf league which he openly admitted would be devastating to Mr. Nicklaus' reputation and legacy:

> Q.    [O]ne thing you said that I think is important is that the association with Jack Nicklaus' name with the Saudi LIV Tournament would be adverse to Jack Nicklaus' reputation.  Would you agree with that?

> A.    I think it would be adverse to the company's reputation, and to his reputation, yes.

> * * *

> Jack's brand and … his image and … market position is kind of clean cut, all-American traditionalist in the golf world.  That's who Jack is.

> The Saudis, of course, have a number of issues, including, you know, this Khashoggi incident.  [N]one of that fit in with the rest of … his image.

> * * *

> Keep in mind, Phil Mickelson basically lost all of his reputation on this mess with the Saudis…. [He] probably will not make the hall of fame in golf now because of that association.

Depo. of H. Milstein, 09/12/22, pp. 168:07-15, 170:16-23, 176:12-21.

> Other Company officials, including Mr. O'Brien, have also acknowledged in testimony that the mere association of Mr. Nicklaus' name with LIV Golf would be severely damaging to his reputation and legacy. It would cause him to be viewed as a traitor, as he helped found the PGA Tour and hosts a premier event on the Tour, namely, the Memorial Tournament.

> Nevertheless, the Defendants decided to broadcast their fictional story to the widest possible audience, in an effort to convince the world that Mr. Nicklaus had wanted to accept a leadership role with the Saudi golf league, and the Company had to "save[] [him] from himself."

* * *

> [They] also falsely represented to clients and others that Mr. Nicklaus' advanced age had resulted in dementia and he needed to have his car keys taken away.

* * *

> [In other words, the Defendants] made a conscious decision to spread lies about Mr. Nicklaus both inside and outside of litigation; lies that accused Mr. Nicklaus of wanting to sell out the PGA Tour and having dementia ….

Compl. ¶¶ 152-55, 194, 200, 241-47.

In Florida, those allegations are plainly sufficient to state a claim for defamation *per se*. "As Mr. Milstein acknowledged during his deposition, a person of common mind at the time the false statements about Mr. Nicklaus and the Saudi golf league were made knew that '[t]he Saudis … have a number of issues,' including the now infamous 'Khashoggi incident.' The assertion that Mr. Nicklaus wanted to accept a leadership role with the new Saudi golf league was therefore inherently 'adverse to … his reputation' and rendered commercial relations with him undesirable." Compl. ¶ 252 (quoting Depo. of H. Milstein, 09/12/22, pp. 168:07-15, 170:16-23).

Likewise, the assault on Mr. Nicklaus' age and health is also actionable *per se*, as it "impute[d] to [him] conditions incompatible with the proper exercise of [his] lawful business." *Spears*, 848 So. 2d at 1179; *Newman v. Crom Corp.*, 2012 WL 3536548, at *1 (N.D. Fla. Aug. 15, 2012) (recognizing that "false statements about [an individual's] character and ability to work … fall into the category of slander per se," as they "tend to injure a person in his business or trade"); *Matonis v. Care Holdings Group, L.L.C.*, 423 F. Supp. 3d 1304, 1314-15 (S.D. Fla. 2019) (denying motion to dismiss claim for defamation *per se* where claimant alleged that defendants made false statements which tended to injure her professionally, including that "she was suffering from an

ongoing health problem that affected her ability to work"); *de Cortes v. Brickell Inv. Realty, LLC*, 546 F. Supp. 3d 1332, 1346-47 (S.D. Fla. 2021) (same where claimant alleged that defendants falsely stated that she was retired and implied that she was untrustworthy).

The Defendants would have this Court construe their false statements regarding Mr. Nicklaus' age and health as "mere rhetorical hyperbole, which are not actionable," Mot. 22, but that would plainly be improper in light of what was actually written and said.  Unlike in *Fortson v. Colangelo*, 434 F. Supp. 2d 1369 (S.D. Fla. 2006) (cited at Mot. 22), where the claimant sought relief for having been called "a vacant lot," Mr. O'Brien made false statements of fact concerning Mr. Nicklaus' *mental health*.  He "falsely represented to clients and others that Mr. Nicklaus' advanced age had resulted in *dementia* and he needed to have his car keys taken away."  Compl. ¶¶ 194, 200, 247 (emphasis added).  Thus, it cannot legitimately be argued that the statements were simply hyperbolic opinions which are not actionable.  *See, e.g., Coffee v. Stolidakis*, 2022 WL 2533535, at *6 (D. Nev. July 6, 2022) (denying motion to dismiss claim of defamation *per se* based on multiple statements, including that the claimant was "suffering from early onset dementia").

The Defendants also take aim at Mr. Nicklaus' alternative claim of defamation *per quod*, arguing that "[t]he Complaint contains no allegations of special damages," as required.  Mot. 22.  However, that argument fares no better.  The Complaint explicitly alleges that the false statements sued upon "were made and repeated for the malicious purpose of damaging Mr. Nicklaus' reputation as both a person and a professional, and *they in fact caused harm to his reputation and his ability to compete with the Company for business*."  Compl. ¶ 251 (emphasis added).

Those business losses unquestionably qualify as special damages, "[t]he chief characteristic of [which] is a realized or liquidated loss."  *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268 (S.D. Fla. 2004) (cited at Mot. 22); *see also* Restatement (2d) of Torts § 575, Cmt. b (1977) (recognizing that, for claims of defamation *per quod*, the requirement of special damages is satisfied by losses that are "pecuniary or economic in character").

Thus, the Motion should be plainly denied insofar as it argues that the Complaint fails to adequately allege the elements of defamation *per se* or defamation *per quod.*

### C.   Counts II Through V Are Not Dependent on Mr. Nicklaus' Ownership of Intellectual Property Rights or Otherwise Subject to Dismissal

The remaining sections of the Defendants' Motion argue that Counts II through V should be dismissed for a variety of reasons, none of which have merit.  Their lead argument is that Counts II through V fail as a matter of law in light of the PSA and LLC Agreement, as the claims

asserted in those Counts "are wholly dependent on [Mr. Nicklaus] owning the rights to commercially exploit his name, image and likeness." Mot. 23. That is, put charitably, incorrect. While we obviously disagree with Defendants' view of the PSA and LLC Agreement, Counts II through V do *not* depend on whether Mr. Nicklaus owns the right to commercially exploit his name, image, and likeness. Nor are they deficient in any other way.

### 1.    Counts II and IV State Viable Claims Based on False Statements Intended to Impair Competition

Counts II and IV assert claims for common law unfair competition and violations of the Lanham Act based on false statements intended to impair competition. The core allegation underlying both claims is that:

> Messrs. Milstein and O'Brien, individually and as agents of the Company, knowingly made false statements and engaged in other deceitful conduct which disparaged Mr. Nicklaus' reputation, misrepresented the condition of his health, and misled others into believing that he was unable to engage in the business of golf course design on his own and in his own name.

Compl. ¶¶ 258, 273.

The false statements and other deceitful conduct sued upon are identified with specificity in the Complaint and will not be repeated at length here, as their adequacy is not challenged. Suffice it to say, the Defendants have been overtly seeking to damage Mr. Nicklaus' reputation in order to hinder his ability to compete, and – despite Justice Cohen's ruling to the contrary – "they have been actively telling anyone who will listen that Mr. Nicklaus *cannot* design golf courses in his own name *without* the Company's consent." *Id.* ¶¶ 208, 258, 273 (emphasis added).

In fact, the Defendants' Motion takes this even further, arguing that Mr. Nicklaus "cannot base any claim of unfair competition on the Company's use of [his] name, image, or likeness" in light of the Company's claim that it owns Mr. Nicklaus' name, image, and likeness. Mot. 25. In other words, the Defendants contend that they are entitled to continue lying to the public about Mr. Nicklaus' ability to compete for golf course design work in his own name, and he is powerless to stop them from doing so. *Id.*

We disagree. "Under Florida common law, unfair competition is an 'umbrella for all statutory and non-statutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'" *Taslidzic v. Luther*, 2018 WL 3134419, at *6 (S.D. Fla. May 21, 2018) (citations omitted). The plaintiff need only allege "that it competes with the [d]efendant for a common pool of customers," and that the defendant engaged in

"deceptive or fraudulent conduct" which resulted in "[a] likelihood of consumer confusion." *Id.* Similarly, to state a claim for unfair competition or false advertising pursuant to the Lanham Act, the plaintiff need only allege that the defendant made "false or misleading" statements relating to "[a] product or service affect[ing] interstate commerce," which "deceived, or had the capacity to deceive, consumers" and "had a material effect on purchasing decisions," and that "the plaintiff has been or is likely to be injured as a result." *Id.* at *3; *Matonis*, 423 F. Supp. 3d at 1313.

In the present case, the Defendants do not dispute that the Complaint alleges specific facts establishing each of those required elements, including that "Mr. Nicklaus and the Company are competitors with respect to golf course design and share a common pool of potential customers." Compl. ¶¶ 257-62, 272-78.  Rather, the Defendants effectively contend that the Court should *ignore* those allegations – and Justice Cohen's ruling on the issue – in light of their view that Mr. Nicklaus should not be permitted to do golf course design work in his own name.  Mot. 25. They urge this Court to deny Mr. Nicklaus recourse for their fraudulent and deceptive conduct based on a specious argument that has already been rejected. *Id.*

We respectfully submit that the Court should decline that invitation, as the allegations of Counts II and IV must be accepted as true at this stage and are indisputably sufficient to state claims upon which relief can be granted.  *See, e.g., Taslidzic*, 2018 WL 3134419, at *3, 5-6; *Matonis*, 423 F. Supp. 3d at 1313; *de Cortes*, 546 F. Supp. 3d at 1341-42.

### 2.      Counts III and V State Viable Claims for False Endorsement

Counts III and V, in turn, assert claims under Fla. Stat. § 540.08 and the Lanham Act for false endorsement.  Those claims allege that the Defendants have used and are continuing to use Mr. Nicklaus' name, image, and likeness in ways which falsely represent that (a) he is still providing services to the Company and its affiliates, and (b) he personally endorses certain businesses, products, and services which he does not in fact endorse.  Compl. ¶¶ 265-67, 282-83.

The Defendants do not deny that they have used Mr. Nicklaus' name, image, and likeness to make those false representations.  In fact, they unabashedly assert that they are entitled to do so because the Company claims to own Mr. Nicklaus' name, image, and likeness rights.  Mot. 23-26. However, the Defendants are obviously mistaken in that regard, as the law would not allow them to engage in such conduct even if they *did* own Mr. Nicklaus' name, image, and likeness rights.

In Fla. Stat. § 540.08, our state's legislature declared that it is unlawful for a person to use an individual's name, image, or likeness for any commercial or advertising purpose without his "express written or oral consent," and it is unlawful for a person to license the commercial use of

an individual's name, image, or likeness unless he consents "in writing." Fla. Stat. § 540.08(1). Similarly, under the Lanham Act, it is unlawful for a person to use a name, symbol, or device in commerce if it "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(A). Indeed, the FTC has also issued regulations which bear on this issue, one of which specifies that "[e]ndorsements must reflect the honest opinions, findings, beliefs, or experience *of the endorser*." 16 CFR § 255.1(a) (emphasis added).

Here, the Complaint alleges facts establishing that the Defendants have used and licensed Mr. Nicklaus' name, image, and likeness in ways to which he has not given the required consents, and they are continuing to do so with impunity. Compl. ¶¶ 203-39, 265-66, 282. It also alleges that the Defendants' actions in this regard have generated false implications and impressions that "(a) Mr. Nicklaus continues to be associated with the Company; (b) Mr. Nicklaus is associated with [the Company's current parent entity] 8AM Golf; and (c) Mr. Nicklaus personally endorses certain businesses, goods, and services." *Id.* ¶¶ 267, 282-84.

The Defendants contend that Mr. Nicklaus signed away any right to complain about this when he joined the Company, Mot. 25, but the transaction documents refute that in multiple ways. First, the PSA explicitly specified that "the right of Jack W. Nicklaus to utilize his endorsement, name, nickname …, [and] likeness" for his own personal purposes "[wa]s not an asset of GBI and continue[d] to be retained by Mr. Nicklaus individually." NYSCEF 71, PSA Sch. 4.10(b). What GBI had – and conveyed to the Company – was a *non*-exclusive right "to use and/or license" Mr. Nicklaus' name, image, and likeness for certain purposes, subject to a variety of limitations. *Id.* § 4.10(a), Annex A, Sch. 4.10(a), and Sch. 4.10(b).

Second, the PSA and LLC Agreement also specified that the Company's business included "marketing personal service contracts related to the personal endorsement and other publicity rights *of Jack W. Nicklaus*," reaffirming that those rights were retained by Mr. Nicklaus individually. NYSCEF 71, PSA § 1.1 ("Business") (emphasis added); NYSCEF 72, LLC Agreement § 1.4. If the Company owned those rights – as opposed to merely serving as a *broker* of those rights – that contract language would have been written differently.

Third, and perhaps most tellingly, Mr. Nicklaus' Non-Competition Agreement and Employment Agreement both expressly contemplated that he would be free to engage in a variety of activities using his name, image, and likeness once his non-compete periods expired, including:

(a)     "provid[ing] [his] personal services as a spokesman or authoriz[ing] the promotional use of [his] name or likeness for the business, products or services of a Competitor"; and

(b)     "lend[ing] his personal endorsement to, or provid[ing] services as an endorsement spokesman for, any product, service or Person."

NYSCEF 73, Non-Competition Agreement § 1; NYSCEF 74, Employment Agreement § 2.1(b)(ii). In fact, it was precisely *because* Mr. Nicklaus was retaining his publicity rights individually that the Company felt the need to bargain for those non-compete provisions.  If the Company owned Mr. Nicklaus' publicity rights as claimed, those provisions would have been unnecessary.

The Defendants relatedly argue that, under the LLC Agreement, Mr. Nicklaus merely has a "limited veto" right with respect to the use of his name, image, and likeness, Mot. 23 & 25-26, but that is hardly an accurate description of his rights and would not alter the outcome in any event. The LLC Agreement provision referenced in the Motion operates to ensure that the Company may not use, license, or otherwise transfer any of the intellectual property defined as the "Nicklaus IP" – some of which is owned by the Company and some of which is owned by Mr. Nicklaus – "without the prior consent of Mr. Nicklaus."  LLC Agreement § 6.3.  The provision also states that Mr. Nicklaus is justified in withholding his consent if the proposed use, licensing, or transfer "could reflect negatively upon the character, honesty, integrity, morality, business acumen, or abilities or otherwise diminish or conflict with the reputation or public image of [him]."  *Id.*

In the present case, Mr. Nicklaus expressly alleges that the Defendants have used and licensed his name, image, and likeness in ways to which he has not consented, including ways that "have created the *false* implication that [he] has a continuing association with the Company … [and] personally endorses certain businesses, goods, and services, *when in reality he does not*." Compl. ¶¶ 265-67 (emphasis added).   Thus, even if Mr. Nicklaus' rights under Fla. Stat. § 540.08 were somehow constrained by LLC Agreement § 6.3, the Complaint would still adequately allege a violation of the statute for which relief can and should be granted.

The Defendants go on to note that the Eleventh Circuit has yet to recognize a separate claim for "false endorsement" under the Lanham Act, Mot. 26 n. 5, but that is somewhat misleading. The Eleventh Circuit has evaluated such claims multiple times and determined that they are viable regardless of the label applied if the defendant used the claimant's name, image, or likeness in a manner which results in "a likelihood of consumer confusion, mistake, or deception as to the origin, sponsorship, or approval of" particular goods, services, or commercial activities. *Webster v. Dean Guitars*, 955 F.3d 1270, 1278 (11th Cir. 2020).  In other words, "generally such

a claim involves proof that the defendant used the name or likeness of a person in a manner that is likely to cause confusion among consumers as to the affiliation, connection, or association between that person and the defendant's goods or as to that person's sponsorship of the defendant's goods." *Edmonson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1160 (11th Cir. 2022).

In this case, the claims under Fla. Stat. § 540.08 and the Lanham Act involve exactly that. They allege specific facts establishing that the Defendants' wrongful uses of Mr. Nicklaus' name, image, and likeness have created false implications which "are likely to cause reasonably prudent consumers in the marketplace to be confused as to whether (a) Mr. Nicklaus continues to be associated with the Company; (b) Mr. Nicklaus is associated with 8AM Golf; and (c) Mr. Nicklaus personally endorses certain businesses, goods, and services." Compl. ¶¶ 203-39, 267, 283.

Thus, like the other Counts discussed above, Counts III and V are indisputably viable. *See, e.g., Taylor v. Trapeze Mgt., LLC*, 2018 WL 9708619, at *2-4, 6 (S.D. Fla. Mar. 26, 2018) (denying motion to dismiss claims for false endorsement under Fla. Stat. § 540.08 and Lanham Act arising out of the "Defendants' unauthorized use of Plaintiffs' images, likenesses and/or identities to advertise and promote Defendants' businesses on websites and social media accounts"); *Souza v. Nowhere Bottle & Social Club, Inc.*, 2020 WL 13420543, at *4-5 (S.D. Fla. Feb. 27, 2020) (denying motion to dismiss claims for false endorsement under Fla. Stat. § 540.08 and Lanham Act where the Plaintiffs alleged that "Defendant used Plaintiffs' images 'to create the false impression with the public that [Plaintiffs] either worked at … or endorsed' Defendant's business").

## CONCLUSION

For the foregoing reasons, the Defendants' motion to stay proceedings or in the alternative to dismiss the Complaint should be denied in its entirety.

Dated: June 21, 2023

Respectfully submitted,

**STEARNS WEAVER MILLER WEISSLER**
**ALHADEFF & SITTERSON, P.A.**
150 West Flagler Street, Suite 2200
Miami, Florida 33131
Phone: (305) 789-3200
Fax: (305) 789-3395

By: */s/ Eugene E. Stearns*
     Eugene E. Stearns
     Fla. Bar No. 0149335
     estearns@stearnsweaver.com
     Matthew Buttrick
     Fla. Bar No. 0176028
     mbuttrick@stearnsweaver.com
     Cecilia D. Simmons
     Fla. Bar. No. 469726
     csimmons@stearnsweaver.com
     Albert D. Lichy
     Fla. Bar No. 94272
     alichy@stearnsweaver.com
     Adrienne Love
     Fla. Bar. No 21835
     alove@stearnsweaver.com

*Counsel for Plaintiff Jack W. Nicklaus*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on June 21, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the Service List via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

By: <u>*/s/ Eugene E. Stearns*</u>
        Eugene E. Stearns

## SERVICE LIST

| | |
|---|---|
| **COLE, SCOTT & KISSANE, P.A.**<br>222 Lakeview Ave., Suite 120<br>West Palm Beach, FL 33401<br>Tel: (561) 612-3459<br>Fax: (561) 683-8977<br><br>Jonathan Vine<br>Florida Bar No. 10966<br>jonathan.vine@csklegal.com<br><br>Justin B. Levine<br>Florida Bar No. 106463<br>justin.levine@csklegal.com<br><br>Lizza C. Constantine<br>Florida Bar No. 1002945<br>lizza.constantine@csklegal.com<br><br>Tre'Ana Thomson<br>Florida Bar No. 1031361<br>treana.thompson@csklegal.com<br><br>*Counsel for Defendants* | **CONSTANTINE CANNON LLP**<br>335 Madison Avenue, 9th Floor<br>New York, NY 10017<br>Tel: (212) 350-2700<br>Fax: (212) 350-2701<br><br>Gary J. Malone (*pro hac vice*)<br>gmalone@constantinecannon.com<br><br>Robert L. Begleiter (*pro hac vice*)<br>rbegleiter@constantinecannon.com<br><br>Ankur Kapoor (*pro hac vice*)<br>akapoor@constantinecannon.com<br><br>Taline Sahakian (*pro hac vice*)<br>tsahakian@constantinecannon.com<br><br>**CONSTANTINE CANNON LLP**<br>1001 Pennsylvania Avenue, Suite 1300N<br>Washington, DC 20004<br>Tel: (202) 204-3500<br>Fax: (202) 204-3501<br><br>Janice Johnson (*pro hac vice*)<br>jjohnson@constantinecannon.com<br><br>*Counsel for Defendants* |